ACCEPTED
03-14-00661-CV
4251520
THIRD COURT OF APPEALS
AUSTIN, TEXAS
2/23/2015 4:01:27 PM
JEFFREY D. KYLE
CLERK

**No. 03-14-00661-CV**

IN THE COURT OF APPEALS
FOR THE THIRD DISTRICT OF TEXAS AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
2/23/2015 4:01:27 PM
JEFFREY D. KYLE
Clerk

**DEVVY KIDD ET AL.,**

Appellants,

**v.**

**PUBLIC UTILITY COMMISSION OF TEXAS,**

Appellee.

*Appeal from the 419th Judicial District Court, Travis County, Texas*
*The Honorable Darlene Byrne, Judge Presiding*

**BRIEF OF APPELLEES AEP TEXAS CENTRAL COMPANY, AEP TEXAS NORTH COMPANY, CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC, TEXAS-NEW MEXICO POWER COMPANY, AND ONCOR ELECTRIC DELIVERY COMPANY LLC**

Patrick J. Pearsall
State Bar No. 24047492
ppearsall@dwmrlaw.com
DUGGINS WREN MANN &
ROMERO, LLP
P. O. Box 1149
Austin, Texas 78767-1149
(512) 744-9300
(512) 744-9399 *fax*
**ATTORNEY FOR AEP TEXAS CENTRAL COMPANY AND AEP TEXAS NORTH COMPANY**

Dale Wainwright
State Bar No. 00000049
dale.wainwright@bgllp.com
BRACEWELL & GIULIANI LLP
111 Congress Avenue, Ste. 2300
Austin, Texas 78701
(512) 472-7800
(800) 404-3970 *fax*
**ATTORNEY FOR CENTERPOINT ENERGY HOUSTON ELECTRIC, LLC**

Stephanie C. Sparks
State Bar No. 24042900
ssparks@jw.com
JACKSON WALKER L.L.P.
901 Main St., Ste. 6000
Dallas, Texas 75202
(214) 953-6000
(214) 953-5822 *fax*
**ATTORNEY FOR TEXAS-NEW MEXICO POWER COMPANY**

Jo Ann Biggs
State Bar No. 02312400
jbiggs@velaw.com
VINSON & ELKINS LLP
2001 Ross Ave., Ste. 3700
Dallas, Texas 75201-2975
(214) 220-7735
(214) 999-7735 *fax*
**ATTORNEY FOR ONCOR ELECTRIC DELIVERY COMPANY LLC**

ORAL ARGUMENT PROVISIONALLY REQUESTED

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

INDEX OF AUTHORITIES............................................................................ ii

STATEMENT REGARDING ORAL ARGUMENT ............................................. iii

STATEMENT OF FACTS ...............................................................................1

SUMMARY OF THE ARGUMENT ...................................................................2

STANDARD OF REVIEW ...............................................................................3

ARGUMENT AND AUTHORITIES....................................................................3

I.      Sovereign immunity has not been waived.........................................3

II.     The APA's public hearing requirement applies only when an agency adopts a rule.....................................................................................6

III.    The Commission has seriously considered Appellants' concerns about advanced metering technology and allowed them to participate in proceedings at the Commission..................................................10

CONCLUSION AND PRAYER .........................................................................15

CERTIFICATE OF COMPLIANCE....................................................................18

APPENDICES ...............................................................................................20

# INDEX OF AUTHORITIES

**Cases**

*El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*,
247 S.W.3d 709 (Tex. 2008) ..................................................................................4

*Texas Comm'n on Envtl. Quality v. Bonser-Lain*,
438 S.W.3d 887 (Tex. App.—Austin 2014, no pet.) ................................... 3, 5, 9

*Texas Dep't of Parks & Wildlife v. Miranda*,
133 S.W.3d 217 (Tex. 2004) ..................................................................................3

**Statutes**

Tex. Gov't Code Ann. § 311.034 ...........................................................................4, 5

Tex. Gov't Code Ann. § 2001.021 ...................................................................... 1, 5, 6

Tex. Gov't Code Ann. § 2001.023 ............................................................................8

Tex. Gov't Code Ann. § 2001.029 .................................................................... 6, 7, 8

Tex. Gov't Code Ann. § 2001.035 .................................................................. 2, 4, 5, 8

Tex. Gov't Code Ann. § 2001.038 .............................................................................5

Tex. Gov't Code Ann. § 2001.171 ............................................................................5

**Other Authorities**

S. Rep. No. 752, 79th Cong., 1st Sess., pt. 4, at 201 (1945) ....................................7

**Rules**

16 Tex. Admin. Code § 22.282 ..................................................................................6

16 Tex. Admin. Code § 25.133 .......................................................................... 12, 13, 14

**Commission Proceedings**

Pub. Util. Comm'n of Texas, Project No. 40404, *Petition for Initiation of
Rulemaking Proceedings Regarding Smart Meters* ......................................... 1, 10

Pub. Util. Comm'n of Texas, Project No. 41111, *Rulemaking Related to
Advanced Metering Alternatives* ................................................................... 12, 13

Pub. Util. Comm'n of Texas, Project No. 40190, *Project Relating to
Advanced Metering Issues* ....................................................................... 10, 11, 12

## STATEMENT REGARDING ORAL ARGUMENT

If the Court believes oral argument will aid its decisional process, Appellees AEP Texas Central Company, AEP Texas North Company, CenterPoint Energy Houston Electric, LLC, Texas-New Mexico Power Company, and Oncor Electric Delivery Company LLC (collectively, "Utility Appellees"), will be available to address the Court's questions or concerns. However, the Utility Appellees do not believe that oral argument is necessary to resolve the issues in this case. This case concerns only the straightforward application of the doctrine of sovereign immunity and the construction of unambiguous statutory provisions.

## STATEMENT OF FACTS

The Commission proceeding from which Appellants filed their appeal involved a request to the Commission under Administrative Procedure Act (APA) § 2001.021 in May 2012 "to initiate and conduct rulemaking procedures… relating to the deployment of smart meters by electrical utilities and others as part of their Advanced Metering System (AMS) program." *See* Clerk's Record (CR) at 20 (Pub. Util. Comm'n of Texas, *Petition for Initiation of Rulemaking Proceedings Regarding Smart Meters*, Project No. 40404, Order Denying Petition for Rulemaking at 1 (July 13, 2012) ("Project No. 40404")). The Commission docketed Appellants' rulemaking petition in Project No. 40404.  In June 2012, the Appellants requested the Commission to hold a public hearing on the issues raised in their petition for a rulemaking.  Rather than initiate a rulemaking proceeding as a result of the Appellants' petition, in July 2012, the Commission issued an order denying the petition for a rulemaking and explained that it was denying the petition "because the Commission has another project to address Petitioners' concerns about smart meters, Project No. 40190, *PUC Proceeding to Evaluate the Feasibility of Instituting a Smart Meter Opt-out Program.*" *See id.* at 24-25 (Project No. 40404, Order Denying Petition for Rulemaking at 5-6). The Appellants then initiated judicial review of the Commission's order.

1

The Commission did ultimately adopt a rule addressing advanced metering service in Project No. 41111. As discussed below, several of the Appellants participated in Project No. 41111. None of the Appellants, however, challenged the validity of or otherwise appealed the rule promulgated in Project No. 41111.

In addition to the facts stated above, the Utility Appellees adopt and incorporate herein Appellee Texas Public Utility Commission's Statement of Facts, as set forth in its Appellee's Brief filed on February 23, 2015.

## SUMMARY OF THE ARGUMENT

In this appeal, Appellants contend they are not seeking judicial review of the Commission's decision denying their petition for rulemaking in Project No. 40404. *See* Appellants' Brief at 10 ("this is not an appeal of the denial of a rulemaking"). Instead, Appellants claim they seek judicial review of the Commission's denial of their request for a public hearing in that project. Appellants argue that APA § 2001.035 waives sovereign immunity with respect to their lawsuit. *Id.* at 12-19. APA § 2001.035, however, applies only to a rule actually adopted by an agency. Tex. Gov't Code Ann. § 2001.035(a) (applies to "a rule ... *a state agency adopts* ....") (emphasis added). The Commission did not adopt a rule in Project No. 40404. Thus, APA § 2001.035 does not provide jurisdiction for Appellants' suit. Therefore, the suit is barred by the well-established doctrine of sovereign immunity.

In addition to the points discussed below, the Utility Appellees adopt and incorporate herein the arguments of the Commission in its Appellee's Brief.

## STANDARD OF REVIEW

A trial court's order granting a plea to the jurisdiction is reviewed *de novo*. *See Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225-26 (Tex. 2004); *see also Texas Comm'n on Envtl. Quality v. Bonser-Lain*, 438 S.W.3d 887, 892-93 (Tex. App.—Austin 2014, no pet.). To determine whether a plaintiff has affirmatively demonstrated the trial court's subject-matter jurisdiction to hear a case, a reviewing court considers the facts alleged in the petition along with any evidence submitted by the parties, to the extent such evidence is relevant to the jurisdictional issue. *Miranda*, 133 S.W.3d at 227. The pleadings are construed in the plaintiff's favor, taking all factual assertions as true and looking to the plaintiff's intent. *Id.* at 226-27. If the pleadings affirmatively negate jurisdiction, then the plea to the jurisdiction must be granted. *Id.*

## ARGUMENT AND AUTHORITIES

### I. Sovereign immunity has not been waived.

A trial court lacks subject-matter jurisdiction over lawsuits against the State and its agencies absent an express waiver of sovereign immunity. *Id.* at 224. And this rule applies to judicial review of agency administrative actions. *Bonser-Lain*,

438 S.W.3d at 893. A waiver of immunity must be expressed by clear and unambiguous language. Tex. Gov't Code Ann. § 311.034.

Appellants contend that APA § 2001.035 waives sovereign immunity with respect to their appeal of the Commission's refusal to hold a public hearing in Project No. 40404. *See* Appellants' Brief at 12-19. The plain language of that provision, however, makes clear that it does not apply to this case.

APA § 2001.035 states, in relevant part, as follows:

(a)     A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.

(b)     A person must initiate a proceeding *to contest a rule* on the ground of noncompliance with the procedural requirements of Sections 2001.0225 through 2001.034 not later than the second anniversary of the effective date of the rule.

Tex. Gov't Code Ann. § 2001.035(a)-(b) (emphasis added).

Nothing in APA § 2001.035 expressly waives sovereign immunity when an agency denies a petition for rulemaking or a request for a hearing to initiate a rulemaking.   There is no question that a rule is invalid when an agency promulgates it without complying with the proper rulemaking procedures. *See El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n*, 247 S.W.3d 709, 715 (Tex. 2008) (citing Tex. Gov't Code Ann. § 2001.035(a)). But Appellants do not challenge the validity of a rule.  More importantly, the Commission did not adopt a rule in the underlying docket. Consequently, APA § 2001.035 does not apply.

4

The legislature has unambiguously expressed its intent to waive sovereign immunity to allow judicial review of certain types of agency decisions under the APA. *See, e.g.,* Tex. Gov't Code Ann. § 2001.038 (permitting a suit for declaratory relief to determine the validity or applicability of a rule) and § 2001.171 (providing, under certain circumstances, an independent right to judicial review of a final decision in a contested case). The APA, however, is silent with respect to whether a person may appeal, or otherwise challenge, the denial of a hearing request where the Commission did not adopt a rule. And, APA § 2001.035, the provision Appellants rely upon for jurisdiction, includes compliance with APA §§ 2001.0225 through 2001.034 and tellingly excludes from its purview § 2001.021, the provision under which Appellants filed their petition for a rulemaking in Project No. 40404.

In *Bonser-Lain*, this Court held that the APA's "deliberate silence" with respect to agency decisions on petitions for rulemaking established that the "APA does not provide a right to judicial review of an agency's refusal to adopt rules." 438 S.W.3d at 894. Statutory "silence" is not a "clear and unambiguous" waiver of immunity to enable a suit against a state. Tex. Gov't Code Ann. § 311.034. The same rule applies here.

5

## II. The APA's public hearing requirement applies only when an agency adopts a rule.

The crux of Appellants' complaint is that the Commission erred in denying their request for a rulemaking without first holding the public hearing they requested under APA § 2001.029 and 16 Tex. Admin. Code § 22.282(d). Appellants' reliance on these provisions is misplaced.

Section 2001.029 provides that "[a] state agency shall grant an opportunity for a public hearing before it adopts a substantive rule if a public hearing is requested by: (1) at least 25 persons ...." Tex. Gov't Code Ann. § 2001.029(b)(1). Similarly, 16 Tex. Admin. Code § 22.282(d) provides that the Commission may initiate a rulemaking project by publishing notice in accordance with the rules, and that a public hearing on a proposed rule "shall be granted if requested by at least 25 persons." 16 Tex. Admin. Code § 22.282(d). Both provisions deal with rulemakings that have already been initiated, not a petition for initiation of a rulemaking.[1] Moreover, neither provision provides a petitioner the right to a public hearing on a petition for rulemaking.

---

[1]     A petition for the initiation of rulemaking is governed by APA § 2001.021, which provides a state agency with only two options for addressing the petition: (1) deny the petition in writing, stating its reasons for the denial or (2) initiate a rulemaking proceeding. Tex. Gov't Code Ann. § 2001.021(c). The rulemaking provisions (such as a public hearing under APA § 2001.029) only apply after the Commission has decided to initiate a rulemaking proceeding. *Id.* § 2001.029(b).

Even if an actual rulemaking proceeding is initiated (which did not happen in the instant case), APA § 2001.029 requires a hearing only if a rule is actually adopted – "[a] state agency shall grant an opportunity for a public hearing *before it adopts a substantive rule ....*" Tex. Gov't Code Ann. § 2001.029(b) (emphasis added). If the agency ultimately takes no action, there is no requirement to hold a hearing.

The legislative history of analogous provisions of the federal APA further rebuts Appellants' alleged right to a public hearing in this case. Specifically, the Senate Judiciary Committee Report on the federal APA states the following with respect to petitions for rulemaking:

> The mere filing of a petition does not require an agency to grant it, *or to hold a hearing,* or engage in any other public rule making proceedings. The refusal of an agency to grant the petition or to hold rule making proceedings, therefore, would not per se be subject to judicial reversal.

S. Rep. No. 752, 79th Cong., 1st Sess., pt. 4, at 201 (1945) (emphasis added).

Appellants argue this cannot be correct because it would allow the Commission to play a "shell game" to eliminate a party's right to a hearing "by simply failing to complete the adoption of the specific rule for which the hearing was requested" and then proposing its own rule on the same subject in a separate proceeding. *See* Appellants' Brief at 19 & 21. Appellants insist this could mean

7

"that no public hearing on a rulemaking would ever have to be held at all." *Id.* at 21. Appellants are wrong.

It is true that the Commission is not required to hold a hearing if it does not adopt a rule. But the Commission cannot adopt a rule without holding a hearing when properly requested. Any rule adopted in violation of the public hearing requirement in APA § 2001.029 is voidable. *See* Tex. Gov't Code Ann. § 2001.035(a).

If the Commission proposes a similar rule in a separate proceeding, as Appellants suggest, it must also provide notice of its intent to adopt the proposed rule. *See id.* § 2001.023. A party can then participate in the new rule rulemaking proceeding and request a hearing, which, as discussed below, is exactly what Appellants did.

Appellants' characterization of the Commission's discretion to manage its rulemaking docket as a "shell game" is a fiction. Appellants not only had an opportunity to participate in a public hearing in another project (Project No. 41111) on the same matters at issue, but Appellants failed to appeal the rule the Commission actually adopted in that proceeding. Appellants point to no legislative requirement that the Commission must hold a separate hearing on any petition for rulemaking so long as twenty-five people request the hearing. Appellants' unbridled interpretation of the statute would mandate hearings regardless of

8

whether a petition is duplicative of a pending rulemaking (as was the case with Project Nos. 40404 and 40190) or is simply a verbatim recitation of a previously rejected petition. This would create a limitless waste of agency resources, and Appellants have provided no valid reason to justify such an interpretation.

Appellants' claim of "a right without a remedy" is inapposite. For one, Appellants did not have a right to a public hearing. Appellants, therefore, do not have a remedy to appeal the denial of their hearing. Appellants tellingly confuse the right to a hearing after a rulemaking proceeding has been opened with the Commission's discretionary function to grant or deny a petition for a rulemaking. Appellants did have a "remedy" to address issues with the advanced metering service rule adopted in Project No. 41111. Appellants could have appealed the adopted rule and challenged the rulemaking process. They chose not to avail themselves of the available remedy.

In sum, Appellants have not cited any clear waiver of sovereign immunity that applies to their lawsuit. This Court has already ruled that the APA does not provide a right to judicial review of an agency's refusal to adopt rules. *See Bonser-Lain*, 438 S.W.3d at 894. Similarly, the APA does not permit an appeal of an agency's refusal to hold a hearing in a proceeding in which the agency did not adopt a rule. It is only when the Commission initiates a rulemaking and actually adopts a rule that a hearing must be held when properly requested, as the

Commission did in Project No. 41111. Therefore, the trial court correctly granted the Commission's plea to the jurisdiction.

## III. The Commission has seriously considered Appellants' concerns about advanced metering technology and allowed them to participate in proceedings at the Commission.

While not pertinent to the legal question of sovereign immunity, the impression Appellants attempt to create is that the Commission ignored their asserted concerns regarding advanced metering technology. That is not accurate. Instead of ignoring Appellants' concerns, the Commission gave appropriate consideration to the matters raised by Appellants and accorded them two opportunities to participate in a public hearing and present oral testimony and supporting information on these matters.

Prior to Appellants' petition for a rulemaking in Project No. 40404, the Commission initiated an investigative proceeding in Project No. 40190 to look into issues related to advanced meters, including health and safety matters.[2] In its order denying Appellants' petition for a rulemaking, the Commission notified Appellants that it intended to consider the issues raised by them in Project No. 40190. *See* CR at 24-25 (Project No. 40404, Order Denying Petition for Rulemaking at 5-6). The

---

    [2]   *See* Pub. Util. Comm'n of Texas, *Project Relating to Advanced Metering Issues*, Project No. 40190, Final Details for August 21st Public Forum on Advanced Metering & Related Issues (Aug. 20, 2012) ("Project No. 40190"). A copy of this document is included in Appendix A. The document          can          be          found          at: <http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=40190&TXT_ITEM_NO=570> (last visited on February 23, 2015).

10

Commission also transferred Appellants' comments from Project No. 40404 to Project No. 40190.[3] Appellants were given the opportunity to participate in the public forum held in Project No. 40190 on August 21, 2012, and several individual Appellants presented testimony and submitted information at this public forum.[4]

On December 17, 2012, after considering and evaluating the academic literature on radio frequency ("RF") and electromagnetic frequency ("EMF") emissions from advanced meters, the PUC Staff filed a report in Project No. 40190.[5] The PUC Staff concluded that "the large body of scientific research reveals no definite or proven biological effects from exposure to low-level RF signals" and further stated that it "had found no credible evidence to suggest that advanced meters emit harmful amounts of EMF."[6]

---

[3]  *See generally* Project No. 40190, Item Nos. 399-517 (July 24, 2012) (transferred comments from Project No. 40404).  The list of filings in Project No. 40190 can be found at http://interchange.puc.texas.gov/WebApp/Interchange/application/dbapps/filings/pgControl.asp?TXT_UTILITY_TYPE=A&TXT_CNTRL_NO=40190&TXT_ITEM_MATCH=1&TXT_ITEM_NO=&TXT_N_UTILITY=&TXT-n_FILE_PARTY=&TXT_DOC_TYPE=ALL&TXT_D_FROM&TXT_D_TO=&TXT_NEW=true (last visited on February 23, 2015).

[4]  *See* Appendix A at 2-3 (listing Appellants Devvy Kidd, Thelma Taormina, and Beth Biesel as "Invited" or "Public & Stakeholder Comment" participants).

[5]  *See* Project No. 40190, Staff Report on Health and Radiofrequency Electromagnetic Fields from Advanced Meters, Introductory Memorandum (Dec. 17, 2012). This document is included in Appendix B. The full report can be found at: <http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=40190&TXT_ITEM_NO=661> (last visited on February 23, 2015).

[6]  *Id*. at 1.

On January 7, 2013, the Commission initiated project No. 41111, a proposed rulemaking proceeding, to consider adoption of a rule relating to advanced metering alternatives. On February 21, 2013, the Commission issued its proposed rule, 16 Tex. Admin. Code § 25.133, for a smart meter opt-out in Project No. 41111.[7] On the same day, the Commission provided the petitioners in Project No. 40190 with notice of the proposed rule.[8] The Commission accepted written public comment on its proposed rule in April 2013. As part of the public comment process in Project No. 41111, Appellants submitted extensive written materials on their health and safety concerns regarding advanced meters.[9]

---

[7] *See* Pub. Util. Comm'n of Texas, Project No. 41111, *Rulemaking Related to Advanced Metering Alternatives*, Proposal for Publication on New 25.133 and Amendment to 25.214 as Approved at the February 14, 2013 Open Meeting (Feb. 21, 2013) ("Project No. 41111"), published in 38 Tex. Reg. 1328 (Mar. 1, 2013). This document can be found at: http://interchange.puc.state.tx.us/WebApp/Interchange/Documents/41111_6_750581.PDF> (last visited on February 23, 2015).

[8] *See* Project No. 40190, Information on Proposed Rule (Feb. 21, 2013). This document is included in Appendix C. This document can also be found at:

<http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=40190&TXT_ITEM_NO=700> (last visited on February 23, 2015).

[9] *See* Project No. 41111, Hearing Submissions & Proposals (April 19, 2013). Appellants' submission can be found at:

<http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=41111&TXT_ITEM_NO=22> (last visited on February 23, 2015).

On March 29, 2013, the Texas Eagle Forum, whose members include certain of the Appellants, requested that a public hearing be held in Project No. 41111.[10] On April 10, 2013, the Commission issued a notice that a public hearing would be held on April 19, 2013 in Project No. 41111.[11] At this public hearing, Appellants' attorney (David Tuckfield at the time) and several of the individual Appellants testified about the meters.[12]

On August 15, 2013, the Commission issued its order adopting 16 Tex. Admin. Code § 25.133, which provides a mechanism for a customer who does not want an advanced meter to opt out.[13] In its order adopting this rule, the Commission addressed Appellants' health and safety concerns. The Commission stated that:

---

[10] *See* Project No. 41111, Request for Hearing (Mar. 29, 2013). The Texas Eagle Forum's hearing request is included in Appendix D. The pleading can also be found at: <http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=41111&TXT_ITEM_NO=8> (last visited on February 23, 2015).

[11] *See* Project No. 41111, Notice of Public Hearing (April 10, 2013). A copy of the Commission's notice is included in Appendix E. The notice can also be found at: < http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=41111&TXT_ITEM_NO=16> (last visited on February 23, 2015).

[12] *See* Project No. 41111, Order Adopting New 25.133 and Amendments to 25.214 as Approved at the August 9, 2013 Open Meeting at 1-2 (Aug. 15, 2013), published in 38 Tex. Reg. 5452 (Aug. 23, 2013) (listing Appellants Devvy Kidd, Nick and Thelma Taormina, and Beth Biesel and Appellants' attorney at that time, David Tuckfield, as participating in and testifying at the hearing held in Project No. 41111, in addition to submitting written comments). A copy of the Commission's order in Project No. 41111, excluding attachments, is included in Appendix F. The order can also be found at: <http://interchange.puc.state.tx.us/WebApp/Interchange/application/dbapps/filings/pgSearch_Results.asp?TXT_CNTR_NO=41111&TXT_ITEM_NO=41> (last visited on February 23, 2015).

[13] *Id.* at 55.

Public Commenters provided anecdotal information related to negative health effects they attribute to the installation of advanced meters. David Tuckfield, representing the petitioners in Project No. 40404 (Petitioners), commented that the commission should conduct a study of the health effects of advanced metering and provide the public with information regarding health and safety. …

The commission acknowledges the comments made by Public Commenters Mr. Biesel, Ms. Biesel, Mr. Tuckfield, Mr. Allen, Mr. Ramsland, Mr. Hemphill, and the Petitioners. ***The commission evaluated health, privacy, and operational concerns against advanced meters and concluded that the concerns are unwarranted. However, through this rulemaking the commission is giving customers the right to choose metering service that does not require use of advanced meters.*** As with other non-standard services, customers choosing this non-standard metering service will be required to pay the costs for the service.[14]

Despite their claims to the contrary, Appellants did provide written materials, testimony and comments in public hearings before the Commission regarding their concerns about advanced metering systems. Moreover, Appellants failed to appeal the rule promulgated in Project No. 41111. Accordingly, while not pertinent to the legal issue of sovereign immunity, the Commission has given serious consideration to the matters Appellants raised and on two occasions accorded Appellants the opportunity for the public hearing they would have this Court believe they were denied.

---

[14] *Id*. at 22 and 24 (emphasis added).

## CONCLUSION AND PRAYER

For the foregoing reasons, Appellees AEP Texas Central Company, AEP Texas North Company, CenterPoint Energy Houston Electric, LLC, Texas-New Mexico Power Company, and Oncor Electric Delivery Company LLC, respectfully request that this Court affirm the trial court's Order Granting Defendant's Plea to the Jurisdiction and dismissing the cause for want of subject-matter jurisdiction, and further request all other relief to which they may show themselves entitled.

Respectfully submitted,

Rhonda Colbert Ryan
State Bar No. 17478800
rcryan@aep.com
**AMERICAN ELECTRIC POWER
SERVICE CORP.**
400 W. 15th St., Ste. 1500
Austin, Texas  78701
(512) 481-3321
(512) 481-4587 fax

15

Patrick Pearsall
State Bar No. 24047492
ppearsall@dwmrlaw.com
**DUGGINS WREN MANN & ROMERO, LLP**
P.O. Box 1149
Austin, Texas 78767
(512) 744-9300
(512) 744-9399 (fax)

 */s/ Patrick Pearsall*
Patrick Pearsall

**ATTORNEYS FOR APPELLEES**
**AEP TEXAS CENTRAL COMPANY**
**AND AEP TEXAS NORTH COMPANY**


Dale Wainwright
State Bar No. 00000049
Dale.Wainwright@bgllp.com
Davison Grant
State Bar No. 08300010
Davison.Grant@bgllp.com
Lindsay Hagans
Lindsay.Hagans@bgllp.com
State Bar No. 24087651
**BRACEWELL & GIULIANI LLP**
111 Congress Avenue, Ste. 2300
Austin, Texas 78701
(512) 472-7800
(800) 404-3970 *fax*

Jason M. Ryan
State Bar No. 24033150
Jason.ryan@centerpointenergy.com
Assistant General Counsel
**CENTERPOINT ENERGY SERVICE**
**COMPANY, LLC**
1111 Louisiana Street, Ste. 4669
Houston, Texas  77002

16

(713) 207-7261
(713) 574-2661 *fax*

*/s/ Dale Wainwright*
Dale Wainwright

**ATTORNEYS FOR APPELLEE**
**CENTERPOINT ENERGY HOUSTON**
**ELECTRIC, LLC**


Patrick R. Cowlishaw
State Bar No. 04932700
pcowlishaw@jw.com
Stephanie C. Sparks
State Bar No. 24042900
**JACKSON WALKER L.L.P.**
901 Main St., Ste. 6000
Dallas, Texas  75202
(214) 953-6000
(214) 953-5822 *fax*

Scott Seamster
State Bar No. 00784939
Scott.seamster@pnmresources.com
Corporate Counsel
**TEXAS-NEW MEXICO POWER COMPANY**
225 E. John Carpenter Fwy., Ste. 1500
Irving, Texas  75062
(469) 484-8577
(469) 484-8033 *fax*

*/s/ Stephanie C. Sparks*
Stephanie C. Sparks

**ATTORNEYS FOR APPELLEE**
**TEXAS-NEW MEXICO POWER COMPANY**

17

Jo Ann Biggs
State Bar No. 02312400
jbiggs@velaw.com
Cortney C. Thomas
State Bar No. 24075153
cthomas@velaw.com
**VINSON & ELKINS LLP**
2001 Ross Ave., Ste. 3700
Dallas, Texas  75201-2975
(214) 220-7735
(214) 999-7735 *fax*

*/s/ Jo Ann Biggs*
Jo Ann Biggs

**ATTORNEYS FOR APPELLEE**
**ONCOR ELECTRIC DELIVERY**
**COMPANY LLC**

## CERTIFICATE OF COMPLIANCE

I certify that this document contains 3,388 words in the portions of the document that are subject to the word limits of Texas Rule of Appellate Procedure 9.4(i), as measured by the undersigned's word-processing software.

*/s/ Patrick J. Pearsall*
Patrick J. Pearsall

## CERTIFICATE OF SERVICE

As required by Texas Rule of Appellate Procedure 9.5, I certify that on the 23rd day of February, 2015, the foregoing document was electronically filed with the Clerk of the Court using the electronic case filing system of the Court, and that a true and correct copy was served on the following lead counsel for all parties listed below via electronic service:

Roger B. Borgelt
BORGELT LAW
614 S. Capital of Texas Highway
Austin, Texas 78746
*Counsel for Appellants Devvy Kidd, et al.*

Kellie E. Billings-Ray
OFFICE OF THE ATTORNEY GENERAL
Environmental Protection Div.
P. O. Box 12548, MC-066
Austin, Texas 78711-2548
*Counsel for Appellee Public Utility Commission of Texas*

　　　　　　　　*/s/ Patrick J. Pearsall*
　　　　　　　　Patrick J. Pearsall

# **APPENDICES**

A.   Pub. Util. Comm'n of Texas, Project Relating to Advanced Metering Issues, Project No. 40190, Final Details for August 21st Public Forum on Advanced Metering & Related Issues (Aug. 20, 2012)

B.   Pub. Util. Comm'n of Texas, Project Relating to Advanced Metering Issues, Project No. 40190, Staff Report on Health and Radiofrequency Electromagnetic Fields from Advanced Meters, Introductory Memorandum (Dec. 17, 2012)

C.   Pub. Util. Comm'n of Texas, Project Relating to Advanced Metering Issues, Project No. 40190, Information on Proposed Rule (Feb. 21, 2013)

D.   Pub. Util. Comm'n of Texas, Project No. 41111, Rulemaking Related to Advanced Metering Alternatives, Request for Hearing (Mar. 29, 2013)

E.   Pub. Util. Comm'n of Texas, Project No. 41111, Rulemaking Related to Advanced Metering Alternatives, Notice of Public Hearing (April 10, 2013)

F.   Pub. Util. Comm'n of Texas, Project No. 41111, Rulemaking Related to Advanced Metering Alternatives, Order Adopting New 25.133 and Amendments to 25.214 as Approved at the August 9, 2013 Open Meeting (Aug. 15, 2013)

# APPENDIX A

## Final Details for 8-21-12 Public Forum

# Public Utility Commission of Texas

## Memorandum

To:             All Interested Parties

From:           Christine Wright, Infrastructure & Reliability Division
                Jacob Lawler & Joseph Younger, Legal Division

Date:           August 20, 2012

Re:             **Project No. 40190**: Project Relating to Advanced Metering Issues: August
                21st Public Forum – *Important Information including the Final Agenda,
                Meeting Procedures and Speakers Roster*

Attached is important information for interested parties regarding the Public Forum. This Forum will be open to the public and will be held in the Reagan Building located at the corner of 15th Street and Congress. Parking is available on the street, at the Capitol Visitors Parking Lot (at the corner of 13th Street and Trinity) and at the Bob Bullock History Museum Parking Garage (at the corner of 18th Street and Congress).

The final agenda is attached. The Speakers Roster contains the names of individuals that have agreed in advance to speak at the Public Forum as of 10:00 a.m., August 20th. If you send a request to speak after this has been filed, your name will added to the list by staff. Same-day sign-up will be allowed, *although space will be limited*. If you are a speaker, *you are not required* to file written comments summarizing your position in this project.

The meeting will begin at 10:00 a.m. All speakers must sign-in beforehand. Sign In begins promptly at 9:30 a.m. We will be taking a lunch break.

This meeting will be broadcast live, and can be accessed on the Commission webpage at: http://www.puc.state.tx.us/agency/topic_files/40190_Forum.aspx.

This broadcast will remain online and available for viewing after the meeting. Transcripts will also be available following the meeting. They can be accessed by contacting Kennedy Reporting at http://www.kennedyreporting.com/

1

**PROJECT NO. 40190**

| | | |
|---|---|---|
| **PROJECT RELATING TO** | § | **PUBLIC UTILITY COMMISSION** |
| **ADVANCED METERING** | § | |
| **ISSUES** | § | **OF TEXAS** |

**Public Forum**
**Community Input on Advanced Meters and Related Topics**

**August 21, 2012**
**Location: Reagan Building, 105 West 15th St.**
**Room HGR-140/Overflow in Room 110**
**Sign In Begins: 9:30 A.M.**
**Start Time: 10:00 A.M.**

I.      **Welcome Remarks**

II.     **Overview of Meeting Procedures**

III.    **Staff Introduction**

IV.     **Public Official Comments**

V.      **Invited Comments**
    A.  *ERCOT ISO (Joel Mickey)*
    B.  *We The People Are The 9-12 Association, Inc. (Thelma Taormina)*
    C.  *Pecan Street (Brewster McCracken)*
    D.  *Ban Texas Smart Meters (Cindy Carriger)*
    E.  *Texas is Hot*
    F.  *Devvy Kidd*
    G.  *City of Houston (Tina Paez)*
    H.  *Citizen Lobbyist Network & Texas 10th Amendment Center (Sharlyn Wall)*
    I.  *Smolen & Fox, Smolen & Associates (Paul Smolen)*
    J.  *Texans Against Smart Meters (John Marler)*
    K.  *Public Citizen (Tom "Smitty" Smith)*

VI.     **Utility Response Panel**

VII.    **Expert Panel**
    A.  *Brent Bullock (Technical Consultant)*
    B.  *Rob Kavet, ScD (Senior Technical Executive, EPRI)*
    C.  *Curtis Bennett (Chief Science Officer, Building Construction Engineering Technologist Adjunct Faculty For 2 Education Groups Thermografix Consulting Corporation)*
    D.  *Robert Hebner, Ph.D. (Director, Center for Electromechanics, University of Texas at Austin)*

VIII.   **Consumer & Stakeholder Comments**

**Speakers Roster**
**Project 40190: Public Forum for Community Input on Advanced Meters & Related Topics**
**August 21, 2012**

| Invited Comments | Organization |
|---|---|
| Joel Mickey | ERCOT ISO |
| Thelma A. Taormina | We the People/912 Commission |
| Brewster McCracken | Pecan Street |
| Cindy Carriger | Ban Texas Smart Meters |
| TBA | Texas is Hot |
| Devvy Kidd | |
| Tina Paez | City of Houston |
| Sharlyn Wall | Citizen Lobbyist Network & Texas 10th Amendment Center |
| Paul Smolen | Fox Smollen & Associates |
| John Marler | Texans Against Smart Meters |
| Tom "Smitty" Smith | Public Citizen |

| Utility Response Panel | Organization |
|---|---|
| TBA | Oncor Electric Delivery |
| TBA | Oncor Electric Delivery |
| TBA | Texas New Mexico Power |
| TBA | Texas New Mexico Power |
| TBA | CenterPoint Energy Houston Electric |
| TBA | CenterPoint Energy Houston Electric |
| TBA | AEP Texas |
| TBA | AEP Texas |

| Expert Panel | Organization |
|---|---|
| Brent Bullock | Technical Consultant |
| Rob Kavet, ScD | Senior Technical Executive, EPRI |
| Curtis Bennett | Chief Science Officer, Thermografix Consulting Corporation |
| Robert Hebner, Ph.D. | Director, Center for Electromechanics, UT Austin |

| Public Official Testimony | Organization |
|---|---|
| Mayor Allen Owen | Missouri City |
| Mayor Marcus E. Knight | Lancaster |
| Mayor Greg Wortham | Sweetwater |

| Public & Stakeholder Comment | Organization/Location |
|---|---|
| Beth Biesel | Dallas |
| Terry L. Guy | Spring |
| April Arfa | ECO Development Group LLC |
| Phillip McDonough | Montgomery |
| Tracy Stephens | Hurst |
| Tracy Eubanks | Carrollton |
| Ward Hansen | Arlington |
| Brenda Crockett | Champion Energy |
| Ned Ross | Direct Energy |
| Ginger Russell | Texas Patriots Lax |
| Steve Davis | ARM |
| Janise Cookston | We Texans |
| Thomas A. Bazan | Houston |

## Public Forum
## Important Information and Meeting Procedures
Updated Monday, August 20th, 2012

The purpose of this Public Forum is for the Public Utility Commission of Texas (Commission) to receive public comment on issues relating to advanced meters. The goal of the forum is to receive comments from multiple perspectives in order to better inform the Commission's decision-making process. The Commission will not take a vote at the Public Forum on any proposal presented at the forum. The Public Forum is also not a debate. It is an opportunity for the public to be heard. The Commission encourages public attendance and participation at this Public Forum. Participants are expected to follow the outlined procedures to ensure fairness to all parties and to maintain an orderly and efficient proceeding.

**Participation Welcomed and Encouraged**
Participation by members of the public at this Public Forum is welcomed and encouraged. The following procedures for the forum have been designed to produce the most efficient and effective process for allowing the public to provide comments to the Commission. The Commission reserves the right to change these procedures as it deems necessary in order to allow the forum to function as efficiently as possible.

**What to Expect**
- The Public Forum will begin promptly at the published start time.
- Doors to the meeting room will open approximately 30 minutes before the published start time.
- A modified agenda and a Speakers Roster is attached.

**How to Participate**
- Each person already on the published Speakers Roster will still need to sign-in on the day of the Forum.
    - *There will be additional, but limited, time for participants who are not on the published Speakers Roster to speak at the Public Forum. Same day sign-up will be available between 9:30 a.m. and 10:00 a.m. at the sign-in table.*

**Invited Comments**
- Speakers will be taken in the order that they appear on the Roster. Any speaker may yield his time to another speaker on the list in order to give a single speaker a maximum of 20 minutes speaking time. Each speaker has a maximum of 5 minutes.
- Invited and Expert comments should not be redundant.
- Speakers should present all comments as briefly as possible.
- Speakers must remain courteous and respectful at all times.

4

**Consumer & Stakeholder Comments**

- Each speaker will be asked to fill out a speaker card when signing in, prior to the start of the Public Forum.
- Speakers will be taken in the order that they appear on the Roster. We have set a time-limit to ensure as many speakers as possible have the opportunity to speak. Each speaker has 3 minutes to speak.
- Any speaker may yield his time to another speaker on the list in order to give a single speaker a maximum of 15 minutes speaking time.
- Public comments should not be redundant.
- Speakers should present all comments as briefly as possible.
- Speakers must remain courteous and respectful at all times.

**Groups**

- If a group of individuals wishes to address the Commission on the same topic, the group must designate one spokesperson. That spokesperson will be allowed to speak only during the time allotted.

**Prohibitions**

- Those in attendance are asked to please refrain from disrupting the meeting by making noise of any kind (this includes shouting, whistling, applauding, and the use of noise-making devices).
- Those in attendance are asked to please refrain from bringing signs, banners, or other similar items into the meeting room.
- The Commission will not receive public comment at this Forum unless it appears on the posted agenda or the speaker is recognized by the Commission.
- Anyone who does not follow these procedures or who disrupts the Public Forum may be asked to leave.

**APPENDIX B**

**Staff Report on RF & EMF from SmartMeters**

**Donna L. Nelson**
Chairman

**Kenneth W. Anderson, Jr.**
Commissioner

**Rolando Pablos**
Commissioner

**Brian H. Lloyd**
Executive Director



**Rick Perry**
Governor

# *Public Utility Commission of Texas*

Date:        December 17, 2012

To:          Chairman Donna L. Nelson
             Commissioner Kenneth W. Anderson, Jr.
             Commissioner Rolando Pablos

From:        Alan Rivaldo
             Infrastructure & Reliability Division

Subject:     Project No. 40190, Project Relating to Advanced Metering Issues
             *Report on Health and Radiofrequency Electromagnetic Fields from Advanced Meters*

Recently, some citizens of Texas have expressed concern over the potential health effects of exposure to the radiofrequency emissions from the wireless technology of advanced metering. Some of these individuals have appeared before or submitted comments to the Commission (under Project 40190, *Project Relating to Advanced Metering Issues*) and the Texas Senate Committee on Business and Commerce (at http://www.senate.state.tx.us/75r/senate/commit/c510/c510.htm).

Some have relied on social media as a source of information because it disseminates ideas rapidly and widely, but it also can be inaccurate and lack objectivity. Therefore, Staff decided to investigate the health concerns expressed by citizens and other interested parties. The product of this investigation is the attached document intended to objectively address the issue and help inform decision makers. Staff reviewed recent research on the potential health effects of radio frequency electromagnetic field (RF EMF), reported on the findings, and assessed disputes regarding the findings.

Staff found many scientific research papers published on the effects of EMF on health over a period of nearly 90 years; they number in the thousands. Despite this extensive body of work, scientific research continues, and dozens of papers are published each year.

*Staff has determined that the large body of scientific research reveals no definite or proven biological effects from exposure to low-level RF signals. Further, Staff found no credible evidence to suggest that advanced meters emit harmful amounts of EMF.*

While many different organizations have performed primary research on health and RF EMF, Staff relied heavily on the following sources:

1. The California Council on Science and Technology (CCST), an independent state agency, assessed the available evidence of whether FCC standards provide sufficient protection of public health. Its report also questioned whether additional standards are needed to ensure adequate protection from adverse health effects of wireless communication technology.
2. The Michigan Public Service Commission requested help from Lawrence Berkeley National Laboratory (LBNL) in assessing claims made by some individuals who refuted the findings of the CCST report. The PUCT report summarizes the LBNL work.
3. The measurements and assessments performed by the Electrical Power Research Institute (EPRI), an organization that performs research and provides technical expertise to the electrical utility industry.

*Staff found the CCST conclusions, LBNL's work, and the investigations by EPRI to be highly credible and based on sound scientific principles.*

Other material Staff reviewed, found valuable, and used to inform the report came from:

- The federal government (FCC, NIH, and other agencies);
- The Canadian government and its provincial health authorities;
- Countries in Western Europe;
- Several municipalities deploying advanced meters;
- Various governmental entities in Australia;
- Academia;
- The United Nations' World Health Organization;
- Utility industry organizations; and
- International standards-settings organizations.

Alan Rivaldo is available to answer any questions you may have.



# Health and RF EMF from Advanced Meters

*An Overview of
Recent Investigations and Analyses*

**Public Utility Commission of Texas
Infrastructure & Reliability Division
Staff Report**

Prepared by Alan Rivaldo
Project No. 40190

December 2012

This document is work supported by the Department of Energy under award numbers DE-OE0000092 and DE-OE0000180.

*Any views presented in this paper do not necessarily represent a Commission decision.*

# Table of Contents

Executive Summary ................................................................................................................... 1

Introduction .............................................................................................................................. 5

The Science ................................................................................................................................ 6

    Background – Radiation, Science ........................................................................................... 6

        Radiation ........................................................................................................................... 6

        Figure 1: Chart of the Electromagnetic Spectrum .......................................................... 7

        Figure 2: Types of Radiation and Their Frequency Ranges ............................................. 8

        Figure 3: Calculated Average Power Density vs. Distance for a Typical Smart Meter ..... 9

        The Scientific Method, the Value of Meta-analysis, Laymen Difficulties, and other Cautions ..................... 14

Recent Studies and Expert Opinions ...................................................................................... 24

    California Council on Science and Technology Report and Responses .................................. 24

        Response to CCST Report: County of Santa Cruz Health Services Agency ..................... 24

        Michigan Public Service Commission: SGTAP Assessment of Santa Cruz Memo ........... 25

        Michigan Public Service Commission: SGTAP Assessment of AAEM Submittal ............ 26

        Table 1: SGTAP Assessment Using Hill Criteria .............................................................. 28

    Electric Power Research Institute ........................................................................................ 30

        EPRI Technical Report on RF Emissions from Two Models of Smart Meters ................. 30

        EPRI Comments on the Santa Cruz and AAEM Memoranda .......................................... 32

        Table 2: EPRI Findings – Radio Frequency Levels from Various Sources ........................ 37

        EPRI Comments on Sage Report ..................................................................................... 38

    Joint White Paper of EEI, UTC, and AEIC ............................................................................. 38

Government and Academia ..................................................................................................... 40

    National Cancer Institute at the National Institutes of Health ........................................... 40

    FCC Letter: Equipment Authorization, Exposure Limits, and Interference .......................... 41

        GAO Report: Exposure and Testing Requirements for Mobile Phones Should Be Reassessed ................... 42

    Other Governmental Jurisdictions and Agencies ................................................................ 43

        City of Naperville, Illinois ............................................................................................... 43

        Maine Center for Disease Control & Prevention ........................................................... 44

        Vermont Department of Health ..................................................................................... 44

        Monterey County, California .......................................................................................... 45

        Australia: Smart Meter Installations in the State of Victoria ........................................ 45

        United Kingdom: Health Protection Agency .................................................................. 47

        Health Canada: Safety Code 6 ....................................................................................... 47

British Columbia Provincial Health.................................................................................................. 48

Ontario Province: Ontario Agency for Health Protection and Promotion .................................... 48

City of Richmond, British Columbia and Vancouver Coastal Health ............................................ 49

Norwegian Institute of Public Health ........................................................................................... 49

Swedish Council for Working Life and Social Research................................................................. 50

Health Council of the Netherlands................................................................................................ 50

World Health Organization ........................................................................................................... 50

Comments by Academia on Public Concerns about Wireless Smart Meters .................................... 52

Montréal Polytechnic and McGill University Open Letter ............................................................ 52

University of Ottawa: RFcom Review Panel Reports .................................................................... 52

Other Issues.......................................................................................................................................... 54

Potential for Interference with Medical Devices ................................................................................ 54

Claims of Electromagnetic Hypersensitivity....................................................................................... 55

World Health Organization ........................................................................................................... 55

King's College London: Systematic Review of Provocation Studies for EHS ................................ 56

Recent Court Decision Regarding Claim of EHS ........................................................................... 57

Use of EMF as a Weapon ..................................................................................................................... 57

Directed Energy Weapons............................................................................................................. 57

Cold War Studies on Behavior Modification and Human Vulnerability........................................ 58

Other Material...................................................................................................................................... 60

Conclusion .............................................................................................................................................. 62

Acronyms and Abbreviations ................................................................................................................. 64

References and Resources ...................................................................................................................... 66

# Executive Summary

This paper is a survey of existing scientific research and analyses that have been performed to investigate the potential health effects of exposure to low-level radio frequency electromagnetic fields emitted by wireless communication devices including smart meters. No independent empirical research has been performed by Public Utility Commission of Texas (PUCT) staff, but the results of several studies are summarized in this report.

*Decades of scientific research have not provided any proven or unambiguous biological effects from exposure to low-level radio frequency signals. Further, Staff reviewed all available material and found no credible evidence to suggest that smart meters emit harmful amounts of Electromagnetic Field (EMF) radiation.*

Radiation comes in two forms: ionizing and non-ionizing. The methods of data transmittal by smart meters most common in Texas (which communicate wirelessly) and other forms of telecommunications (television, radio, cell phones, satellite) utilize non-ionizing EMF radiation in the Radio Frequency (RF) band, commonly known as RF EMF.

In contrast, ionizing radiation carries an inherently greater amount of energy; it may come from the decay of fissionable material like uranium or from EMF at significantly higher frequencies, such as X-rays or cosmic rays. Because of its inherent high energy, ionizing radiation is known to cause cellular disruption which may lead to various acute or chronic medical problems, including the induction of cancer.

*Smart meters do not emit or utilize ionizing radiation.*

RF EMF can cause the heating of living tissue (thermal effect) when the tissue is exposed to a certain level of intensity, which is the only known risk of exposure to such emissions. The Federal Communications Commission (FCC) has therefore established two tiers of Maximum Permissible Exposure (MPE) - one tier applies if exposure occurs in an occupational or "controlled" situation, and the other tier applies if the general population is exposed or exposure results from an "uncontrolled" situation. The FCC uses a safety factor for the general population tier that sets the MPE at 1/50th of the level of known thermal effects while the occupational MPE is set at 1/10th of the level. Because smart meters are devices deployed among the general population, the more restrictive of the two safety factors is applied; the MPE for the general population is 80% lower than the occupational MPE.

Many governmental health agencies from around the world, including those at the state, provincial, county, and city levels, in addition to academic institutions and other researchers have stated that there are no known non-thermal effects from exposure to RF EMF. This lack of non-thermal effect includes the effects which manifest from exposure to ionizing radiation. Nonetheless, substantial medical research on any potential non-thermal effects of non-ionizing radiation has been conducted and is ongoing. It is anticipated that medical researchers will continue to perform investigations of both the potential thermal and non-thermal health effects of RF for the foreseeable future.

It is important to note that one must use caution when relying solely on the results of individual research studies because conflicts or inconsistencies may exist among the results of other individual studies. Laymen often may not recognize poorly executed studies, or they can misinterpret the results of properly conducted scientific research. Either circumstance may lead a casual observer to draw errant conclusions. Furthermore, it is impossible to scientifically prove absolute safety (the null hypothesis).

The Electric Power Research Institute (EPRI) has undertaken several substantial investigations of smart meter RF EMF, and found that smart meters comply with the FCC MPE requirements. Furthermore, it found that in-residence exposure to the emissions from a smart meter is greatly mitigated by several factors:

- The intensity of RF EMF is reduced *exponentially* with greater distance from the emitting device;
- The shielding provided by the meter enclosure;
- The home's building materials further weaken the field strength;
- The meter antenna orientation inhibits the inward direction of the field pattern; and
- RF EMF emissions are only intermittent; a smart meter typically transmits 1 - 5% of the time.

Several governmental entities such as the City of Naperville in Illinois, the Vermont Department of Health, the Victorian State Government of Australia, and the City of Richmond in British Columbia, Canada have performed their own tests on RF EMF from smart meters. These tests corroborated the results of EPRI's investigations.

Some smart meter opponents have raised the concern that the meters may interfere with other electronic devices. Smart meters typically communicate using the 902-928 MHz frequency band which is unlicensed spectrum and falls in the vicinity of where some cordless telephones operate. The FCC's technical rules mitigate the potential for the meters to interfere with other electronic devices by requiring them to be tested and certified as compliant with these rules before they can be marketed. Financial penalties can be assessed if one does not comply with the appropriate FCC equipment authorization procedure.

Despite a lack of credible evidence, opponents have challenged the use of common devices that emit RF EMF on the basis of health and environmental concerns. Some of these concerns involved cell phones and towers, some focused on the use of Wi-Fi[1] in schools, and a few were specifically related to smart meter deployments. As a result of concerns about the wireless technology employed by smart meters, the California state legislature commissioned the California Council on Science and Technology (CCST) to perform a study. The CCST, an independent, non-profit organization, solicited input from technical experts and reviewed and evaluated available research information about health impacts of RF emitted by electric appliances and smart meters. The CCST report concluded that:

- The exposure to RF from smart meters was lower than that from many household devices;
- The FCC standard provides adequate protection from known thermal effects;
- There were no identified non-thermal health effects from existing common household devices, including smart meters; and
- There was no call at this time for devising standards to govern the non-thermal effects of RF exposure.

In response to these findings, various parties opposed to smart meters filed comments with the California Public Utilities Commission which questioned or conflicted with the conclusions of the CCST report. As a result, the Michigan Public Service Commission asked Lawrence Berkeley National Laboratory (LBNL) to review the assertions made in those comments. EPRI also provided its opinions on the submitted comments separately. EPRI found that the submitted comments ignored a substantial amount of existing evidence and that the content indicated a general misunderstanding of concepts and basic principles about smart meters. LBNL was far more critical of the meter opponents' comments in its response and provided greatly detailed assessments of what it viewed as shortcomings of the submittals.

---

[1] Wi-Fi is a popular technology that allows an electronic device to exchange data wirelessly using radio waves over a computer network, including high-speed Internet connections. Wi-Fi products are based on the Institute of Electrical and Electronics Engineers' (IEEE) 802.11 standards.

Some opponents of smart meters have raised the idea of the existence of Electromagnetic Hypersensitivity (EHS), a condition in which certain people seem to be especially susceptible to EMF, exhibiting a wide range of physical afflictions. The World Health Organization (WHO) has issued documents on the topic, including recitations of a number of studies which had been conducted on individuals claiming to suffer from EHS. The studies typically attempted to elicit symptoms under controlled laboratory conditions. The WHO concluded that the symptoms experienced by those who have been described as being hypersensitive were not correlated with EMF exposure, and therefore there was no scientific basis to link EHS symptoms to EMF exposure. It suggested that symptoms experienced by some EHS individuals might arise from environmental factors unrelated to EMF or that the symptoms may be due to pre-existing psychiatric conditions or stress reactions resulting from worrying about EMF health effects, rather than the EMF exposure itself. Further, scientific studies show that people who are ill are highly receptive to negative suggestion and may demonstrate a "nocebo response" as a result of these suggestions.

A few people opposed to the use of wireless technologies have made claims that EMF can be used as a weapon to cause pain, disrupt thought, or alter or control human behavior. Smart meters do not have the capabilities to do these things.

*Smart meters are designed to measure a customer's overall electricity usage and deliver that data to the utility. A meter may also offer a limited set of information to an end user if he desires. Smart meters are not intended for, are not designed to, and do not have the capability to harm an individual or direct a person's thoughts or actions.*

This page was intentionally left blank.

# Introduction

Some members of the public have expressed concerns over the possible health effects from exposure to electromagnetic fields (EMF) emitted by advanced meters that transmit data wirelessly (smart meters).  People have stated their concerns in public forums hosted by the Public Utility Commission of Texas (PUCT) or submitted written comments to the agency.  The comments are available on the PUC's website under project 40190.[2]  Citizens have also appeared before the Texas Senate Committee on Business and Commerce[3] to make statements.  This report is intended to inform decision makers and other parties interested in the topic.

*Decades of scientific research have not provided any proven or unambiguous biological effects from exposure to low-level radio frequency signals.  In reviewing all available material, Staff found no credible evidence to suggest that smart meters emit harmful amounts of EMF.*

This paper begins by explaining radiation which is a word that has several meanings.  This document explains the distinction between ionizing and non-ionizing radiation.   Also discussed are some fundamental characteristics of radio-frequency EMF (RF EMF) which is the non-ionizing form of radiation utilized by almost all wireless forms of telecommunication and by smart meters that send data through the air.

Because properly understanding radiation and health depends upon understanding the foundations of science, this paper explains the scientific method and outlines what constitutes valid science.  Some people have claimed that they can make scientific arguments against the use of wireless communications technology, or describe what they view as its egregious hazards, or produce evidence of harm.  This document provides guidance when considering such assertions.

As new technologies continue to pervade our lives, matters of science are addressed more often by our legal system.  Public policy must also address technology, and those who craft laws and regulations often rely on external sources to provide subject matter expertise in matters of science, including medicine.  This was true for the California Public Utilities Commission (CPUC).   CPUC asked the California Council on Science and Technology (CCST) to analyze submittals made by various experts in science and medicine regarding RF EMF.

CPUC received comments that were critical of the CCST report.  Various parties responded in defense of the conclusions of the CCST report.  This paper summarizes the CCST report, some of the reply comments, and responses to those comments.  Staff found the CCST conclusions to be based on sound scientific principles.

Several entities, such as the Electric Power Research Institute (EPRI), have measured the level of RF EMF exposure one would receive from smart meters.  This report summarizes the findings of the EPRI investigations as well as those performed by other organizations.

This paper discusses standards for human exposure to EMF and regulations that govern devices which emit EMF.  This report provides statements from health agencies of several countries and those made by academia regarding human exposure to RF EMF.  This document concludes with a discussion about a purported medical condition called electromagnetic hypersensitivity and the notion of using EMF as a weapon.  A chart of acronyms and abbreviations follows, along with an alphabetized list of references and resources.

---

2

<http://interchange.puc.texas.gov/WebApp/Interchange/application/dbapps/filings/pgControl.asp?TXT_UTILITY_TYPE=A&TXT_CNTRL_NO=40190>.

3 <http://bandc.posterous.com/updated-october-9-2012-agenda-with-links-57790>.

# The Science

## Background – Radiation, Science

The fear of things that cannot be seen is innate to human beings. Imagine being dropped off alone in a forest in the middle of the night, with no moon to light the way. Are there venomous snakes or scorpions underfoot? Are there other unseen threats nearby? RF EMF is also invisible, so some people may be predisposed to feeling anxious about it.

Fear of the unknown is also common, and to some people, the notion of wireless communications technology is new, or something with which they have no experience. To make matters worse, wireless technology is a form of electromagnetic radiation (EMR), and the term "radiation" is rather ambiguous and commonly misunderstood. Exposure to radiation has been traditionally associated with chronic illnesses (specifically cancer) and death. Lastly, microwave ovens use EMR to cook food and boil water; knowing this, some people may imagine themselves being cooked or boiled alive if exposed to EMR.

### Radiation

Radiation can be characterized as energetic particles or waves traveling through matter or space. Radiation can come from natural or man-made sources. For this report, it is important to first know that there are two types of radiation: ionizing and non-ionizing. Making the distinction is crucial because the word "radiation" on its own can evoke images of the victims of the atom bomb or the outcomes of the Chernobyl and Fukushima Daiichi disasters, when in fact the many forms of radiation we encounter in our daily lives are inert.

#### Ionizing Radiation

Ionizing radiation can come in one of two forms: particulate (e.g. neutron, alpha, or beta particles) or electromagnetic (e.g. gamma, cosmic, or X- rays). Ionizing radiation has such a high energy level that when it hits an atom, typically an electron is stripped away or dislodged from the shell of the atom. This changes the properties of the atom – leaving it with a net positive charge. Note that the high energy level of ionizing radiation is basic to its nature, and distinct from what its *intensity* may be in any given instance.

Ionizing radiation is generally harmful and potentially lethal because it can alter the molecules in living organisms, such as the genetic material of cells. If the genetic material of a cell is altered, it may lead to death of the cell or to cell mutation.

Ionizing radiation can come from outer space or from naturally occurring materials in the terrestrial environment, such as uranium or radon gas. Ionizing radiation can also be introduced into the environment from human activities like nuclear power production, medical and industrial uses, the transportation of radioactive material, mining, and by drilling for oil and gas. *Note that smart meters do not produce or use ionizing radiation.*

#### Non-Ionizing Radiation

In contrast, the waves of non-ionizing radiation inherently do not possess enough energy to displace electrons from the shell of an electron. Non-ionizing radiation may cause excitation of an electron, moving it to a higher energy state, but not stripping it away.

Electromagnetic radiation whose frequency is between that of extremely low frequency radiation and ultraviolet light is considered non-ionizing radiation. The radio emissions from cell phones, smart meters, and other forms of wireless communication lie between these two extremes. Therefore, radio communication from a smart meter is a form of non-ionizing radiation.

*Electromagnetic Spectrum*

The various forms of radiation, whether ionizing or non-ionizing, lie on a continuum called the electromagnetic spectrum, as seen in Figure 1. Smart meters that communicate wirelessly use frequencies that are between the frequencies of UHF television channels and those of mobile phones (somewhere between 900 MHz and 2.4 GHz), depending on the wireless technology (or technologies) the meters employ.

Figure 2 shows some of the chart's information in a tabular format. The frequency range in which wireless smart meters transmit data has been emphasized in that figure.

Note that the Public Utility Commission of Texas addressed potential health effects of extremely low frequency (60 Hz) electric power at very high voltages and currents, as is conducted in transmission lines. That report, issued in 1992, was entitled "Executive Summary: Health Effects of Exposure to Powerline-Frequency Electric and Magnetic Fields." The considerations being addressed in this *Health and RF EMF from Smart Meters* report are substantially different from those contemplated in 1992.

## Figure 1: Chart of the Electromagnetic Spectrum[4]



---

[4] Not shown in the chart is the fact that as the frequency (Hz) of radiation increases, the "electron volt" (eV) value increases in a linear fashion. In this context, electron volts serve as a measure of how much energy the radiation carries and therefore the potential it has to excite an electron (or, if it has enough energy, dislodge it from an atom).

### Figure 2: Types of Radiation and Their Frequency Ranges

| Frequency Range | Top End of Frequency Range (in Hz) | Designation or Abbreviation | Primary Use |
|---|---|---|---|
| | | | |
| Radio.  Non-ionizing radiation. | | | |
| 3 – 30 Hz | 30 | ELF | Submarine communications |
| 30 – 300 Hz | 300 | SLF | Not commonly used; electrical power is in this range |
| 300 – 3000 Hz | 3,000 | ULF | Military communications |
| 3 – 30 kHz | 30,000 | VLF | Submarine communication |
| 30 – 300 kHz | 300,000 | LF | Military, AM radio |
| 300 kHz – 3 MHz | 3 million | MF | AM radio, shortwave radio |
| 3 – 30 MHz | 30 million | HF | Amateur radio, CB radio, aviation radio |
| 30 – 300 MHz | 300 million | VHF | VHF TV, FM radio, amateur radio |
| *300 MHz – 3 GHz* | *3 billion* | *UHF "microwave"* | *UHF TV, land-based mobile radio, cell phones, smart meters* |
| 3 – 30 GHz | 30 billion | SHF "microwave" | WLAN, radars, industrial devices |
| 30 – 300 GHz | 300 billion | EHF "microwave" | Short range data transmission |
| | | | |
| Light.  Non-ionizing radiation. | | | |
| 300 GHz – 400 THz | 400 trillion | Infrared (IR) | TV remote controls, heat lamps |
| 400 THz – 770 THz | 770 trillion | Visible ("light") | Illumination |
| | | | |
| Ionizing radiation. | | | |
| 750 THz – 30 PHz | 30 quadrillion | Ultraviolet (UV) | Tanning beds, medical, industrial applications |
| 30 PHz – 30 EHz | 30 quintillion | X-Ray | Medicine,  scientific, and industrial uses |
| more than 15 EHz | > 15 quintillion | Gamma ray | Medicine,  scientific, and industrial uses |

***Electromagnetic Fields***

An electromagnetic field is the result of the mutual interaction of electric and magnetic fields.[5]  An electric field can be most simply described as being produced by stationary charges.  A higher voltage yields a stronger electric field.  In contrast, a magnetic field is produced by moving charges (typically electrons, i.e., an electric current).  A greater current flow yields a stronger magnetic field.

An RF electromagnetic field is an electromagnetic field that is produced by electrical current that is oscillating at a radio frequency, which is defined as a frequency between 3 cycles per second and 300 billion cycles per second.  Smart meters typically communicate with one another (or to their data concentrator) in a frequency band that is near 900 MHz.

Electromagnetic (EM) field intensity decreases greatly with distance.  There are many variables involved in precisely calculating the anticipated intensity of an EM field from a given distance.  To simplify the mathematics involved, it can be reasonably stated that the intensity of an EM wave, which is three-

---

[5] <http://www.britannica.com/EBchecked/topic/183201/electromagnetic-field>.

dimensional, decreases exponentially at a rate of approximately the square of the distance from its source. This is known as the inverse-square law,[6] expressed as a mathematical formula by:

$$Y = \frac{1}{X^2} \text{ (where } Y \text{ is the intensity and } X \text{ is relative distance).}$$

For example, if the EM intensity from a smart meter is measured to be $Y_0$ at an initial distance of 1 foot away, then $Y_1$, the field intensity from two feet away, would be $(\frac{1}{2^2})Y_0$, or $\frac{1}{4}Y_0$. From a three-foot distance, the intensity $Y_2$ will be $(\frac{1}{3^2})Y_0$, or $\frac{1}{9}Y_0$. From ten feet away, the field intensity will only be $(\frac{1}{10^2})Y_0$, or 1/100th of what it was at one foot away. Figure 3 shows how the average power density of EMF from a typical smart meter varies with distance.

Upon inspecting the graph, the power density value may appear to become zero, but in actuality it does not; the resolution of the image belies the asymptotic nature of the curve. While the power density may seem to become infinitesimal at the greater distances shown, the radio circuitry of smart meters is sensitive enough to receive and process the signal.

**Figure 3: Calculated Average Power Density vs. Distance for a Typical Smart Meter[7]**



---

[6] <http://www.osha.gov/SLTC/radiofrequencyradiation/electromagnetic_fieldmemo/electromagnetic.html#appendix_b>.
[7] Notes: The graph shows expected (calculated) values. The power density is average power density, not instantaneous; measured values will vary around a nominal value. This graph does not account for possible ground reflections, but ground reflections would not change the basic shape of the curve. Graph source: EPRI.

*EMF and RF EMF in our Environment*

Almost all household devices powered by electricity emit RF EMF in some amount. The FCC has classified devices in three categories – intentional radiators, unintentional radiators, and incidental radiators.

- Intentional radiators deliberately generate and emit RF energy. Typical intentional radiators include cordless telephones, remote control toys, garage door openers, mobile data devices such as iPads, and other low power transmitters.

- Unintentional radiators are devices that generate and use RF energy within the device but are not intended to emit RF energy. Typical unintentional radiators include devices such as personal computers, printers, automobile dashboard electronics, and other digital devices that have internal "clocks" or circuitry used for timing within the device. Radio receivers, such as television receivers and AM/FM radios, are also unintentional radiators.

- Incidental radiators are devices that generate RF energy during the course of their operation but are not intentionally designed to generate or emit that energy. Typical incidental radiators include automobile ignition systems, ceiling fans, vacuum cleaners, electric shavers, and mechanical light switches.

RF EMF also comes from natural sources, such as the sun, the Earth, and the outer layer of the Earth's atmosphere (the ionosphere).

The environment in which we live includes numerous other sources of RF EMF sourced from outside the home. These sources are intentionally transmitted and beyond an individual's control. The transmitting sources emit RF at a much greater intensity than smart meters do, and the signals permeate homes and other buildings. This RF EMF has had a ubiquitous presence both indoors and outdoors since the 1920s when AM radio broadcasts (centered near the 1 MHz frequency) were introduced. In the 1930s, FM radio (around 100 MHz) was introduced, and then in the 1940s and 1950s, the broadcasting of VHF television (50 to 200 MHz) and UHF television (400 to 900 MHz) expanded. Satellite communication started in the 1960s and is now commonplace, including for consumer use. Cellular telephone towers (base stations) have been deployed in increasing numbers since at least the 1990s; they are now considered ubiquitous.

Other sources of RF EMF one may encounter in public and private places are wireless routers, cordless telephones, cellular phones, RF remote control devices, and baby monitors. The intensity of EMF emitted by each of these devices is documented to be well below the threshold that requires any type of notification signage.[8]

*The Role of RF EMF in our Country's Infrastructure*

The United States of America (U.S.) has had a wireless communications infrastructure in place for nearly a hundred years. For example, radio and television stations have continually broadcasted their programming in all directions for public consumption since the early part of last century. Emergency services like police, fire, and ambulance services have their own dedicated radio spectrum. Municipal governments and the military also transmit data on various frequency bands assigned to them. Citizen's Band and short wave radio are used by individuals and hobbyists, but one could argue that it is also a part of our nation's communications infrastructure that benefits all, especially in times of emergency.

---

[8] <http://standards.ieee.org/findstds/standard/C95.2-1999.html>.

Satellite transmissions blanket our country from above, using various frequencies in the RF band.  Downlinks from satellites are used by the television and radio industries for delivery of syndicated programming to local stations.  Satellites also provide Internet access to users in remote areas and television programming for those without access to cable television or who seek an alternative.  They also provide subscription-based programming for SiriusXM radio, and to fulfill government functions such as transmitting climate and mapping data and Global Positioning System (GPS) locational and timing information (which is used by utilities).  The military also uses satellites for communications and surveillance.

Cell phones and their associated base stations are also a common source of EMF, having become ubiquitous worldwide; the International Telecommunication Union reported that there were six billion mobile phone subscriptions by the end of 2011, nearly one for every human being on the planet.[9]

Some people object to the installation of wireless smart meters on the grounds that they fear exposure to RF and because they do not anticipate benefitting from the devices' advanced capabilities.  What they may not realize or acknowledge is that every individual is continuously exposed to RF emitted by a multitude of local television (TV) and radio stations, irrespective of whether one ever chooses to tune into any of them.

When a new radio or TV station begins broadcasting in a community, it introduces a new source of RF to a wide area.  While the *exposure* to RF emissions is the primary consideration for the topic of this paper, some opponents of smart meters have called attention to their power output.  It is therefore worth noting that the permitted maximum effective radiated power (ERP, which includes antenna gain[10]) of an FM radio station transmitter in the U.S., depending upon its FCC classification, can be as high as 100,000 watts.[11]  In contrast, the radio module in a wireless smart meter is only capable of a maximum power output of one watt, and in some implementations, it is even less than that.  The ERP of a stationary cell phone base station is limited to either 500 or 1000 watts, depending on its location.[12]  The maximum peak ERP of a cell phone in the U.S., for example one operating in the GSM-1900 band and at GSM Power Class Number 30, is two watts.[13]

*Despite the fact that radio stations broadcast at power levels that are tens of thousands times higher than those of smart meters, Staff could not find any references to reported health complaints or individuals attributing their health issues to new radio or TV transmissions.*  Similarly, while a limited number of people may still have some trepidation regarding cellphone towers, their ubiquity and the continued popularity of cell phones and other wireless communication devices seems to have quelled the number of concerns being expressed.

Advanced Metering Infrastructure

Making prudent investments in RF communications technologies has become essential to maintaining our quality of life, and many aspects of the world's infrastructure depend upon it.  Many industries, including electrical utilities, use radio communication as an essential tool.  Until recently, utilities have traditionally limited their use of radio to telemetry, transmitting system data from distant points along the transmission portion of the electric grid.

---

[9] <http://www.itu.int/net/pressoffice/press_releases/2012/70.aspx>.
[10] In this context, this is defined by how well a transmitting antenna converts input power into radio waves headed in a specified direction.
[11] <http://www.fcc.gov/encyclopedia/fm-broadcast-station-classes-and-service-contours>.
[12] <http://www.gpo.gov/fdsys/pkg/CFR-2011-title47-vol2/xml/CFR-2011-title47-vol2-sec22-913.xml>.
[13] <http://www.radio-electronics.com/info/cellulartelecomms/gsm_technical/power-control-classes-amplifier.php>.

Now many of the electric utilities in the U.S. are enhancing the distribution portion of the electrical infrastructure by modernizing its technology. One of the ways electrical utilities are upgrading distribution grid technology is by replacing existing electric meters with Advanced Metering Infrastructure (AMI). The meters being replaced typically have an analog display[14] in the form of a series of dials that indicate accumulated usage and a large spinning aluminum disk that protrudes through the face of the meter. This electromechanical technology is over a century old and has shortcomings.

The most important feature of the meters used in AMI ("smart meters") is that they measure and record usage data in regular intervals[15] and allow for two-way communications between the utility and the customer. These smart meters and their associated communication components form an infrastructure that allow utilities to overcome the old technology's limitations and is now crucial to the utility and to the energy market's proper functioning.

Almost all smart meters used in the U.S. communicate by means of wireless technology. Each utility proposes the technology it will deploy and determines how it is to be configured in order to best suit the needs of its service area. The most common method of communication chosen by Texas utilities has been in the form of a wireless mesh network.

A wireless mesh network topology allows "mesh-enabled" meters to securely route data via other nearby meters and relay devices. These meters and relay devices are connected to several other mesh-enabled devices. All these devices function as signal repeaters and relay the data to an access point. The access point device aggregates, encrypts, and conveys the data to and from the utility (this is known as the backhaul portion of the network). The access point typically uses cellular phone technology to transport this data.[16]

### Wireless Technology Standards and Regulation

Intentional radiator devices such as cordless telephones, cellular phone handsets, and smart meters operate in unlicensed spectrum. Unlicensed spectrum is simply a band that has pre-defined rules for both the hardware and the deployment methods of the transmitting radio; they are required to be tested and certified as compliant with these rules before they can be marketed. Financial penalties can be assessed if one does not comply with the appropriate Federal Communications Commission (FCC) equipment authorization procedure.[17] The mitigation of potential interference within the bands is addressed by the FCC definition of technical rules rather than the agency restricting the bands by issuing an exclusive license to use the spectrum.[18,19]

Any person or entity that complies with the rules for the equipment (which are pre-certified by the manufacturer) and its use can establish a license-free network at any time for either private or public purposes. This is why a person can set up a wireless network at home and a utility can set up its smart meter mesh network without having to obtain a license from the FCC. The radio(s) in the smart meter is pre-certified, just as a home user's wireless router is.

---

[14] Note that not all meters being replaced have the same appearance. A few of the old meters may have digital displays and solid state circuitry, but are not considered to be AMI.

[15] Due to the limited scope of this paper, the specific market and regulatory aspects of Texas and the ERCOT market and the infrastructure design choices of each of the utilities will not be discussed.

[16] There are several possible variations to the mesh design described above. Take what is outlined here as an example.

[17] <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet63/oet63rev.pdf>.

[18] <http://www.wimax.com/wimax-regulatory/what-is-unlicensed-spectrum-what-frequencies-are-they-in>.

[19] U.S. frequency allocations: <http://www.ntia.doc.gov/files/ntia/publications/spectrum_wall_chart_aug2011.pdf>.

The FCC is required by the National Environmental Policy Act of 1969 to evaluate the effect of emissions from FCC-regulated transmitters on the quality of the human environment. At the present time there is no federally-mandated RF exposure standard. However, several non-government organizations, such as the American National Standards Institute (ANSI), the Institute of Electrical and Electronics Engineers (IEEE), and the National Council on Radiation Protection and Measurements (NCRP) have issued recommendations for human exposure to RF electromagnetic fields.[20] The potential hazards associated with RF electromagnetic fields are discussed in the FCC's Office of Engineering and Technologies (OET) Bulletin No. 56, "Questions and Answers About Biological Effects and Potential Hazards of Radiofrequency Electromagnetic Fields."[21]

On August 1, 1996, the FCC adopted the NCRP's recommended MPE limits for field strength and power density for the transmitters operating at frequencies of 300 kHz to 100 GHz. In addition, the FCC adopted the Specific Absorption Rate (SAR) limits for devices operating within close proximity to the body as specified within the ANSI/IEEE C95.1-1992 guidelines.[22] The FCC's requirements are detailed in Parts 1 and 2 of the FCC's Rules and Regulations [47 C.F.R. 1.1307(b), 1.1310, 2.1091, 2.1093].[23,24,25,26]

Studies by EPRI and others have found that the exposure an individual would receive from a smart meter that is 10 feet away is not much different from the range of exposure levels received from TV and radio broadcasts.

### The Effects of RF EMF on Living Tissue

There are three scientifically established mechanisms where EMF is known to cause health effects:[27,28]

- Induced voltage gradients and/or electric currents in the body;
- Thermal effects (dielectric heating); and
- Ionizing radiation effects.

The relative importance of these mechanisms depends on the EMF frequency and field strength. Decades of research into EMF and health has produced a large body of scientific literature which national and international standards organizations have reviewed to establish their safe exposure limits. For example, the WHO has formally recognized the International Commission on Non-Ionizing Radiation Protection (ICNIRP) to develop its international EMF exposure guidelines.

At frequencies in the range of 0-3 kHz, induced voltage gradients and/or electric currents in the body are the only known health effects in the presence of strong electric and magnetic fields. Because the purpose of this report is to address smart meters that communicate using RF, induced voltages and currents will not be discussed. Smart meters do not emit ionizing radiation, so that topic will also not be covered in this document. If one would like to know more about the health effects of induced voltages or ionizing radiation, credible resources are freely available elsewhere.

---

[20] <http://transition.fcc.gov/oet/rfsafety/background.html>.

[21] <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet56/oet56e4.pdf>.

[22] <http://standards.ieee.org/findstds/standard/C95.1-2005.html>.

[23] <http://www.gpo.gov/fdsys/pkg/CFR-2011-title47-vol1/xml/CFR-2011-title47-vol1-sec1-1307.xml>.

[24] <http://www.gpo.gov/fdsys/pkg/CFR-2011-title47-vol1/xml/CFR-2011-title47-vol1-sec1-1310.xml>.

[25] <http://www.gpo.gov/fdsys/pkg/CFR-2009-title47-vol1/xml/CFR-2009-title47-vol1-sec2-1091.xml>.

[26] <http://www.gpo.gov/fdsys/pkg/CFR-2009-title47-vol1/xml/CFR-2009-title47-vol1-sec2-1093.xml>.

[27] <http://www.emfandhealth.com/EMFExplained.html>.

[28] <http://standards.ieee.org/findstds/standard/C95.6-2002.html>.

Thermal effects are the primary health impact when living tissue absorbs enough EMF power to cause heating. This effect is the primary concern in the RF frequency range of 30 MHz to 300 GHz. In theory, the total EMF power absorbed by tissue is determined by the photon energy multiplied by the number of photons per second being absorbed. The practical method used to measure this energy is based on the SAR. For portable devices, the FCC specifies that SAR safety limits are to be used.[29] These safety limits are specified in units of watts per kilogram (W/kg) of body tissue.

Note that the energy from devices that are not intended for use within 20 centimeters of a user, such as smart meters, is measured using a different methodology. The FCC safety limits for these devices, known as Maximum Permissible Exposure (MPE), are specified in units of microwatts per square centimeter ($\mu W/cm^2$).

Existing regulations from the FCC set the SAR and MPE safety limits in the U.S. Other countries such as the United Kingdom (UK), Canada, and Australia have similar standards. International standards regarding safety for commercial products also exist from entities such as the WHO and the ICNIRP and are also similar to the U.S. standards.

## The Scientific Method, the Value of Meta-analysis, Laymen Difficulties, and other Cautions

The investigation of RF EMF and its potential effects on health requires an understanding of several fields of science. While the intent of this report is not to impart a deep understanding of all the relevant scientific fields of study, it is still important to have a basic grasp on the concepts and what science itself entails. The latter is referred to as the scientific method.

Meta-analysis is an important tool in science because in some areas of study there are a large number of studies which are similar, and researchers want to have a method of combining them to help facilitate drawing satisfactory conclusions.

People generally have an interest in maintaining their health, so any given research study that shows a positive correlation between a disease and an environmental factor will naturally have the tendency to pique the interest of the public more than one that does not show any correlation. While journalists and news editors have codes of ethics and guidelines for professional conduct,[30,31,32,33] there is a risk that the mass media may sensationalize an individual study which shows such a correlation and be less inclined to report research studies that refute the findings, because documenting something which may be interpreted by an audience as uneventful is not as captivating or lucrative. Studies have revealed that the publishing of misconceptions about alleged effects of exposure to electric or magnetic fields in the popular press is not uncommon.[34,35,36,37] Some less reputable media outlets may be motivated by viewership ratings, subscription renewals, or webpage hits, rather than reporting the news properly. Integrity in the media plays a role in maintaining the integrity of scientific research.

---

[29] The FCC defines portable devices as transmitters whose radiating structures are designed to be used within 20 centimeters (approximately eight inches) of the body of the user.

[30] <http://www.rtdna.org/pages/media_items/code-of-ethics-and-professional-conduct48.php?g=36?id=48>.

[31] <http://www.apme.com/?page=EthicsStatement>.

[32] <http://asne.org/content.asp?pl=24&sl=171&contentid=171>.

[33] <http://www.spj.org/ethicscode.asp>.

[34] <http://www.dtic.mil/dtic/tr/fulltext/u2/a275434.pdf>.

[35] <http://www.jmpee.org/JMPEE_PDFs/26-4_bl/JMPEE-Vol26-Pg189-Jauchem.pdf>.

[36] <http://www.jmpee.org/JMPEE_PDFs/28-3_bl/JMPEE-Vol28-3-Pg140-Jauchem.pdf>.

[37] <http://www.jmpee.org/JMPEE_PDFs/30-3_bl/JMPEE-Vol30-Pg165-Jauchem.pdf>.

Understanding the concepts behind science is important because opponents of wireless data transmission technologies have attempted to use science (typically by quoting research studies) as support for their arguments. At the same time, one must remain mindful of the relationships among science, modern media, and the public.

### Scientific Method

The modern use of the word "science" is defined both as a reliable body of knowledge that can be logically and rationally explained and also by the method of pursuing that knowledge, namely, the scientific method. Scientific method requires inquiry to be based on evidence that is empirical and measurable and is subject to specific principles of reasoning. More specifically, the scientific method consists of systematic observation, measurement, and experiment, as well as the formulation, testing, and modification of hypotheses.[38]

The following process steps[39] are considered the basic elements of scientific method:

- Formulate a question - to summon an explanation of a specific observation, or it can be open-ended;
- Hypothesis - a conjecture that may explain the observed behavior;
- Prediction - made by determining the logical consequences of the hypothesis;
- Test - investigate (via experiment) whether the real world behaves as predicted by the hypothesis; and
- Analysis - determine what the experimental results demonstrate and decide the next actions to take.

Other components are necessary to the scientific process, even when all the iterations of the steps above have been completed:

- Replication - if an experiment is repeated and does not produce the same results, this implies that the original results were in error. As a result, it is common for a single experiment to be performed multiple times, especially when there are uncontrolled variables or other indications of experimental error. Surprising or significant results may motivate other scientists to also investigate, especially if the results would be important to their own work.
- External review - experts perform a peer review, which is an evaluation of the experiment. These experts give their opinions anonymously to foster unbiased criticism. The peer review does not certify correctness of the results, only that the experiments themselves were sound. Note that the evaluation of the experiment depends on its description being supplied by the experimenter. If the work passes peer review (which may require new experiments requested by the reviewers), it will be published in a peer-reviewed scientific journal. The journal that publishes the results indicates the perceived quality of the work.
- Data recording and sharing - scientists must record all data very precisely to reduce their own bias and aid in replication by others. This data must be supplied to other scientists who wish to replicate any results. Experimental samples that may be difficult to obtain must also be shared.

Scientific studies are intended to be as objective as possible to reduce any bias in how the results are interpreted. All data and the methodologies employed are to be documented, archived, and shared so that they are available for close scrutiny by other researchers. This gives scientists the opportunity to verify results by attempting to reproduce them and establish statistical measures of the reliability of the experimental data.

---

[38] <http://oxforddictionaries.com/definition/english/scientific%2Bmethod>.
[39] <http://en.wikipedia.org/wiki/Scientific_method>.

*Meta-analysis*

The study of EMF has been going on for decades resulting in a multitude of research studies, many of which possess similar elements. The existence of such large bodies of work makes researchers want to integrate similar studies and attempt to synthesize more definitive conclusions. The traditional method of integration calls for a reviewer to provide a narrative, namely a chronological discourse on previous findings.[40] Gene V. Glass, the statistician and researcher who coined the term meta-analysis, considered the traditional method to be flawed and inexact because reviewers:

- Are unable to deal with the large number of studies on a topic and focus on a small subset of studies, often without describing how the subset was selected;
- Often cite the conclusions of previous reviews without examining those reviews critically; and
- Are usually active and prominent in the field under review. Therefore, they might not be inclined to give full weight to evidence that is contrary to their own positions.

In a meta-analysis, research studies are collected, coded, and interpreted using statistical methods similar to those used in primary data analysis. The result is an integrated review of findings that is more objective and exact than a narrative review.

*Inherent Problems and Laymen Difficulties with Scientific Research; Non-traditional Medicine*

Science is by no means a discipline of perfection; it depends upon human thought and activity, and is thereby subject to human failings, including the introduction of bias into the process steps outlined above. Most failures can be attributed to inadvertent errors, while some failures can be pinned on researchers that have taken shortcuts through the scientific process. Only rarely have researchers who had been generally considered to be legitimate been found attempting to subvert science for personal benefit, to perhaps gain notoriety, or to secure future research grants.[41]

Findings of scientific misconduct occasionally come to light. In the course of gathering material for this paper, Staff discovered several studies of RF EMF and health that were found to be fraudulent. For example, the U.S. Department of Health and Human Services' (HHS) Office of Research Integrity found that Robert P. Liburdy, Ph.D. engaged in scientific misconduct in biomedical research by intentionally falsifying and fabricating data and claims about the purported cellular effects of EMF that were reported in two of his scientific papers.[42] Another example of misconduct was exposed through an investigation performed by an independent review body at the Medical University of Vienna. The investigation revealed that data was fabricated in two papers authored by lab chief Hugo Rüdiger and his colleagues in 2005 and 2008 which reported DNA breakage in cells exposed to electromagnetic fields. The papers were part of a European Union-funded project called REFLEX.[43]

Some people have made assertions that research studies that had depended upon funding or other support from industry should be considered as unreliable and having tainted results. What is far more important than the sources of funding for research is strict adherence to the scientific process. Rigorous peer reviews, combined with attempts by others to replicate results, tend to remove from consideration studies whose results rely on questionable research practices. Opponents of wireless technology may not understand this, and have expressed dismay when content from studies they favor does not appear in other documents such as

---

[40] <http://echo.edres.org:8080/meta>.

[41] <http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0005738>.

[42] <http://grants.nih.gov/grants/guide/notice-files/not99-111.html>.

[43] <http://www.emfandhealth.com/sciencerudigerfraud.pdf>.

the report by the California Council on Science and Technology.[44]  There is a risk that opponents may attribute the exclusion of favored material to attempts by government agencies or industry to suppress the truth rather than accepting the idea that the opponents' favored studies were errant or lacked scientific rigor.

Nonetheless, some research studies can receive undeserved notoriety despite shortcomings such as:

- Experiments that are poorly designed or lack sufficient controls;
- Studies that are inadequately peer-reviewed;
- Public revelation of findings that are only preliminary;
- Reports that are unpublished but appear in the popular press;
- Reports published in scientific journals of lesser esteem;
- Conclusions that are drawn to satisfy a political agenda rather than advance human knowledge; and
- Cited primary research studies are old and out of date.

The "BioInitiative Report"[45] is an example of a report that received notoriety despite being viewed negatively by the research community.  Its contributors are described as a group of 14 scientists, researchers, and public health policy professionals.  The stated purpose of the report was to document "bioeffects, adverse health effects and public health conclusions about impacts of non-ionizing radiation."  The document was edited by Cindy Sage, an environmental consultant, and Dr. David O. Carpenter, director of the Institute for Health and the Environment at the State University at Albany (New York).

The report is often cited by opponents of wireless technology, but it was widely criticized by government research agencies and subject matter experts in Australia,[46] Belgium,[47] the European Commission (EC),[48] France,[49] Germany,[50] and the Netherlands.[51]  It was also criticized by EPRI[52] and the IEEE.[53]  The overall opinion of these institutions was that the report had many shortcomings.  Some of the stated criticisms were that the report:

- Provided views that were not consistent with the consensus of science;
- Recommended safety limits that were not supported by the weight of scientific evidence;
- Included selection bias in several research areas;
- Lacked objectivity and balance; and
- Suffered from uneven editing quality.

Some researchers have developed a level of notoriety for their assertions regarding the purported dangers of EMF exposure.  Opponents of wireless technology have naturally called upon these people to testify as expert witnesses and this tends to raise their profiles to an even greater degree.  These efforts have not always been successful.  For example, Carpenter attempted to rely on his work on the BioInitiative Report as one of the qualifications to testify as an expert for intervenors opposed to plans by Hydro Québec, a utility in Canada, to

---

[44] <http://www.ccst.us/publications/2011/2011smart-final.pdf>.

[45] <http://www.bioinitiative.org/freeaccess/report/docs/report.pdf>.

[46] <http://www.acrbr.org.au/FAQ/ACRBR%20Bioinitiative%20Report%2018%20Dec%202008.pdf>.

[47] <http://mmfai.info/public/docs/eng/MMF_Viewpoint_BioInitiativeReport.pdf>.

[48] <http://ihcp.jrc.ec.europa.eu/our_activities/public-health/exposure_health_impact_met/emf-net/docs/efrtdocuments/EMF-NET%20Comments%20on%20the%20BioInitiative%20Report%2030OCT2007.pdf>.

[49] <http://www.afsset.fr/upload/bibliotheque/96473798227921471984690199381/Rapport_RF_20_151009_l.pdf>.

[50] <http://www.emf-forschungsprogramm.de/int_forschung/wirk_mensch_tier/Synopse_EMFStudien_2008.pdf>.

[51] <http://www.gezondheidsraad.nl/sites/default/files/200817E_0.pdf>.

[52] <http://emf.epri.com/BioInitiative_Working_Group_Report_Updated_7-09.pdf>.

[53] <http://www.emfandhealth.com/12265_COMAR_2009.pdf>.

install wireless smart meters on homes and businesses.  The regulatory authority for the province, The Québec Energy Board (The Board), stated (translated from French):[54]

> "The Board has refused to grant the requested expert status on the grounds that David Carpenter is not a doctor, never had clinical experience with patients and has never personally done any research on the effects of RF health.[55]  The Board does not, however, reject his testimony in the case because of his knowledge on the research done by others in this field.  It therefore accepted this testimony, subject to establishing the probative value to be accorded."

The Board also did not view Carpenter as independent and unbiased, as required by its rules governing the expectations of expert witnesses.  The Board stated (translated from French):[56]

> "Clearly, the witness Carpenter, expert or not, does not meet the criteria of objectivity which the Board is entitled to expect."

Another individual who has been described as an expert by opponents of wireless technology is Magda Havas, a professor at Trent University, a liberal arts institution located in Peterborough, Ontario, Canada.   Havas is not a medical doctor; she has a B.S. degree in biology and a Ph.D. in botany (the study of plant life).[57]

While not naming Havas directly, in response to her assertions against the proposed installation of Wi-Fi in several schools in Canada and the U.S., her colleagues at Trent University published a brief statement[58] in the *Peterborough Examiner* newspaper:

> On the issue of health effects of radio frequency waves, a large body of evidence now exists, and the international consensus is described in the references listed at www.trentu.ca/physics/emfrefs.pdf. Based on these considerations, we do not believe that electromagnetic waves associated with Wi-Fi in schools pose a health risk to children or teachers.
>
> > Profs Bill Atkinson, Peter Dawson, David Patton, Ralph Shiell, Alan Slavin and Rachel Wortis
> > Members of the Department of Physics, Trent University

Havas' critics are not limited to her colleagues at Trent.  There are a few websites whose stated goals are to enhance the public's familiarity with sound scientific concepts.  These sites state that their contributors seek to promote a better understanding of science and to help others distinguish between evidence-based science and poor science.  Some contributors have responded to Havas' activities by creating pages that are dedicated to exposing and explaining what they claim to be significant flaws in her studies, contradictory statements she has made, comments which were not consistent with established facts, and instances where they claim she had misled the public.[59,60,61,62,63,64,65]

---

[54] <http://internet.regie-energie.qc.ca/Depot/Projets/111/Documents/R-3770-2011-A-0163-DEC-DEC-2012_10_05.pdf>.

[55] David O. Carpenter holds a medical degree (M.D.) from Harvard but is not accredited to practice medicine.

[56] <http://www.regie-energie.qc.ca/regie/DirectivesInstructions/Regie_RoleExperts_18juillet2011.pdf>.

[57] <http://www.magdahavas.org/dr-magda-havas-bio/>.

[58] <http://www.thepeteroroughexaminer.com/2010/10/15/physicists-see-no-danger-from-wifi-in-schools>.

[59] <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%201.html>.

[60] <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%202.html>.

[61] <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%203.html>.

[62] <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%204.html>.

[63] <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%205.html>.

[64] <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%206.html>.

Note that some of the work that Havas performs involves the study of Electromagnetic Hypersensitivity (EHS), which has not been recognized by the medical or scientific communities as a valid diagnosis.

Some scientists and medical practitioners may be valued as experts by a small segment of the population because their ideas have been proclaimed as novel or superior because they do not conform to the prevailing conclusions of the scientific or medical communities. These researchers and medical professionals may be characterized as fighting the medical or scientific establishments for the benefit of their supporters. The problem is if these maverick researchers become imbued with noble stature because of these impressions, it may put the integrity of true science and medicine at risk.

Scientists prefer to maintain cordial relationships with one another and therefore avoid using the terms "junk science" and "pseudoscience" when referring to research or unconventional medical treatments they find questionable, because these terms are considered pejorative.

While skepticism of research is central to ensuring its quality, it is important to avoid being drawn to the allure of ideas that conflict with the body of scientific evidence. Without an appreciation for the meaning and value of scientific consensus, one risks being distracted by notions that have been discounted by numerous studies conducted in adherence to the scientific method.

Scientific consensus can be described as the collective judgment, position, and opinion of the community of scientists in a particular field of study.[66] In the context of scientific research, consensus is general agreement and not unanimity, which has a stricter meaning. This collective judgment of scientists cannot be used as a valid scientific argument on its own, and that it is not part of the scientific method; it is more the *result* of it.

A consensus can be developed by scientists through replication of experimental results, peer review, and publication of results – key components of the scientific method. When this process is followed iteratively and agreement exists, those within the discipline recognize they have reached a consensus. As scientific research continues and new data is produced by experiment, models are refined. This change may bring about shifts in scientific consensus. How consensus within the scientific community develops over time is a study in its own right.[67]

The challenge for researchers becomes communicating to outsiders (especially laymen) that scientific consensus has been reached. This is because to the uninitiated, the debates through which science progresses may seem to be contestation. Laypeople and others outside the particular field of study who misinterpret these scientific debates as adversarial may reach erroneous conclusions about the science. When scientific debate is misinterpreted in this manner, effective government also may be subject to risk. The risk is that members of the public that have misconceptions about the existence of scientific consensus may exert pressure on their elected leaders to devise public policy that is based on faulty assumptions.

In medicine, one result of misinterpreting scientific debate can be a mistaken belief in a medical diagnosis that the scientific community does not recognize as valid, such as EHS. If the true cause of an affliction is not diagnosed, it can lead to negative consequences for an individual. Medical professionals and others may offer treatments that are not efficacious or have not been properly vetted for safety. The pursuit of these treatments can delay receiving effective medical care.

---

[65] <http://www.sciencebasedmedicine.org/index.php/cfls-dirty-electricity-and-bad-science/>.
[66] <http://en.wikipedia.org/wiki/Scientific_consensus>.
[67] <http://asr.sagepub.com/content/75/6/817.full.pdf+html>.

The Internet offers amulets made of crystal or stone, typically worn as a pendant around the neck, that are purported to help an individual overcome EHS or to mitigate the claimed negative health effects of exposure to EMF. No valid scientific explanations are offered to explain the mechanisms by which these items may operate. Dietary supplements are promoted with claims they provide a "strong protective effect" against EMF but have not been assessed by the U.S. Food and Drug Administration (FDA) for safety or effectiveness.

Some physicians offer treatments for EHS and other purported "environmental sensitivities." One such doctor is Dr. William J. Rea of Dallas, Texas. An example treatment by Rea is that he will administer injections of a highly diluted solution of automobile exhaust to provide an "electromagnetic imprint" of the environmental pollutant. Rea claims that a patient's immune system will interact with the injections and desensitize the patient to the substance.

Staff has not been able to locate any other references to the term "electromagnetic imprint" in a medical context.

Rea's treatments had met with controversy, leading the Texas Medical Board to file a complaint against him[68,69,70] that resulted in a Mediated Agreed Order issued in 2010, requiring his consent form to state:

- The injections given are not FDA-approved;
- The patient will be receiving non-traditional medicine (must be in bold and oversized print);
- The effectiveness of the injections is disputed;
- There has been no testing of the contents of the injection or any proven medical effectiveness;
- The therapeutic value of the injections is not established or proven;
- There is no active agent in the therapy being provided; and
- The injections are not endorsed, sanctioned, or approved by the Texas Medical Board.

Rea's controversial treatments were also featured on a segment of ABC News' *Nightline* television program in 2008.[71,72]

Rea appeared before the Texas Senate Committee on Business and Commerce on October 9, 2012 to speak as a medical expert in opposition to wireless smart meters.

***Cautions about Anecdotes, Attempts at "Do-it-Yourself" Science, and Reliance on Social Media and Blogs***

Opponents of smart meters have provided accounts of ill health or have cited anecdotal reports of health problems that have been attributed by laypeople to the installation of smart meters. Caution must be used when considering anecdotal reports, because they:

- Are prone to human cognitive biases such as confirmation bias;[73]
- Use nonprobability sampling and therefore suffer from self-selection bias;[74]

---

[68] <http://www.casewatch.org/board/med/rea/order.shtml>.
[69] <http://www.med.ohio.gov/pdf/Minutes/2011/08-11minutes.pdf>.
[70] <http://www.tmb.state.tx.us/news/press/2010/090210.php>.
[71] <http://abcnews.go.com/Nightline/video?id=5881281>.
[72] <http://www.youtube.com/watch?v=-gx4zxxi0xQ>.
[73] In psychology and cognitive science, confirmation bias is a tendency to search for or interpret information in a way that confirms one's preconceptions, leading to statistical errors. Source: <http://www.sciencedaily.com/articles/c/confirmation_bias.htm>.

- Do not supply a sufficiently large sample size;
- Prevent a rigorous statistical analysis of subject sample data;
- Do not account for a myriad of variables present in the environment (lack of controls); and
- Do not provide evidence that other aspects of the scientific method were followed.

In summary, conclusions drawn primarily from anecdotal reports do not possess scientific merit.

A common tendency for laypeople is to "cherry pick" scientific literature. Cherry picking is the act of pointing to data or individual cases that seem to confirm a particular position, while ignoring a significant portion of data or cases that may contradict the position. Selectively referencing only the studies that support a view is a common example of confirmation bias. Cherry picking may be committed unintentionally. Scientists are not immune to the behavior.

When raising concerns about wireless technology, some opponents have acquired RF EMF measurement equipment and posted online videos[75] showing readings being taken from smart meter installations. These videos have been presented as evidence that the smart meters were emitting RF EMF at levels higher than those claimed by utilities or meter manufacturers. More discerning viewers may question the validity of these videos for the following reasons:

- The videos tend to be brief, relying on fleeting numbers displayed on a readout;
- The data do not appear to be recorded for later study or shared with others;
- No evidence is provided that the operator is certified to use the measuring equipment;
- It is not noted whether the operator received any formal training to avoid, for example, using improper techniques when setting up or handling the equipment;
- Little explanation is offered to help the viewer determine if the appropriate settings were used (such as unit scaling) or whether instantaneous peak or average values were being measured;
- No evidence is given that the equipment was properly calibrated; and
- There may be other tools available which are better suited to the intended use.

One video[76] on YouTube that provides an example of an EMF measurement device being used purports to show the deleterious effects of a smart meter on a shrub situated directly in front of the meter in Stratford, Ontario, Canada. On the afflicted plant, the leaves have curled up and are losing color. There are two shrubs of identical breed on either side of it which do not seem to be as adversely affected. While a shrub is clearly not a human being, some smart meter opponents refer to the video as evidence of its apparent danger to all living things.

The person who recorded the video enabled the "audio analysis" mode on the measurement device, which creates a shrill sound reminiscent of a police siren but with varying pitch. The sound is intended to represent a characteristic signal pattern of the EMF being detected, which helps the device's user to identify the source of emissions. To an individual who has not experienced the operation of this device, the sound it makes in the presence of EMF may seem disturbing and evoke an unpleasant emotional response in the uninitiated.

---

[74] Self-selection bias is a specific form of selection bias. Selection bias leads to distortions, because certain characteristics are over-represented in a sample. Self-selection bias introduces other errors. For example, sample populations that are the result of self-selection suffer from a correlation with willingness to be included. There may be a purposeful intent on the part of respondents.

[75] Go to YouTube: <http://www.youtube.com> and search for "smart meter emissions" or other similar phrases.

[76] <http://www.youtube.com/watch?v=lsuP_WBBr2c>.

An interesting observation about this video which some viewers may not notice is that as the camera focuses closely on the vegetation, it is readily apparent that the shrub is infested by what appears to be a large number whiteflies or aphids.  These kinds of insects suck juices from the leaves of host plants, and can lead to serious injury, causing wilting, yellowing, leaf drop, and possibly death.  As the video camera pans back and forth, one can see that the insects are also on the leaves of the adjacent shrubs, but are not yet as prevalent.  The ability for viewers to provide comment is disabled for this particular video, so no one can call attention to the insect infestation or challenge the claims made by the person who posted the video.

The Texas A&M Forest Service estimated that 301 million trees had died across Texas forestlands as a result of the 2011 drought,[77] but to date there have been no known credible reports of dying vegetation attributed to smart meters or other wireless equipment despite the fact that millions of the devices have been deployed in the state.

Many smart meter opponents who have made assertions about the purported detrimental health effects of wireless technology have cited material obtained from blogs,[78] Internet videos, and other forms of social media as sources of information.  Blogs may contain items that are topical but they are not to be confused with news sites; contributors to blogs are not held to standards for journalistic integrity.  Most of the cited blogs are run by self-described activists who overtly state their opposition to smart meters and for various reasons.  While blogs and social media sites have democratized the Internet, enabling almost anyone to widely publish his points of view, caution must be used when considering material obtained from such sources.  These sites have many shortcomings, including the following:

- Site content is not vetted for objectivity or a diversity of opinions;
- Inaccurate reporting is common, and errors are rarely corrected;
- Many comments are written in an authoritative manner, promoting speculative statements as factual;
- Provocative language and hyperbole are often used to elicit emotional responses;
- Individuals promoted as experts tend to lack substantial academic credentials or possess credentials that are not associated with the field of study under consideration; and
- There is no assurance that authors resist the influence of advertisers or special interests.

The people who run blogs typically are not scientists and do not realize that an individual study is not to be considered definitive.  Much of the research that Staff found cited on blogs was old and may have been out of date, or had been considered unreliable by the scientific community.

### Case Law and Matters of Science

The Supreme Court cases *Daubert v. Merrell Dow Pharmaceuticals,*[79] *General Electric Co. v. Joiner*,[80] and *Kumho Tire Co. v. Carmichael*[81] articulated what is known as the "Daubert standard."  The standard addressed Rule 702 of the Federal Rules of Evidence,[82,83] and clearly defined a judge's role in playing "gatekeeper," determining whether expert testimony is based on sound scientific reasoning and methodology.

---

[77] <http://texasforestservice.tamu.edu/main/popup.aspx?id=16509>.

[78] A blog is a website that typically contains an online personal journal and that sometimes allows users to post their own opinions and commentary or other information.

[79] 509 U.S. 579 (1993).

[80] 522 U.S. 136 (1997).

[81] 526 U.S. 137 (1999).

[82] Pub. L. 93–595, §1, Jan. 2, 1975, 88 Stat. 1937; Apr. 17, 2000, eff. Dec. 1, 2000; Apr. 26, 2011, eff. Dec. 1, 2011.

[83] <http://www.law.cornell.edu/rules/fre/rule_702>.

According to Rule 702, *Testimony by Expert Witnesses,* a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

a. The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
b. The testimony is based on sufficient facts or data;
c. The testimony is the product of reliable principles and methods; and
d. The expert has reliably applied the principles and methods to the facts of the case.

In 2011, the National Academies published[84] the third edition of its *Reference Manual on Scientific Evidence*,[85] which was developed to guide judges as they encounter scientific evidence at trials. The cases are taken into consideration when government uses the "weight of evidence" to create public health policy and law.[86]
In a matter that is germane to the topic of this report, the Daubert case and the reference manual were both cited in a recent court decision in which the plaintiff claimed his exposure to low-level RF EMF emitted by electronics within his neighbor's house were triggering adverse health effects.[87] The court excluded the plaintiff's evidence because it was not scientifically reliable and consequently granted the defendant's motion for summary judgment for failing to demonstrate causation.[88]

### Public Policy

The WHO published "Establishing a Dialogue on Risks from Electromagnetic Fields,"[89] a handbook intended as a guide for decision makers and those who craft policy to help reduce misunderstandings and improve trust through better dialogue when faced with a combination of public controversy, scientific uncertainty, and the need to operate or establish infrastructure facilities that emit EMF. The guide discusses risk assessment, risk perception by the public, and risk management. The document also calls out the need for involvement by individuals or organizations with the right set of competencies. It states that a combination of relevant scientific expertise, strong communication skills, and good judgment are required by those in the areas of management and regulation to properly respond to challenges presented by the topic. The handbook also provides references and suggested reading material for those who seek more information.

---

[84] <http://www8.nationalacademies.org/onpinews/newsitem.aspx?RecordID=13163>.
[85] <http://www.nap.edu/catalog.php?record_id=13163>.
[86] <http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2004.044727>.
[87] Firstenberg v. Monribot and Leith, No. D-101-CV-2010-00029, New Mexico 1st Dist, Santa Fe County, Sept 18, 2012.
[88] <http://www.casewatch.org/civil/firstenburg/dismissal_order.pdf>.
[89] <http://www.who.int/peh-emf/publications/EMF_Risk_ALL.pdf>.

# Recent Studies and Expert Opinions

## *California Council on Science and Technology Report and Responses*

In 2010, the CPUC initiated an investigation of smart meters. Several members of the California State Assembly asked the California Council on Science and Technology to provide assistance to the CPUC.

CCST is an independent, not-for-profit 501(c)(3) corporation established in 1988 by the California legislature. It is designed to offer expert advice to the state government and to recommend solutions to science- and technology-related policy issues. CCST's Board of Directors is composed of representatives from its sponsoring academic institutions, as well as the business and philanthropic communities.[90]

The Assembly's request to provide assistance was motivated by concerns expressed by the public about the possibility of health effects from exposure to RF EMF emitted by smart meters. In January 2011, CCST issued "Health Impacts of Radio Frequency from Smart Meters." The document was authored by a project team that consulted with over two dozen experts and sifted through more than one hundred articles and reports which CCST considered as providing a thorough, unbiased overview in a relatively rapid manner. The report identified four key findings: [91]

1. Wireless smart meters, when installed and properly maintained, result in much lower levels of RF exposure than many existing common household electronic devices, particularly cell phones and microwave ovens.
2. The current FCC standard[92,93,94] provides an adequate safety factor against known thermally induced health impacts of existing common household electronic devices and smart meters.
3. To date, scientific studies have not identified or confirmed negative health effects from potential non-thermal impacts of RF emissions such as those produced by existing common household electronic devices and smart meters.
4. Not enough is currently known about potential non-thermal impacts of radio frequency emissions to identify or recommend additional standards for such impacts.

CCST did not undertake primary research of its own to address issues. Its response was limited to soliciting input from technical experts and to reviewing and evaluating available information from past and current research about health impacts of RF emitted by electric appliances in general, and more specifically by smart meters.

### Response to CCST Report: County of Santa Cruz Health Services Agency

Following the release of the CCST report, Poki Stewart Namkung, Health Officer of the County of Santa Cruz Health Services Agency (Santa Cruz), issued a memorandum. The memo was published on January 13, 2012 and is entitled "Health Risks Associated with Smart Meters."[95] The document has gained notoriety for two reasons. The first reason is because it made assertions that were in direct opposition to the CCST report's key

---

[90] <http://www.ccst.us/about.php>.

[91] <http://www.ccst.us/publications/2011/2011smart-final.pdf>.

[92] <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet65/oet65.pdf>.

[93] <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet56/oet56e4.pdf>.

[94] <http://www.gpo.gov/fdsys/pkg/CFR-2011-title47-vol1/xml/CFR-2011-title47-vol1-sec1-1310.xml>.

[95] <http://www.santacruzhealth.org/pdf/2012%20Report%20on%20SmartMeters.pdf>.

findings.  The second reason is because the assertions made in the Santa Cruz memo have been used by some smart meter detractors to justify calls for a moratorium on installation of the devices.

The Santa Cruz memo stated that CCST's report did not account for the frequency of transmissions, any reflections of the emissions, banks of smart meters firing simultaneously, or distances closer than three feet. The memo also asserted that smart meters would emit RF EMF almost continuously and that it would not be possible to program them to not operate at 100% of a duty cycle (on continuously).  It stated that because of these factors, one could not claim that Smart Meters do not exceed the time-averaged MPE limit adopted by the FCC.

The Santa Cruz memo also stated that RF EMF exposure is additive[96] and consumers may have already increased their exposures to RF EMF emissions in the home through the voluntary use of RF emitting devices.

## Michigan Public Service Commission: SGTAP Assessment of Santa Cruz Memo

On March 20, 2012, the Michigan Public Service Commission (MPSC) asked the Smart Grid Technical Advisory Project (SGTAP) to review the Santa Cruz memorandum.  SGTAP is located at the Lawrence Berkeley National Laboratory (LBNL) and provides technical assistance and training to state regulatory commissions on topics related to smart grid.  Primary SGTAP contributors are Roger Levy, a Research Specialist and owner of Levy Associates, and Janie Page, a Science/Engineering Associate at LBNL and the former Managing Editor at Bioelectromagnetics Society.  SGTAP's response provided an analysis[97] of the Santa Cruz memo and called its accuracy and substance into question.

SGTAP noted the following:

1. The Santa Cruz memo made statements that were technically and scientifically incorrect and not supported by any research.
2. The memo did not appear to provide a balanced representation of the research, the risks, or the mitigation options.
3. The memo was instead largely focused on scientifically unsupported claims related to EHS.
4. Only half of the memo's citations met the peer review criteria that Santa Cruz itself had identified as necessary to be considered as a valid source.
5. Out of the remaining references, half came from a single issue of the journal Pathophysiology,[98] which would only provide a limited acknowledgement to other relevant health, scientific, or industry sources. By relying so much on the journal, Santa Cruz denied exposing itself to a diversity of sources.

Finally, SGTAP noted that science can work toward understanding the causes of any health effects if and when they are observed, but it has never been able to categorically declare *anything* as being completely safe.

### SGTAP Comments on Hirsch Document

SGTAP pointed out that the Santa Cruz memo had referred to a five-page document authored by Daniel Hirsch, a lecturer on Nuclear Policy at the University of California, Santa Cruz.  This is notable because Hirsch had critiqued the CCST report and opponents of smart meters have cited Hirsch's document as support for their argument.

---

[96] Note that the letter stated *additive* not *cumulative*.
[97] <http://eetd.lbl.gov/ea/ems/reports/schsa-042012.pdf>.
[98] <http://www.sciencedirect.com/science/journal/09284680/16/2-3>.

SGTAP concluded that:

1. The Hirsch document was not a formal report. It was a private submittal to the CPUC that did not meet Santa Cruz's own standards for consideration.
2. The educational and professional credentials of neither Hirsch nor his assistants could be identified which may have qualified them to profess expertise on EMF radiation, health, or smart meter operations.
3. The Hirsch document was severely flawed in several respects:
   a. It made arbitrary assumptions;
   b. It changed results that had been independently measured for some RF EMF emitting devices to levels that are not physically possible; and
   c. It further inflated figures that already had been overstated in the CCST report.

EPRI also published a paper critical of the Santa Cruz memo. EPRI's comments will be discussed later in this report.

## Michigan Public Service Commission: SGTAP Assessment of AAEM Submittal

On April 12, 2012, the American Academy of Environmental Medicine (AAEM)[99] submitted a letter[100] to the MPSC in opposition to the installation of smart meters in homes and schools. According to AAEM's website, it is an international association of physicians and other professionals interested in the clinical aspects of humans and their environment. AAEM states on its site that it is interested in expanding the knowledge of interactions between human individuals and their environment, as these may be demonstrated to be reflected in their total health.

The AAEM site states that it provides research and education in the recognition, treatment and prevention of illnesses induced by exposures to biological and chemical agents encountered in air, food, and water. The certifying board for AAEM is the American Board of Environmental Medicine (ABEM), founded in 1988.[101] It is worth noting that neither AAEM nor ABEM is recognized by the American Board of Medical Specialties (ABMS).[102,103] Furthermore, the certification criteria required by ABEM are relatively sparse compared to those of ABMS. ABEM requires that an applicant have three years' experience practicing environmental medicine, take the AAEM medical instructional courses, and pass a written and an oral exam.

In contrast, the ABMS certification process involves 3-7 years of residency in the specialty, testing in the specific area of practice, a fellowship program of 1-3 years' duration and an optional subspecialty certification. In order to maintain certification the doctor is subjected to an *ongoing* peer evaluation and improvement process designed and administered by specialists in the specific area of medicine.

As a result of AAEM's letter, MPSC asked SGTAP to review the submittal. SGTAP provided a report[104] on April 18, 2012, which focused on the logical foundation of the AAEM statements and the relevance of its citations to

---

[99] <http://www.aaemonline.org/>.

[100] <http://efile.mpsc.state.mi.us/efile/docs/17000/0391.pdf>.

[101] <http://www.americanboardofenvironmentalmedicine.org>.

[102] <http://www.abms.org/Who_We_Help/Physicians/specialties.aspx>.

[103] The ABMS was established in 1933, and is composed of approved medical boards which represent 24 broad areas of specialty medicine. ABMS is the largest physician-led specialty certification organization in the U.S. The American Medical Association's Council on Medical Education plays a significant role in ABMS.

[104] <http://eetd.lbl.gov/ea/emp/reports/aaem-042012.pdf>.

the smart meter issues.  SGTAP did not comment on the technical merits of the individual research citations in the AAEM letter.

The SGTAP assessment found the following four aspects of the AAEM submittal to be problematic:

1. AAEM's assertion that research established causality of non-thermal effects;
2. The AAEM research citations and references were unrelated to smart meters;
3. AAEM's claims of electromagnetic hypersensitivity; and
4. AAEM's statements about the RF environment.

The following items provide detail on SGTAP's findings.

***Aspect 1: SGTAP's Findings on AAEM's Assertion of Non-thermal Effects Causality***

When considering the purported causality of non-thermal effects, recall that RF represents an extremely wide range of radio waves from 3 kHz to 300 GHz that spans eight orders of magnitude.[105]  SGTAP stated that the RF EMF range cannot be generalized down to a single signal and that RF EMF is distinguished by a variety of independent characteristics, including frequency and intensity.

SGTAP pointed out that existing research has emphasized the unique characteristics and potential differences in effects from various RF EMF signals and sources.  Thus, SGTAP concluded, an RF EMF effect reported at one frequency from one source cannot be presumed to imply an effect at another frequency from a completely different source.

The thermal effects observed as a result of exposure to RF EMF emissions at lower intensities are due to known mechanisms and could imply larger effects at a higher intensity.

Non-thermal effects are different because they appear to be related to distinct characteristics of the biological system being exposed and that symptoms or effects appear at specific frequencies or at distinct combinations of fields but not at others.  Because there are no identified clear mechanisms for non-thermal RF EMF effects, there is no basis for someone to extrapolate observed non-thermal effects from one RF EMF source to another.

The AAEM submittal referred to the nine "Hill Criteria"[106] and the results of research studies which AAEM had extended to smart meters.  Note that the criteria are most often used for assessing evidence of causation in epidemiological studies to test whether a particular agent is the cause of a selected effect.  The criteria are typically employed when it is difficult to establish controls for all experimental variables.  Using the criteria in research requires one to infer the causative agents from observational data.

SGTAP pointed out that inference is not proof and stated that the criteria cannot be applied when there are no research-related observational results.  SGTAP concluded that it is not appropriate to presume an effect when the RF EMF sources differed in frequency, intensity, and proximity to critical biological tissues.  Table 1 was included in the SGTAP report and addresses each criterion in relation to cell phones and smart meters. Reviewing the assessment of these criteria, it appears that the criteria have not been satisfied for cell phones, but it is quite obvious that the Hill criteria have not been satisfied for smart meters.  No matter how well the criteria may or may not have been satisfied for cell phones, the significant differences between the two

---

[105] An order of magnitude is a Power of Ten, so eight orders of magnitude would be $10^8$, or a 1 followed by eight zeroes (100,000,000).
[106] <http://www.edwardtufte.com/tufte/hill>.

technologies and the absence of research that specifically addresses smart meter operating characteristics make any attempt to assess smart meters using Hill's criteria moot.

**Table 1: SGTAP Assessment Using Hill Criteria**

| Hill Criteria | Cell phones | Smart Meters |
|---|---|---|
| **Strength**: How large is the effect? | No widespread disease has yet been reported. | No published, peer-reviewed, scientific research at this time. |
| **Consistency**: Has the same association been observed by others, in different populations, using a different method? | Limited evidence from INTERPHONE study,[107] interpreted differently by different researchers. Opponents of smart meters focus strictly on Hardell's positive results without acknowledging the other results in the INTERPHONE study. | No published, peer-reviewed, scientific research at this time.[108] |
| **Specificity**: Does altering only the cause alter the effect? | A variety of studies has looked at changes in experimental setup to alter the source or size of the exposure with compelling results, most of which are related to distinct endpoints (e.g. oxidative stress markers and pathological changes in brain tissue in AAEM citation 16) | No published, peer-reviewed, scientific research at this time. |
| **Temporality**: Does the cause precede the effect? | Hard to discern in some epidemiology studies because hard to know state of individuals prior to study. Generally well controlled in lab studies. | No published, peer-reviewed, scientific research at this time, although some people claim a particular set of symptoms arise shortly after meters are installed. |
| **Biological gradient**: Is there a dose response? | Intensity of fields is often assumed as dose in a thermal model. For non-thermal effects, these criteria may not apply until we have a better understanding of dose. | No published, peer-reviewed, scientific research at this time. |
| **Plausibility**: Does it make sense? (Hill noted that knowledge of the mechanism is limited by current knowledge). | Mechanisms have not been well developed other than heating processes, where it is assumed that energy accumulates until dissipated. | No published, peer-reviewed, scientific research at this time. |

---

[107] <http://ije.oxfordjournals.org/content/39/3/675.full.pdf>.
[108] For the purposes of the Hill criteria, reported symptoms need to be derived from well-structured research, not self-reported anecdotal reports (e.g. Internet blogs, newspaper articles, complaints/statements to regulatory commissions, etc.).

| | | |
|---|---|---|
| **Coherence**: Does the evidence fit with what is known regarding the natural history and biology of the outcome? | Limited coherence – many of the reported effects have unknown etiologies. | No published, peer-reviewed, scientific research at this time. |
| **Experiment**: Are there any clinical studies supporting the association? | There are some studies suggesting effects under certain circumstances. | No published, peer-reviewed, scientific research at this time. |
| **Analogy**: Is the observed association supported by similar associations? | Presumed to be supported by earlier (generally higher power) microwave studies. | Presumed to be supported by cell phone studies. |

*Aspect 2: SGTAP's Findings on AAEM's Research Citations and References*

SGTAP stated that the citations and references in AAEM's letter were unrelated to smart meters. Smart meters operate in the frequency range of 902 - 928 MHz, and at an intensity of less than 1 watt, but the AAEM submittal cited references in which the frequencies and exposures measured appear to be substantively different from the fields that have been measured from smart meters.

In the one study cited by AAEM that did use a frequency in proximity of the range used by smart meters, the reported Specific Absorption Rate was at much greater field strength than that of a smart meter. Also, the test subject animals' proximity to the RF EMF source most likely would have been impossible to duplicate with a normal wall-mounted smart meter.

*Aspect 3: SGTAP's Findings on AAEM's Claims of Electromagnetic Hypersensitivity*

SGTAP found two problems with AAEM's claim that EHS had been documented in controlled and double-blind[109] placebo controlled conditions and in which 100% of subjects showed reproducible reactions to a frequency to which they were supposedly most sensitive. SGTAP pointed out that disagreements to the purported reproducibility of these reactions have been documented.

SGTAP also stated that the researcher AAEM had cited claimed that the frequencies involved in living systems are so precise that even the *phase* of a frequency was significant in research results. SGTAP concluded that while AAEM may have considered its cited researcher as credible, that finding would be in direct opposition to AAEM's attempt to extrapolate results from studies that used another frequency.

SGTAP also performed a detailed meta-analysis[110] of available literature and found that there was no evidence that study participants previously described as being "hypersensitive" had an improved ability to detect RF EMF. This was further reinforced by the conclusions drawn by the World Health Organization's (WHO) examination of EHS. The organization found that well-controlled double-blind studies showed no correlation between symptoms and RF EMF exposure.

---

[109] In a double-blind experiment, neither the test subjects nor the researchers know who belongs to the control group and who belongs to the experimental group. This is done to lessen the influence of any prejudices and unintentional physical cues on the results.

[110] A meta-analysis is a "study of studies," i.e. a systematic method of evaluating statistical data based on results of several independent studies of the same problem.

SGTAP made special note of the fact that the references cited by AAEM to describe claimed sensitivities among self-identified EHS individuals were at very specific frequencies, none of which were associated with the operation of smart meters.

***Aspect 4: SGTAP's Findings on AAEM's Statements about the RF Environment***

SGTAP stated that recent measurements revealed that smart meters contribute only a small fraction of the total RF EMF emissions in a typical environment to which the general population is routinely exposed. SGTAP concluded that only a negligible reduction in total existing RF EMF exposures would result if smart meters were eliminated entirely.

## *Electric Power Research Institute*

EPRI[111] is an independent, nonprofit organization that conducts research and development relating to the generation, delivery and use of electricity for the benefit of the public. EPRI provides technology, policy, and economic analyses to promote long-range research and development planning and supports research in emerging technologies. Scientists and engineers from EPRI, along with experts from academia and industry, address the challenges of electricity including reliability, efficiency, health, safety, and the environment.

For more than 30 years, EPRI has taken an active role in characterizing electromagnetic environments associated with power frequency transmission and distribution systems. More recently, the organization has done the same with RF EMF from smart meters. In February 2010, EPRI released a brief overview on RF EMF exposure associated with smart meters entitled "A Perspective on Radio-Frequency Exposure Associated with Residential Automatic Meter Reading Technology."[112] Since that time, EPRI has performed multiple investigations on RF EMF, and the results have been shared with regulators and industry as well as with the general public in an effort to foster a common understanding of RF EMF environments.

### EPRI Technical Report on RF Emissions from Two Models of Smart Meters

EPRI has published several documents related to the RF EMF emitted by smart meters. In a December 2011 document[113], EPRI presented the results of a study by Richard Tell Associates[114] which EPRI had sponsored. Richard Tell Associates is a scientific consulting business focused on electromagnetic field exposure assessment, compliance with applicable standards and regulations on RF and power frequency fields and training related to the measurement, analysis and interpretation of electromagnetic fields.

The EPRI study was performed over a period of approximately six months during 2011 and analyzed two different wireless smart meters, a General Electric-I210 and a Landis+Gyr Focus AXR-SD, that Pacific Gas & Electric (PG&E) was in the process of deploying in its service territory. The meters contained two low power transmitters. One transmitter was 1W, to be used for communication in a mesh network, while the other was 0.1W, intended for a potential future Home Area Network (HAN). Each meter was also equipped with one of two different wireless communication packages developed by Silver Spring Networks.

The study found that the RF EMF field levels from the smart meters were below the exposure limits specified by the FCC. Furthermore, calculations determined that as the system was operating, nearly 99.9% of the

---

[111] <http://www.epri.com/>.

[112] <http://my.epri.com/portal/server.pt?Abstract_id=000000000001020798>.

[113] <http://my.epri.com/portal/server.pt?Abstract_id=000000000001021829>.

[114] <http://www.radhaz.com/>.

meters transmitted 1% or less of the time, and 99% of the meters transmitted less than 0.4% of the time. FCC exposure limits for the general public take these duty cycles[115] into account when estimating potential exposures and are based on a 30-minute average of power density across the body.

Preliminary measurements on the meters were conducted to:

- Determine the magnitude of the RF fields generated by the 1W mesh transmitter;
- Examine the meter's directional characteristics;
- Observe any unusual low frequency emissions in the 5 Hz to 100 kHz band that might be produced by the electronic circuits within the meters; and
- Measure the attenuation by a simulated stucco wall, common in many California homes.

In the next phase of the study, on-site measurements at six residential locations were conducted. This was done to determine typical indoor values of the RF EMF produced by the smart meter installed on a home. In addition, measurements were taken of the composite RF EMF environment where collections of smart meters were aggregated in a small space. This procedure was performed at three different apartment complexes, including one where 112 smart meters were collocated. Short-term duty cycles for several smart meters were also measured. Finally, the investigators took field measurements at a single data collector which gathers meter data from potentially thousands of residences.

### Calculating Smart Meter RF EMF Emission Duty Cycles

The study collected and analyzed data transmissions from 88,296 smart meters through the utility's data management system. This large sample revealed the statistical distribution of meter duty cycles and enabled the calculation of the value for time-averaged potential exposure.

The EPRI report stated that the analysis identified one meter in 88,296 that exhibited a maximum duty cycle of 13.9%. It also found that half of the meters exhibited duty cycles not exceeding 0.0465%, 99% of meters had duty cycles not exceeding 0.355%, 99.9% had duty cycles at or below 1.12%, and 99.99% of meters had maximum duty cycles of 4.53% or less. The data confirmed that smart meters, while transmitting intermittently throughout the day, create RF fields for only very small fractions of the day. For example, half of all meters would be expected to actually transmit no more than 40 seconds per 24 hour day.

### Considering the Directionality of RF EMF

The study also investigated the directional emission patterns of the meters. It found that the forward direction was strongest; rearward-directed fields were reduced by a factor of ten, and in some cases reductions of a factor of 100 were measured.[116]

### Considering Groups of Meters

EPRI's report demonstrated that groups of smart meters mounted on apartment buildings at three different locations did not result in greater peak values of RF EMF fields than those produced by an individual meter. The study did find that average field magnitudes were higher due to the operation of multiple meter

---

[115] Duty cycle is the time that the radio module in a smart meter is emitting as a fraction of the total time period being considered.
[116] To be more precise, the reductions were 10 and 20 decibels respectively.

transmitters but that higher average composite duty cycles did not change the conclusion that such exposures are compliant with the established FCC limits.

### Considering the HAN Transmitter

The HAN radio inside a smart meter is not currently implemented in PG&E's deployment, but the study found that when it was activated, the resulting EMF RF fields were substantially weaker due to their lower effective isotropic[117] radiated power (EIRP).[118] These radios also complied with the FCC exposure limits.

### Report Conclusions on RF EMF Exposure

The EPRI report concluded that individuals in smart meter-equipped homes are commonly exposed to RF EMF emissions that are orders of magnitude less than what would occur for an individual standing immediately adjacent to and in front of the meter. It stated that the measurements performed in the six subject California residences found that 99% of the measured peak values were less than 0.8% of the MPE for the general public tier, and 90% of the measured values were less than 0.1% of the MPE.

The report stated that RF EMF emissions from smart meters that transmit data wirelessly are constrained by the low power of the transmitter's power and by the antenna's gain. Estimating smart meter fields is a straightforward calculation based on the EIRP of the meter. Locations where the greatest exposure can occur warrant no special consideration of reflections.

In summary, the EPRI report stated that the smart meter emissions are minute compared to the applicable FCC exposure limits. It also concluded that the smart meters comply with the FCC MPEs whether:

- The peak measured fields are corrected for meter duty cycles;
- Spatial averaging or any other factor that reduces RF fields, such as the construction materials of homes is considered;
- The meters exist in a large group or individually; or
- Individuals are outside near the smart meter or inside their residence.

As expected, the EPRI study found that the strongest fields occurred at the closest distance that measurements were performed (one foot). Typical peak fields at this distance were found to be about 10-15% of the MPE. The study also found that time-averaged and spatially-averaged values, at this point of maximum peak field, were estimated to be at most 0.14% of the FCC MPE, depending on the activity of the meter.

## EPRI Comments on the Santa Cruz and AAEM Memoranda

EPRI also provided commentary[119] on the documents that the County of Santa Cruz Health Services Agency and AAEM had issued in response to the report from the CCST. EPRI stated that neither the Santa Cruz memo nor the AAEM document accounted for the large body of research on RF EMF that has been conducted over the past 50 years or the "weight-of-evidence" approach utilized by a large number of expert groups and panels that have convened over the years to assess the literature on RF health science.

---

[117] Isotropic means "uniform in all orientations."

[118] EIRP is the amount of power that a theoretical antenna that evenly distributes power in all directions would emit to produce the peak power density observed in the direction of maximum antenna gain.

[119] <http://my.epri.com/portal/server.pt?Abstract_id=000000000001024952>.

EPRI concluded:

> "The transmittal from the Santa Cruz County health officer reflected a misunderstanding of several terms and concepts, including some of the basic principles of how smart meters work."

### FCC RF EMF Exposure Guidelines

The 1997 FCC rule on RF EMF exposure was crafted from two earlier guidelines. The first guideline was published by the NCRP in 1986.[120] The second guideline was issued by the IEEE in 1991 and revised in 2005.[121] Before the FCC published its rule, it received endorsements from the U.S. Environmental Protection Agency (EPA), the FDA, and the U.S. Occupational Safety and Health Administration (OSHA). The EPA reaffirmed its opinion in 1999 and 2002.

Both sets of guidelines originated from an extensive review of the literature published in the fields of biology and health, regardless of whether the research had been conducted at non-thermal levels of exposure. NCRP and IEEE both concluded that the only established health effects of RF EMF were associated with tissue heating and that there were no confirmed adverse effects from RF exposure levels below an exposure threshold associated with an elevation in body temperature of about 1.8° F (1° C).

EPRI stated that since the FCC rulemaking, experts have revisited the expanding body of scientific evidence concerning potential health effects from RF EMF exposure. The conclusions were consistent with the position taken by the FCC in 1997.

Furthermore, following a comprehensive review of the scientific literature, the International Commission on Non-Ionizing Radiation Protection (ICNIRP) published exposure limits in 1998 and reaffirmed them in 2009, while the IEEE issued its exposure limits in 2005. EPRI stated that both organizations' numbers were very similar to those of the FCC.

### EPRI Addresses the WHO Classification of EMF as a 2B Carcinogen

In the spring of 2011, concerns about RF EMF exposures received significant visibility when the International Agency for Research on Cancer (IARC), a division of the WHO, published the results of its evaluation of potential cancer risks from RF exposures. The "IARC Monographs" identify environmental factors which can increase the risk of cancer in humans. These factors include chemicals, complex mixtures, occupational exposures, physical agents, biological agents, and lifestyle factors. National health agencies can use this information as scientific support for their actions to prevent exposure to potential carcinogens.[122]

According to EPRI, based on what can be considered as limited epidemiologic evidence in studies of cell phones and also limited evidence from a small fraction of all reported animal experiments, IARC classified radiofrequency electromagnetic fields as a "possible" or a Group 2B carcinogen.

To help put things into perspective, one must first understand the hierarchy of IARC categories. The categories, also known as Monograph Groups, consist of the following:

---

[120] "NCRP Report No. 86 - Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields".

[121] <http://standards.ieee.org/findstds/standard/C95.1-2005.html>.

[122] <http://monographs.iarc.fr/>.

- Group 1: Carcinogenic to Humans (i.e., sufficient evidence);
- Group 2A: Probably Carcinogenic (less than sufficient evidence);
- Group 2B: Possibly Carcinogenic (limited evidence, less supportive evidence than 2A);
- Group 3: Not Classifiable (inadequate and/or insufficient evidence for classification).[123]

With reference to Monograph Groups 2A and 2B, IARC stated:

> "The terms probably carcinogenic and possibly carcinogenic have no quantitative significance and are used simply as descriptors of different levels of evidence of human carcinogenicity, with probably carcinogenic signifying a higher level of evidence than possibly carcinogenic."[124]

EPRI stated that the IARC 2B classification of RF EMF provides for a range of qualitative interpretations concerning its potential carcinogenicity. This IARC 2B classification indicates that more research information would be required for a more definitive statement in either direction.

EPRI continued, saying that the weight of current evidence still does not provide a basis to conclude that RF EMF can be considered as being "probably" carcinogenic. EPRI also indicated that IARC has near-term plans to evaluate the potential effects of RF EMF on all health outcomes, including cancer.

### PUCT Staff's Observations on IARC 2B Carcinogens

There are over 200 substances in the IARC's 2B category, many of which have lengthy chemical names. Casual observers of such a list may become alarmed when they recognize a familiar item on it.[125]

Opponents of smart meters have noted the pending inclusion of RF EMF into the IARC 2B classification, and typically mention the pesticide DDT (dichlorodiphenyltrichloroethane) and elemental lead as also having been placed into the same classification (DDT was added in 1991, lead was added in 1987).

All this must be examined objectively and in the proper context.

Decades ago, DDT was found to have a demonstrable negative environmental impact widely viewed as outweighing its perceived benefits and found to accumulate in living tissue, leading to obvious health issues. For those reasons, it was removed from the market. Note that the potential for cancer is not why the substance was withdrawn.

Lead is also a bioaccumulative substance and has known toxic effects, such as interfering with a variety of body processes including those of the nervous system. As a result, its use has been continually reduced over the past few decades. Again, the potential for lead to cause cancer is generally not why the use of the substance has fallen out of favor.

To date, there is insufficient evidence to declare with confidence that either one of these substances is cancer-causing. Otherwise by now, one or both substances most likely would have been placed under a different IARC classification, namely one that required a higher level of evidence.

---

[123] <http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf>.
[124] <http://monographs.iarc.fr/ENG/Preamble/currentb6evalrationale0706.php>.
[125] See the References and Resources page for the entry under "Way, Tom."

In exploring comments made by some smart meter opponents filed with the Commission or found while researching the issue on the Internet, elemental lead and DDT have been mentioned in conjunction with RF EMF, but there has been no mention of the following well-known, common substances that are also included in the 2B Classification by the IARC:

- Coffee (added 1991);
- Pickled vegetables (added 1993); and
- Talc body powder (added 2010).

Lead and DDT are two substances that are widely known to cause health effects other than cancer and therefore carry with them a stigma. To mention them while excluding other substances which are both commonly used and generally considered benign, such as the ones listed above, and without the proper context, imparts a negative bias. This negative bias may prejudice the observer and alarm and confuse those who may have valid concerns about health and are attempting to understand rather complex concepts.

### EPRI Workshops on RF Emissions and Health

In 2011, EPRI hosted two workshops to discuss the IARC classification. A report on the proceedings is available to the public in a document entitled "Program on Technology Innovation: Environmental and Health Issues Related to Radiofrequency Emissions from Smart Grid Technologies - Summary of Two Workshops."[126]

The purpose of the first workshop was to more specifically identify emerging technologies within the electric utility industry whose operation would result in EMF emissions. Such emissions may be produced for purposeful reasons, namely for communications, or might be a byproduct of a technology, such as emissions from appliances powered with variable speed drives.

The second workshop was a gathering of international scientists who shared their expertise to review the most important health issues associated with RF exposure and to identify priorities for further research. This workshop covered all aspects of RF science including exposure assessment, epidemiology, laboratory studies on both animals and humans, and biophysical mechanisms.

As a result of the workshops, EPRI issued a report that functions as a backdrop for potential future research to address environmental and health issues regarding smart grid technologies. It concluded:

- Current research regarding the health implications associated with RF emissions of new technologies has focused primarily on the nearly universal use of cell phones;
- Little information concerning characterization of exposure from projected smart grid and associated technologies is currently available;
- Though no adverse effects of "non-thermal" exposures have been identified, various unresolved questions remain, including a consistent observation of slightly altered brain wave activity in human subjects exposed to radio-frequency fields under laboratory conditions; and
- That the organization was well positioned to inform and educate all stakeholders about environmental risks and risk management options associated with technology deployment and operation.

---

[126] <http://my.epri.com/portal/server.pt?Abstract_id=000000000001024737>.

*EPRI Investigations of RF EMF from Smart Meter Technology and Smart Grid Components*

In 2010, EPRI published a 222-page technical report on its investigation of a particular smart meter entitled "An Investigation of Radiofrequency Fields Associated with the Itron Smart Meter."[127]  The results indicated that RF EMF from the smart meter was well below the MPE established by the FCC.

For instance, at a distance of one foot, the RF EMF from a meter was not expected to exceed 0.8% of the MPE established by the FCC.  For the cell relay, the study found that the RF field would not exceed 0.2% of the MPE. Even at very close distances, such as one foot directly in front of the meter and making the highly unrealistic assumption that the transmitters operate at 100% duty cycle, the resulting exposure was still found to be less than the FCC MPE.

When viewed in the context of a realistic and typical exposure distance of ten feet, the RF fields were much smaller: about 0.008% for the meter and about 0.002% of MPE for the cell relay.

EPRI's study stated that for occupants of a home equipped with a smart meter, interior RF fields were expected to be less than one-tenth as intense simply due to the directional properties of the meter.  The investigation found that when a stucco[128] home's construction was included, the realistic value of the interior RF field would be attenuated to about 0.023% of the MPE for a meter and about 0.065% for a cell relay.

The investigators stated that regardless of duty cycle values for meter and cell relay meters, typical exposures that resulted from the operation of smart meters were very low and complied with scientifically-based human exposure limits by a wide margin.

EPRI also produced a brief case study in February 2011 on another smart meter with similar results under the title "Radio-Frequency Exposure Levels from Smart Meters: A Case Study of One Model."[129]  In the interest of brevity and to avoid repetition, the findings of that EPRI publication are summarized in Table 2 below.  The entire referenced document is publicly available from EPRI.

---

[127] <http://my.epri.com/portal/server.pt?Abstract_id=000000000001021126>.
[128] Stucco is a common home construction material in California, where this analysis was performed.
[129] <http://my.epri.com/portal/server.pt?Abstract_id=000000000001022270>.

| Source | Frequency | Exposure Level (mW/cm$^2$) | Distance | Time | Spatial Characteristic |
|---|---|---|---|---|---|
| Cell phone[131] | 900 MHz and 1800 MHz | 1-5 | At ear | During call | Highly localized |
| Cell phone base station | 900 MHz and 1800 MHz | 0.000005-0.002 | Tens to a few thousand feet | Constant | Relatively uniform |
| Microwave oven | 2450 MHz | ~5<br>0.05-0.2 | 2 inches<br>2 feet | During use | Localized, non-uniform |
| Local area networks[132] | 2400 MHz or 5000 MHz | 0.0002-0.001 (wireless router)<br>0.000005-0.0002 (client card) | 3 feet | Constant when nearby | Localized, non-uniform |
| Radio/TV broadcast | Wide spectrum | 0.001 (highest 1% of population)<br><br>0.000005 (50% of population) | Far from source (in most cases) | Constant | Relatively uniform |
| Smart meter[133] | 900MHz and 2400 MHz | 0.0001 (250mW, 1% duty cycle)<br>0.002 (1 W, 5% duty cycle)<br><br>0.000009 (250 mW, 1% duty cycle)<br>0.0002 (1 W, 5% duty cycle) | 3 feet<br><br><br>10 feet | When in proximity during transmission | Localized, non-uniform |

EPRI has also published a document that outlines eight projects involving the study of EMF and RF health and safety which the organization plans to perform in 2013. Most of these projects have multiple parts, several of which are expected to continue into subsequent years. The organization refers to this series of investigations and their resulting products as Program 60.[134] Its estimated funding for the program in 2013 is $5 million. Among the products to be completed in 2013 are:

- A peer review of literature regarding investigations of potential EMF/RF interference with implanted medical devices (e.g. pacemakers);
- A technical report to address emerging concerns about potential EMF effects on behavior and health of honeybees and cattle; and
- A technical update on RF exposure from wireless sources.

---

[130] FCC rule: From 300 MHz to 1500 MHz, MPE = 0.2 x f/300 mW/cm$^2$ (f is frequency in MHz); for 1500 MHz and greater, MPE = 1 mW/cm$^2$. For example, at 900 MHz MPE = 0.2 x (900/300) mW/cm$^2$ = 0.6 mW/cm$^2$. Note: Compliance for cell phones is provided by manufacturers, and expressed in terms of SAR, which cannot exceed 1.6 W/kg for any single gram of tissue.

[131] Based on a 3-inch, 250 mW antenna emitting in a cylindrical wave front.

[132] Wireless router based on a 30-100 mW isotropic emitter. Client card based on: Foster KR. 2007.

[133] Based on spatial peak power density with 6 dB (x4) antenna gain. For instantaneous power density during transmission, multiply the value for 1% duty cycle by 100, and the value for 5% duty cycle by 20.

[134] <http://mydocs.epri.com/docs/Portfolio/PDF/2013_P060.pdf>.

**EPRI Comments on Sage Report**

In January 2010, Sage Associates,[135] an environmental consulting firm whose principal is Cindy Sage,[136] issued a report entitled "Assessment of Radiofrequency Microwave Radiation Emissions from Smart Meters."[137] The report compared RF field levels of smart meters to the FCC's exposure limits and concluded that smart meters and collector meters installed in California were likely to violate the FCC limits, even under normal conditions of installation and operation. The report also compared field levels from smart meters to those from studies that reported biological and health effects.

In February 2010, EPRI addressed the research findings cited in the Sage report in a document titled "EPRI Comment: Sage Report on Radio-Frequency (RF) Exposures from Smart Meters."[138] EPRI found that:

- The Sage report misapplied the specifications in the FCC rule;
- The report findings had not been replicated or were inconsistent with the results of other studies; and
- Virtually every recent mainstream expert scientific review of the RF health literature conducted in North America and Europe either had not confirmed the effects cited in the report or found them indefinite.

## *Joint White Paper of EEI, UTC, and AEIC*

In March 2011, Edison Electric Institute (EEI), Utilities Telecom Council (UTC), and Association of Edison Illuminating Companies (AEIC) jointly issued a white paper[139] entitled "A Discussion of Smart Meters and RF Exposure Issues."

The paper discusses how the location, distance from the transmitter, shielding by meter enclosures, attenuation of building materials, direction of RF emissions, and transmit duty cycle have a significant effect on RF EMF exposure levels. It also reviews the conclusions of several Smart Meter RF studies and actual measurements of Smart Meter RF emissions. Other observations made in the paper include:

- All smart meter radio devices must be certified to the FCC's rules.
- Tests simulating multi-family metering locations containing several meters in close proximity have shown RF exposure levels dramatically less than the FCC limits.
- The FCC limits on MPE for application to the general public were set using safety factors one-fiftieth (1/50th) of the levels of known effects.
- Exposure levels drop significantly:
  - with the distance from the transmitter,
  - with spatial averaging, and
  - in living spaces due to the attenuation effects of building materials.
- Due to shielding of the meter enclosure and signal patterns, RF exposure from the rear of a metering location is nominally one-tenth of that in front of the meter and dramatically below FCC limits, not including the spatial averaging and building material attenuation reductions.

---

[135] <http://www.silcom.com/~sage/emf/index.html>.
[136] The Sage website states that Mrs. Sage has been involved in EMF issues as an environmental consultant and public policy researcher since 1982. She holds an M.A. degree in Geology and a B.A. in Biology.
[137] <http://sagereports.com/smart-meter-rf/>.
[138] <http://my.epri.com/portal/server.pt?Abstract_id=000000000001022639>.
[139] <http://www.aeic.org/meter_service/smartmetersandrf031511.pdf>.

- For measurement and calculation purposes, some studies use a 100% duty cycle. However, the maximum operational duty cycle for smart meter systems is less than 50% to prevent message traffic congestion and data packet collisions. The typical duty cycle for smart meter systems is between 1% and 5%.
- An RF exposure comparison of a person talking on a cell phone and a person three and ten feet from a continuously operating smart meter would result in smart meter RF exposure that is 0.08% - 0.8% of a cell phone.
- In test environments simulating operational conditions, for power (0.250 - 2 watts), duty cycle (2% – 5%) at close distance (one foot) from in front of the transmitter, smart meters produce very low RF exposure to the consumer. They are typically well under 10% of the FCC exposure regulations.

The paper stated that before utilities accept and deploy smart meters, the devices must meet a number of national standards and comply with state and local codes designed to ensure proper operation, functionality, and safety. Specifically, smart meters and smart meter installations are typically designed to conform with and certified to comply with:

- ANSI C12.1, 12.10, and 12.20 standards for accuracy and performance;
- National Electrical Manufacturers Association (NEMA) SG-AMI 1-2009 "Requirements for Smart Meter Upgradeability";
- FCC standards for intentional and unintentional radio emissions and safety related to RF exposure, Parts 1 and 2 of the FCC's Rules and Regulations [47 C.F.R. 1.1307(b), 1.1310, 2.1091, 2.1093];
- Local technical codes and requirements; and
- Utility-specific and customer beneficial business and technical requirements.

The paper also discusses how manufacturers conduct performance and life cycle testing for meters and for major design changes to existing meters, including hardware and firmware. Once the testing is successfully completed, components of the smart meter system are certified by a utility or a third party for production and purchase. Finally, the paper outlines the process utilities use to accept materials and to evaluate each shipment of equipment for quality and compliance to specification after certification and purchasing.

# Government and Academia

## *National Cancer Institute at the National Institutes of Health*

The National Cancer Institute (NCI)[140] was established by Congress in 1937 and is one of 27 Institutes and Centers that form the National Institutes of Health (NIH).  The NIH is one of the world's foremost medical research centers and is a part of HHS.  NIH officials reported that the agency has provided about $35 million for research on health effects of RF energy from mobile phone use from 2001 to 2011.[141]

NCI's main responsibilities include coordinating the National Cancer Program, conducting and supporting cancer research, training physicians and scientists, and disseminating information about cancer detection, diagnosis, treatment, prevention, control, palliative care, and survivorship.  Most of NCI's budget is used to fund grants and contracts to universities, medical schools, cancer centers, research laboratories, and private firms in the U.S. and about 60 other countries around the world.

One result of NCI's responsibilities to collect, analyze, and disseminate the results of cancer research conducted in the U.S. and in other countries is its webpage "Cell Phones and Cancer Risk,"[142] that concisely provides information in a Question and Answer format.  While the webpage does not explicitly address the wireless communications technologies used by smart meters, if one accepts the notion that these technologies are similar to cell phones, the page offers useful information.

Key points made by NCI:

- Cell phones emit RF energy, a form of non-ionizing EM radiation which can be absorbed by tissues closest to where the phone is held.
- The amount of RF energy to which a cell phone user is exposed depends on the technology of the phone, the distance between the phone's antenna and the user, the extent and type of use, and the user's distance from cell phone towers.
- Studies thus far have not shown a consistent link between cell phone use and cancers of the brain, nerves, or other tissues of the head or neck.  More research is needed because cell phone technology and how people use cell phones have been changing rapidly.

These conclusions were mainly based on the results of some recently published studies including one from early 2012.  NCI had reported on the results[143] indicating that while cell phone use in the U.S. had increased substantially over the period from 1992 to 2008 (from nearly zero to almost 100 percent of the population), the country's trends in glioma, the main type of brain cancer hypothesized to be related to cell phone use, did not mirror that increase.  Results of this study were published online March 8, 2012 in the British Medical Journal.[144]

The NCI statement generally agreed with its comments[145] regarding the Interphone study[146] released nearly two years prior.  The study was an international collaboration and the largest of its kind at the time which had

---

[140] <http://www.cancer.gov/cancertopics/factsheet/NCI/NCI>.

[141] <http://www.gao.gov/assets/600/592901.pdf>.

[142] <http://www.cancer.gov/cancertopics/factsheet/Risk/cellphones>.

[143] <http://www.cancer.gov/newscenter/pressreleases/2012/GliomaCellPhoneUse>.

[144] <http://www.bmj.com/content/344/bmj.e1147>.

[145] <http://www.cancer.gov/newscenter/pressreleases/2010/Interphone2010Results>.

[146] <http://ije.oxfordjournals.org/content/39/3/675.full.pdf>.

looked at both glioma and meningioma, another form of brain cancer. It was published online in the International Journal of Epidemiology on May 17, 2010.

## FCC Letter: Equipment Authorization, Exposure Limits, and Interference

The FCC is an independent U.S. government agency.[147] The agency was established by the Communications Act of 1934 and is charged with regulating interstate and international communications by radio, television, wire, satellite, and cable. Only three commissioners may be members of the same political party. None of them can have a financial interest in any Commission-related business. The commissioners supervise all FCC activities, delegating responsibilities to staff units and Bureaus.

The FCC's OET laboratory oversees the Equipment Authorization program. This program provides guidelines for the sale and use of equipment using the radio frequency spectrum. The devices subject to these rules must comply with the regulations in order to be considered as operating properly and to not create harmful interference. Subject RF devices may not be imported and/or marketed until they have demonstrated compliance with the technical standards specified by the FCC. These standards may be found in the rule section that governs the service wherein the equipment is to be operated. Financial penalties can be assessed if one does not comply with the appropriate FCC equipment authorization procedure. The Equipment Authorization procedures are publicly available for review.[148]

In March 2010, Cindy Sage sent a letter to the FCC with questions on several topics such as the agency's RF exposure limits, adjacent smart meter installations, and the potential for interference with other devices, especially medical devices. In August 2010, Julius Knapp, Chief of the FCC's Office of Engineering and Technology, responded.[149] The FCC letter explained that SAR evaluations were unnecessary with devices not held against the body and that power density (field strength) measurements were a sufficient and appropriate measure of exposure. The letter explained that FCC field strength limits and SAR limits are both time-averaged figures.

The FCC response pointed out that when the agency grants equipment authorizations (EA), it takes into account the peak power of the device because it is relevant to interference concerns. In contrast, exposure evaluations utilize maximum time-averaged power because that measurement takes into account how often a device will transmit. The purpose of a smart meter is to provide very infrequent information, so it transmits only in occasional bursts.

The FCC letter also addressed multiple adjacent smart meter installations. Since each smart meter has its own antenna, the separation distance of a person from most of the antennas is relatively large so that the potential exposure is quite small. Only one transmitter at a time can communicate with the collector to avoid the packets of data colliding with one another. Therefore, exposure from multiple signals at once does not occur. Signal strength decreases exponentially with distance, and there are additional losses of signal due to not being in the line of sight. In order for a device to be granted an EA, even banks of collocated meters must be compliant to the FCC's public exposure limits. Finally, the letter explained that auditing and review of EA grants is a routine function of the OET laboratory.

---

[147] <http://transition.fcc.gov/aboutus.html>.

[148] <http://transition.fcc.gov/oet/ea/procedures.html>.

[149] <http://www.ccst.us/projects/smart/documents/Sage_Letter_from_%20Knapp_FCC.pdf>.

The FCC letter also addressed interference with medical devices, explaining that smart meters operate under Part 15 of the FCC Rules,[150] which specify power limitations to avoid interference. It stated that certain medical devices may need special precautions in many other environments, and that these are generally considered during FDA approval of the individual medical device.

## GAO Report: Exposure and Testing Requirements for Mobile Phones Should Be Reassessed

In July 2012, the U.S. Government Accountability Office (GAO) issued a report[151] that recommended the FCC formally reassess and, if appropriate, change its current RF energy exposure limit and mobile phone testing requirements. It suggested that consideration be given to likely usage configurations, particularly when phones are held against the body. The FCC noted that it is currently considering a draft document which has the potential to address the GAO's recommendations.

The GAO also noted that international organizations have updated their exposure limit recommendation in recent years, based on new research whereas the FCC's current standards were based on research prior to 1996. The new international limit had been widely adopted by other countries, including countries in the European Union.

It is important to note that the GAO stated "*the new recommended limit could allow for more RF energy exposure* (emphasis added), but actual exposure depends on a number of factors including how the phone is held during use." Whereas one may argue that new RF exposure limits could be considered germane to smart meters (although RF emissions from smart meters are several orders of magnitude less than the exposure limit), smart meters are not in direct contact with the body.

According to the GAO report, the National Institute of Environmental Health Sciences (NIEHS), a part of the NIH, has a study underway described as "examining the toxicology and carcinogenic effects of RF energy in laboratory animals as part of the National Toxicology Program." The National Toxicology Program is an interagency program whose three core federal agencies are NIEHS, the Centers for Disease Control and Prevention's (CDC)[152] National Institute for Occupational Safety and Health (NIOSH),[153] and the FDA's National Center for Toxicological Research. Total NIH funding for the study was reported to be $25.6 million, and its estimated year of completion is 2015.

According to the GAO report, CDC officials reported that a staff member is collaborating with researchers in seven countries to conduct additional analyses on data collected through the INTERPHONE study to determine whether occupational exposure to RF energy and chemicals was a risk factor for brain cancer.[154]

---

[150] <http://www.gpo.gov/fdsys/pkg/CFR-2010-title47-vol1/xml/CFR-2010-title47-vol1-part15.xml>.

[151] <http://www.gao.gov/assets/600/592901.pdf>.

[152] The CDC states that its mission is to collaborate to create the expertise, information, and tools that people and communities need to protect their health – through health promotion, prevention of disease, injury and disability, and preparedness for new health threats.

[153] NIOSH states that its mission is to generate new knowledge in the field of occupational safety and health and to transfer that knowledge into practice for the betterment of workers.

[154] Ibid.

## *Other Governmental Jurisdictions and Agencies*

### City of Naperville, Illinois

In early 2011, some utility customers of Naperville, Illinois expressed concerns regarding the RF EMF emissions from the smart grid equipment that was being deployed for the Naperville Smart Grid Initiative (NSGI). To address the concerns, detailed RF measurements were taken from the smart grid equipment, common household devices, and the ambient Naperville RF EMF environment. Engineers from the Naperville Department of Public Utilities performed the RF testing and compared it to permissible FCC power density specifications.

This emissions testing report issued on November 10, 2011 contains the test scope, overall approach, detailed test procedures, the complete set of test data, explanations, illustrations, and conclusions.[155,156] The comprehensive testing resulted in the following key findings:

- The NSGI smart grid equipment emitted RF power densities that are well below the FCC guidelines.
- Measurements of the smart meter equipment's instantaneous or peak RF power densities ranged between 1% and 3.2% of FCC limits at 20 cm in front of the meter. Note that the measurements observed were from a specially programmed continuously transmitting meter, which would yield inflated results when compared with real world situations.
- Measurements of the smart meter equipment average RF power densities ranged between 0.002% and 0.003% of FCC limits at 20 cm in front of the meter over a 30-minute period.
- The maximum backhaul equipment measured instantaneous or peak RF power density observed was 0.0277% of the FCC limit (measured 20 cm directly in front of the antenna).
- The smart grid equipment average RF power densities were lower than typical household devices such as microwaves, cell phones, and Wi-Fi routers.

NSGI also issued a brochure[157] to put the RF EMF emissions from its smart meters into perspective:

> "...a person sitting 10 feet in front of their smart meter would have to be there for more than 100 years[158] to receive the same RF energy that they would receive from a 3-minute cell phone[159] call. If a person were sitting inside their home 3 feet from the back of a smart meter, they would have to be there for more than 200 years[158] to receive the same RF energy as they would from a 3-minute cell phone[159] call."

---

[155] <http://www.naperville.il.us/emplibrary/Smart_Grid/Pilot2-RFEmissionsTesting-SummaryReport.pdf>.
[156] <http://www.naperville.il.us/emplibrary/Smart_Grid/Pilot2RFEmissionsTesting-Final.pdf>.
[157] <http://www.naperville.il.us/emplibrary/Smart_Grid/SmartMeterandRFCommunications.pdf>.
[158] Meter Specifications: Front of meter - Duty Cycle: 0.1%, AMI radio power: 250 mW EIRP, Distance: 10 ft. (305 cm); Behind Meter - Duty Cycle: 0.1%, Distance 3 ft. (91 cm).
[159] Cell Phone Specifications: Duty Cycle 45%, Peak Transmitter Power after antenna: 600 mW EIRP, Distance: 1 cm.

## Maine Center for Disease Control & Prevention

On October 25th, 2010 a complaint was filed with the Maine Public Utilities Commission (MPUC) focusing on concerns related to the health, safety, and security of smart meters.[160]  The Maine Office of the Public Advocate (OPA) called upon the Maine Center for Disease Control & Prevention (Maine CDC) to comment on health concerns related to the wireless communication technology used in the smart meters being installed by Central Maine Power.  The Maine CDC received numerous emails and other communications on the issue, and its Public Health Director, Dr. Dora Anne Mills, reviewed the materials sent to her by both opponents and proponents of smart meters.  Dr. Mills assembled several Maine CDC staff for further review of the material.

A report was issued[161] by the Maine CDC on November 8, 2010 to the MPUC and OPA.  The Maine CDC reported that its review of national and international government or government-affiliated assessments[162] indicated a broad consensus that studies at the time gave no consistent or convincing evidence of a causal relation between RF exposure in the range of frequencies and power used by smart meters and adverse health effects.

According to the Maine CDC's report, they discovered little information in the assessments that spoke directly about the safety of RF exposure from smart meters.  There was, however, much discussion about the safety of mobile phones.  Mobile phone use represents an RF EMF exposure qualitatively similar to smart meters in range of frequency, but because the power of mobile phones is higher and typical use entails exposure closer to the body, the resulting exposure to RF EMF appeared to be quantitatively much greater than that from smart meters.

Thus, the report stated, it appeared that the lack of any consistent and convincing evidence of a causal relation between RF EMF exposure from mobile phones and adverse health effects would indicate even less concern for potential health effects from use of smart meters.

Subsequent to the investigation, the Maine CDC and others received several letters from people expressing concerns about the review.  In order to ensure that OPA, MPUC, and the correspondents had concise responses, Maine CDC grouped the concerns into eight topic areas and compiled a "Frequently Asked Questions" (FAQ) document[163] published on November 29, 2010, which addressed the concerns.

## Vermont Department of Health

In January 2012, the Vermont Department of Health measured the RF EMF emissions at active smart meters that had been installed in the town of Colchester by Green Mountain Power.  The resulting report[164] stated that readings from the meters verified that the devices emitted only a small fraction of the RF EMF emitted from a typical cell phone, even at very close proximity to the meter.  The readings were well below regulatory limits set by the FCC.

The report stated that the measurements taken directly in contact with a smart meter mounted on the exterior wall of a residence ranged from 50 to 140 microwatts per square centimeter (abbreviated $\mu W/cm^2$),

---

[160] <https://www.maine.gov/dhhs/boh/smart_meters.shtml>.

[161] <https://www.maine.gov/dhhs/boh/documents/Smart_Meters_Maine_CDC_Executive_Summary_11_08_10.pdf>.

[162] <https://www.maine.gov/dhhs/boh/documents/Smart_Meters_Review_of_Government_Resources_11_08_10.pdf>.

[163] <https://www.maine.gov/dhhs/boh/documents/smart-meters-faq.pdf>.

[164] <http://healthvermont.gov/pubs/ph_assessments/radio_frequency_radiation_and_health_smart_meters.pdf>.

compared to the FCC's 610 µW/cm$^2$ MPE limit for the general population.[165] Measurements taken at distances of three feet or more away from the smart meter were at or near background levels of RF EMF.

## Monterey County, California

In late 2010, members of the public that had concerns about potential adverse health effects of smart meters asked the Monterey County Board of Supervisors (the Board) to ban the use of smart meters in Monterey County. On January 11, 2011, the Board requested that the Monterey County Health Department review the literature and produce a report that summarized scientific findings related to smart meters and any potential adverse health effects. In March, 2011 the Health Department issued its report, entitled "Review of Health Issues Related to Smart Meters."[166]

The report's conclusions were as follows:

- Currently available literature indicates that exposure to RF energy from smart meters should be less than that experienced by routine mobile phone use.
- Based on the data available at the time of this review, the current FCC standard provides an adequate factor of safety against known thermally induced health impacts of existing common household electronic devices and smart meters.
- Despite extensive studies, there is no consistency of findings across studies regarding an association between non-thermal adverse health effects and exposure to EMFs from mobile phones.
- Due to various factors, further study is warranted to understand the potential for long-term adverse non-thermal health effects of RF energy from sources such as mobile phones.
- The lower exposure levels likely to be experienced from the deployment of smart meters compared to mobile phones should provide consumers some reassurance that there is a lower potential for adverse non-thermal health effects from the operation of smart meters.
- Some countries have adopted different exposure limits for EMF or placement of EMF arrays and towers in relation to certain populations based on the Precautionary Principle rather than on scientific certainty.

## Australia: Smart Meter Installations in the State of Victoria

In Australia, smart meters and other wireless devices used for communication having frequencies similar to mobile and cordless phones, are regulated by the Australian Communications and Media Authority (ACMA). Emissions from these wireless devices must comply with the ACMA Radiocommunications (Electromagnetic Radiation - Human Exposure) Standard 2003 as amended in 2011.[167] This standard mandates the exposure limits set by Australian Radiation Protection and Nuclear Safety Agency (ARPANSA) which were designed to protect against all known adverse health effects. These exposure limits are described in the document "Radiation Protection Standard for Maximum Exposure Levels to Radiofrequency Fields – 3 kHz to 300 GHz."[168]

In 2011, the Victorian state government commissioned an independent study by testing laboratory EMC Technologies to determine the actual levels of RF EMF exposures from smart meters, and make sure that the meters complied with the exposure levels set by ARPANSA.

---

[165] The micron symbol, µ, is a prefix that represents 10$^{-6}$, or one-millionth. 1 µW = one-thousandth of one milliwatt (mW).

[166] <http://publicagendas.co.monterey.ca.us/MG97205/AS97224/AS97230/AI99413/DO99416/DO_99416.pdf>.

[167] <http://www.comlaw.gov.au/Details/F2011C00165>.

[168] <http://www.arpansa.gov.au/pubs/rps/rps3.pdf>.

EMF measurement site surveys were conducted on a range of smart meters installed in various types of houses. The EMF measurements were performed on AMI meters installed by the five major utilities in the state of Victoria. The five utilities have joint programs in place to manage these installations, with the end result being three combined deployments. Most measurements were conducted on single AMI installations but also included a group meter installation (with 9 to 12 meters) from each of the three deployments. In these group meter installations, up to six meters were interrogated simultaneously to measure the maximum combined EMF from multiple transmissions.

EMC Technologies tested both types of electromagnetic exposures produced from smart meters - the EMF generated by the operation of a smart meter and RF emissions related to the built-in two-way communications. EMC Technologies found[169] that the maximum RF EMF power density levels were well below the ARPANSA General Public Limit specified by ARPANSA Radiation Protection Standards, even when the meter was forced to transmit continuously (100% duty cycle). More specifically, exposure levels from smart meters inside dwellings ranged from 0.000001% to 0.0113% of ARPANSA's General Public Limit of 450 µW/cm$^2$.

The test results also showed that in measurements made at sites with grouped meters, even with a number of meters being requested for meter data upload, the EMF peak field measured did not increase above the level of a single meter transmission. No two meters were transmitting simultaneously. The report concluded that the maximum RF EMF power density from a group meter installation is expected to not be higher than that of a single meter installation.

RF EMF tests were also conducted on various household appliances that emit RF fields – a wireless modem, microwave oven, baby monitor, mobile phone and cordless phone. The RF EMF levels from the meters, even when measured from a foot away, were lower than the levels from these other common household items. The actual EMF levels from a meter, when measured inside the house, were very low compared to the levels from the abovementioned items.

*Smart Meters Have Lower ELF EMF Levels than Electromechanical Meters*

Extremely Low Frequency electromagnetic fields (ELF EMF) occur at 50Hz in Australia and at 60Hz in the U.S. and are predominantly found in electric energy generation, transmission, and distribution. Unlike the testing performed by the other organizations in this report, the scope of work in the Australian investigation included the measurement of ELF EMF. Tests were conducted on smart meters and on an electromechanical (i.e., rotating disc) electricity meter, as well as an electric blanket, vacuum cleaner, microwave oven, and CRT (Cathode Ray Tube) television.

In the tests, the 50 Hz fields around the smart meter were lower than those from some other common appliances such as vacuum cleaners and microwave ovens. The levels from other appliances such as hairdryers, power tools, induction cookers, fans, and air conditioners would also be much higher.

Finally, the test results showed that **the fields from the smart meter are slightly lower than the fields from the analog (electromechanical) meter**. The report concluded that the smart meters themselves do not cause any increase in the power line-related EMF levels and that replacement of the older analog meters with AMI meters would reduce ELF EMF exposure.

---

[169] <http://www.dpi.vic.gov.au/smart-meters/publications/reports-and-consultations/ami-meter-em-field-survey-repor>.

### United Kingdom: Health Protection Agency

In April 2012, the Advisory Group on Non-ionising Radiation (AGNIR), an independent advisor to the Health Protection Agency of the UK, produced a document entitled "Health Effects from Radiofrequency Electromagnetic Fields."[170]  The Health Protection Agency is an independent organization that was formed by the UK government in 2003 to protect the public from threats to their health from infectious diseases and environmental hazards.  According to its website, it does this by providing advice and information to the general public, to health professionals such as doctors and nurses, and to national and local government.[171]

The report starts out by saying that the quantity and quality of research published on the potential health effects of RF field exposure has increased substantially since AGNIR had last reviewed the subject in 2003.  While the publication admitted that limitations to the published research still exist and therefore preclude a definitive judgment, the evidence considered did not demonstrate any adverse health effects of RF EMF exposure at levels below the internationally accepted guideline.

The paper stated that while there were possible effects on Electroencephalography (EEG) patterns, they were not conclusively established and that it was unclear whether such effects would have any health consequences.

The AGNIR document also stated that, in regard to RF EMF exposure that was below guideline levels:

- The evidence indicated that it does not cause symptoms.
- RF cannot be detected by people, even by those who considered themselves sensitive to RF fields.
- The evidence pointed toward no material exposure to the risk of cancer although there is little data on risks beyond 15 years from first exposure.
- RF showed no effect on health not related to cancer.
- There was a lack of convincing evidence that it caused health effects in adults or children.

### Health Canada: Safety Code 6

Health Canada[172] is the Canadian federal department responsible for helping its country's people maintain and improve their health, while respecting individual choices and circumstances.  Health Canada's document titled "Limits of Human Exposure to Radiofrequency Electromagnetic Fields in the Frequency Range from 3 kHz to 300 GHz"[173,174] is a code that specifies Canada's radiofrequency exposure guidelines, commonly known as "Safety Code 6 (2009)."  The guidelines provide recommended best practices for ensuring compliance with the maximum exposure levels for controlled and uncontrolled environments.  The Safety Code 6 (2009) standards are similar to the U.S. FCC standards established in 1997.

Regarding MPE, Safety Code 6 states the following:

> "For frequencies from 100 kHz to 300 GHz, tissue heating is the predominant health effect to be avoided.  Other proposed non-thermal effects have not been conclusively documented to occur at levels below the threshold where thermal effects arise."

---

[170] <http://www.hpa.org.uk/webc/HPAwebFile/HPAweb_C/1317133827077>.
[171] <http://www.hpa.org.uk/AboutTheHPA/>.
[172] <http://www.hc-sc.gc.ca/ahc-asc/index-eng.php>.
[173] <http://www.hc-sc.gc.ca/ewh-semt/pubs/radiation/radio_guide-lignes_direct-eng.php>.
[174] <http://www.scribd.com/doc/36604752/Safety-Code-6>.

## British Columbia Provincial Health

On December 23, 2011 a statement[175] was prepared at the request of the British Columbia (BC) Provincial Health Officer by Mary McBride, a Distinguished Scientist at the Department of Cancer Control of the BC Cancer Agency (BCCA) in Vancouver, BC. The letter had been approved by Dr. David McLean, Head of Cancer Prevention at the BCCA.

The statement indicated that research evidence does not support a conclusion that RF EMF, whether from cell phones or smart meters, can cause brain tumors in adults. With more than 20 years' cell phone use and limited information on a risk of other cancers, the information that BCCA officials possess generally does not support the notion of cancer. The statement admits that while there is no direct information on children, more studies are underway to address gaps in their understanding of RF EMF and cancer risk. The statement concluded by saying that extensive laboratory research to date has not identified any mechanisms that could function in either adults or children which would lead to an excess risk of tumors in general.

## Ontario Province: Ontario Agency for Health Protection and Promotion

On September 16, 2010, the Ontario Province of Canada's Agency for Health Protection and Promotion (Ontario Health Agency) issued a brief paper that cautioned against relying on the results of individual research studies regarding the potential health effects from exposure to RF EMF because inconsistencies or conflicts may exist among the results of other individual studies.

The Ontario Health Agency stated that performing reviews of literature that followed an approach of weighing evidence would be far more useful to inform debate and make sound policy than it would be to merely rely on individual studies.

The Ontario Health Agency pointed to the Royal Society of Canada's (RSC) highly credible review from 1999[176] with updates to the review published as recently as 2009.[177,178] The RSC review called for additional research to follow up on new findings from an additional decade of research and noted that there was still no conclusive evidence of adverse health effects at exposure levels that are below the current Canadian guidelines.

The Ontario Health Agency stated that recently published research demonstrated that Wi-Fi exposure is well within recommended limits and is also only a small fraction (less than 1%) of exposure during the typical use of a cell phone. Because of this, much of the research on possible effects of RF EMF has been focused on exposures from cell phones rather than the lower exposures associated with RF uses such as Wi-Fi, and the focus will continue to be on cell phones. The Ontario Health Agency also stated that public exposure, including school children, to Wi-Fi is far lower than what occurs with cell phone use, and that there is no plausible evidence to date that would indicate that current public exposure to Wi-Fi is causing any adverse health effects.

---

[175] <http://www.health.gov.bc.ca/pho/issues.html>.
[176] <http://www.rsc.ca/documents/RFreport-en.pdf>.
[177] <http://www.rsc.ca/documents/expert_panel_radiofrequency_update2.pdf>.
[178] <http://www.ncbi.nlm.nih.gov/pubmed/20183523>.

## City of Richmond, British Columbia and Vancouver Coastal Health

The BC Hydro and Power Authority is an electric utility in British Columbia.  The company serves 1.8 million customers in most areas of the province and is deploying smart meters.  On November 14, 2011, the City of Richmond in British Columbia passed a resolution requesting its Medical Health Officer to "conduct an investigation as to whether smart meters pose a health hazard."  The response,[179] dated December 20, 2011 and signed by the BC Health Officer and two officers from Vancouver Coastal Health, concluded that the smart meters installed and used by BC Hydro were not a health hazard.  Furthermore, the letter stated that "the transmitters in Smart Meters produce electromagnetic fields at levels significantly lower than the maximum allowed for the Canadian public under Health Canada's Safety Code 6."

Other notable findings of the independent consultant, Planetworks Consulting Corporation include:[180,181]

1. Smart meters are active for only a very short duration at a time.
2. The average power density was 0.3795% of Safety Code 6 for a single smart meter.
3. For a bank of ten smart meters, the average power density was found to be 0.4507% of Safety Code 6 (a range from 0.0015% to 1.6835% of Safety Code 6.)
4. The highest power density value recorded from a bank of ten meters was less than 2% of Safety Code 6 limit, while the average power density for both single and a ten meter bank are less than 0.5% of Safety Code 6.

Note that Safety Code 6 requires the power density at the frequency used by the smart meters to be less than 600 $\mu W/cm^2$ for publicly accessible areas (compared to the FCC's limit of 610 $\mu W/cm^2$).  One can see that the power density recorded for a ten meter bank is not ten times that of a single meter, as some may suspect.  Instead, the average power density for the ten meter bank was found to be only about 1.2 times that of a single meter, while the maximum value from a bank of ten meters was slightly less than twice the maximum value recorded from a single meter.

## Norwegian Institute of Public Health

In spring 2010, an Expert Committee was appointed by the Norwegian Institute of Health and commissioned by the Ministry of Health and Care Services and the Ministry of Transport and Communications.  The committee was composed of individuals with expertise in environmental and occupational medicine, biology, physics, metrology, biophysics, biochemistry, epidemiology, and philosophy as well as administration and risk management.  In 2012, the committee issued its report.

The committee assessed the health hazards from low-level electromagnetic fields generated by radio transmitters.  The Committee evaluated the power of the fields, whether they posed a health risk, the current regulatory practice, and whether the threshold limit values for exposure were observed.  A press release from the institute described the report conclusions: [182]

---

[179] <http://www.health.gov.bc.ca/pho/pdf/vch-response-to-richmond-city-council-re-investigation-into-smart-meters.pdf>.

[180] <http://www.bchydro.com/etc/medialib/internet/documents/smi/SMI_SingleSmartMeter.Par.0001.File.SMI-SingleSmartMeter-2011-Oct-11.pdf>.

[181] <http://www.bchydro.com/etc/medialib/internet/documents/smi/SMI_MeterBank.Par.0001.File.SMI-MeterBank-2011-Oct-11.pdf>.

[182]

<http://www.fhi.no/eway/default.aspx?pid=238&trg=MainLeft_5895&MainArea_5811=5895:0:15,2829:1:0:0:::0:0&MainLeft_5895=5825:99168::1:5896:1:::0:0>.

"There is no scientific evidence that low-level electromagnetic field exposure from mobile phones and other transmitting devices causes adverse health effects, according to a report presented by a Norwegian Expert Committee. In addition, the Committee provides advice to authorities about risk management and regulatory practice."

## Swedish Council for Working Life and Social Research

The Swedish Council for Working Life and Social Research (FAS) was commissioned by the government of Sweden to monitor issues relating to research into EHS and to document and report on the state of research at regular intervals, starting in 2003.  In the executive summary of its 2012 report, FAS stated:[183]

"Extensive research for more than a decade has not detected anything new regarding interaction mechanisms between radiofrequency fields and the human body and has found no evidence for health risks below current exposure guidelines.  While absolute certainty can never be achieved, nothing has appeared to suggest that the since long established interaction mechanism of heating would not suffice as basis for health protection."

## Health Council of the Netherlands

The Health Council of the Netherlands is an independent scientific advisory body.[184]  Its task is to provide the Netherlands government and parliament with advice in the field of public health and health/healthcare research.  The agency also addressed EHS in its report, *Electromagnetic Fields: Annual Update 2008*:[185]

"From the good quality scientific data emerges the picture that there is no causal relationship between exposure to radiofrequency electromagnetic fields and the occurrence of symptoms.  However, there is a relationship between symptoms and the *assumption* of being exposed and therefore most likely with the risk perception."

## World Health Organization

The WHO website contains a wealth of information about EMF, including what it is, links to a database of research citations, national standards, publications, information resources, and meetings.  The site also has a link to Germany's EMF-Portal that provides access to research databases.

The organization also hosts the International EMF Project,[186] which was established in 1996 and is open to any WHO Member State government, such as department of health or representatives of other national institutions concerned with radiation protection.   The project was established to assess health and environmental effects of exposure to static and time varying electric and magnetic fields in the frequency range 0-300 GHz.  The site provides access to 39 ongoing studies, 322 published studies, and 12 studies that have been reported but not published.

There are 54 participating countries and eight international organizations involved in the project.  It is fully funded by participating countries and agencies.  Its stated key objectives are to:

---

[183] <http://www.fas.se/pagefiles/5303/10-y-rf-report.pdf>.
[184] <http://www.gezondheidsraad.nl/en>.
[185] <http://www.gezondheidsraad.nl/sites/default/files/200902.pdf>
[186] <http://www.who.int/peh-emf/project/en/>.

- Provide a coordinated international response to concerns about possible health effects of exposure to EMF;
- Assess the scientific literature and make a status report on health effects;
- Identify gaps in knowledge needing further research to make better health risk assessments;
- Encourage a focused research program in conjunction with funding agencies;
- Incorporate the research results into WHO's Environmental Health Criteria monographs where formal health risk assessments will be made on exposure to EMF;
- Facilitate the development of internationally acceptable standards for EMF exposure;
- Provide information on the management of EMF protection programs for national and other authorities, including monographs on EMF risk perception, communication and management; and
- Provide advice to national authorities, other institutions, the general public and workers, about any hazards resulting from EMF exposure and any needed mitigation measures.

The WHO recognized the following independent scientific institutions for their collaboration:

- U.S. Air Force Research Laboratory, Human Effectiveness Directorate (Brooks Air Force Base, TX);
- Australian Radiation and Nuclear Safety Agency (ARPANSA);
- UK Health Protection Agency - Radiation Protection Division;
- German Federal Office for Radiation Protection (BfS); and
- Institute of Population Health, University of Ottawa, Ontario, Canada.

Some key points are made on the WHO website regarding EMF and health. Among them are the following:

- A wide range of environmental influences causes biological effects. 'Biological effect' does not equal 'health hazard'. Special research is needed to identify and measure health hazards;
- There is no doubt that short-term exposure to very high levels of electromagnetic fields can be harmful to health. Current public concern focuses on possible long-term health effects caused by exposure to electromagnetic fields at levels below those required to trigger acute biological responses;
- Despite extensive research, to date there is no evidence to conclude that exposure to low level electromagnetic fields is harmful to human health;
- The focus of international research is the investigation of possible links between cancer and electromagnetic fields, at power line and radiofrequencies;
- Finding a statistical association between some agent and a specific disease does not mean that the agent caused the disease;
- The absence of health effects could mean that there really are none. However, it could also signify that an existing effect is undetectable with present methods;
- Results of diverse studies (cellular, animal, and epidemiology) must be considered together before drawing conclusions about possible health risks of a suspected environmental hazard. Consistent evidence from these very different types of studies increases the degree of certainty about a true effect; and
- Due to a large safety factor, exposure above the guideline limits is not necessarily harmful to health. Furthermore, time-averaging for high frequency fields and the assumption of maximum coupling for low frequency fields introduce an additional safety margin.

Publications and other specific work outputs from efforts of the WHO, its divisions, and collaborating organizations are noted throughout this report and will not be repeated here.

## Comments by Academia on Public Concerns about Wireless Smart Meters

### Montréal Polytechnic and McGill University Open Letter

On May 18, 2012, an open letter was issued in support of smart meter technology[187] and signed by 61 scientists and engineers primarily affiliated with one of two universities located in Montréal, Québec, Canada: École Polytechnique de Montréal (Montreal Polytechnic) and McGill University.  The few signatories who could be thought to have a conflict of interest through their affiliation with the telecommunications industry or Hydro Québec, the utility in the province deploying more than 3 million smart meters, declared their conflict alongside their names.

In the letter, the Québécois engineers and scientists commented:

> "We believe that the fear of wireless technologies is based primarily on i) a misunderstanding of the nature of radio waves and their interaction with the human body, ii) a misreading of the scientific literature on this subject, and iii) a distrust of local, national and international public health organizations."

The Québec Energy Board, the provincial regulator, took the letter into consideration when rendering its decision[188] to allow Hydro Québec to proceed with its plan to install wireless smart meters in its service territory.  The agency stated in its summary[189] (translated from French):

> "The views presented by the public health authorities and the evidence heard by [the Board] on the state of scientific research on the impacts of non-thermal RF on health demonstrate that the emissions from the new generation of smart meters do not present a health risk."

### University of Ottawa: RFcom Review Panel Reports

The University of Ottawa's McLaughlin Centre for Population Health Risk Assessment has a project called RFcom[190] that functions as an Internet-based information resource about health effects of wireless technologies.  RFcom is managed by a science panel that reviews and reports[191] on the most recent research studies about wireless technology and health from around the world.  All studies referenced on its website must meet the following criteria:

- The source must be credible and accountable;
- Material must be peer-reviewed research and data that has been accepted and validated in the Canadian and international communities; and
- All studies must have been carried out by an independent third-party person or organization.

The page contains conclusions and excerpts from reports issued by various organizations from within countries and international bodies including Canada, Denmark, the EC, Finland, France, Germany, Iceland, Netherlands, Norway, Spain, Sweden, the UK, and the U.S.  These excerpts overwhelmingly indicate that there is no

---

[187] <http://www.polymtl.ca/phys/doc/Lettre_ouverte_de_scientifiques_quebecois_les_compteurs_intelligents.pdf>.
[188] <http://internet.regie-energie.qc.ca/Depot/Projets/111/Documents/R-3770-2011-A-0163-DEC-DEC-2012_10_05.pdf>.
[189] <http://internet.regie-energie.qc.ca/Depot/Projets/111/Documents/R-3770-2011-A-0164-DEC-DEC-2012_10_05.PDF>.
[190] <http://www.rfcom.ca/welcome/index.shtml>.
[191] <http://www.rfcom.ca/panel/index.shtml>.

conclusive evidence to support many of the assertions smart meter opponents are making about the harms of RF EMF exposure and negative health outcomes.

# Other Issues

## *Potential for Interference with Medical Devices*

Some people have expressed concern that signals from smart meters could interfere with the operation of implanted electronic devices such as pacemakers or other medical equipment. According to the FCC, because they are electronic devices, there is a potential for such devices to be susceptible to electromagnetic signals that could cause them to malfunction. The FCC stated[192] that there have been anecdotal claims of such effects in the past which involved emissions from microwave ovens but that it has never been shown that the RF energy from a properly operating microwave oven is strong enough to cause such interference. The FCC also stated that the FDA requires pacemaker manufacturers to test their devices for susceptibility to electromagnetic interference (EMI) over a wide range of frequencies and to submit the results as a prerequisite for market approval. Electromagnetic shielding has been incorporated into the design of modern pacemakers to prevent RF signals from interfering with the electronic circuitry in the pacemaker.[193]

Both the FCC and FDA[194] refer to studies which have shown that mobile phones can interfere with implanted cardiac pacemakers if a phone is used in close proximity (within about eight inches) of a pacemaker. Such interference appears to be limited to older pacemakers which may no longer be in use. The agencies recommend that those with pacemakers avoid placing a phone in a pocket close to the location of their pacemaker or putting the phone near the pacemaker location when using the phone.

One of the studies to which the FCC and FDA refer was published in The New England Journal of Medicine[195] in which a total of 980 patients were tested. Seven hundred twenty-five patients were tested with six telephones and 255 were tested with five telephones, providing a total of 5625 tests. Ninety-two tests were eliminated because of incomplete data. Thus, statistical analyses were based on 5533 tests. The study concluded that no interference was observed in any pacemaker at base line. The study stated that while abnormalities of pacing were observed at base line in 23 of 976 patients (2.4%) during testing, evidence of these abnormalities was not considered to be due to interference.

Further, ANSI and the Association for the Advancement of Medical Instrumentation (AAMI) have devised a standard[196] known as ANSI/AAMI PC69:2007 which establishes electromagnetic compatibility test protocols for active implantable cardiovascular devices. The standard is intended for manufacturers of implantable medical devices and consultants who test implantable devices. It specifies test methods related to interference frequencies and their potential effects on implantable devices such as cardiac pacemakers and internal defibrillators. It also requires disclosure of a device's performance issues in the presence of EM emitters where appropriate and provides manufacturers of EM emitters with information about the level of immunity to be expected from active implantable cardiovascular devices.

---

[192] <http://transition.fcc.gov/oet/rfsafety/rf-faqs.html#Q22>.

[193] <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet56/oet56e4.pdf>.

[194] <http://www.fda.gov/Radiation-EmittingProducts/RadiationEmittingProductsandProcedures/HomeBusinessandEntertainment/CellPhones/ucm116311.htm>.

[195] <http://www.nejm.org/doi/pdf/10.1056/NEJM199705223362101>.

[196] <http://webstore.ansi.org/RecordDetail.aspx?sku=ANSI%2FAAMI+PC69%3A2007>.

## *Claims of Electromagnetic Hypersensitivity*

### World Health Organization

The WHO is the directing and coordinating authority for health within the United Nations system. It is responsible for providing leadership on global health matters, shaping the health research agenda, setting norms and standards, articulating evidence-based policy options, providing technical support to countries, and monitoring and assessing health trends.[197]

In December 2005, the WHO International EMF Project created a fact sheet on electromagnetic fields and public health in order to address EHS.[198] The fact sheet describes what was known about the condition, and it provided information for helping people with such symptoms. The information was based on a WHO Workshop on Electrical Hypersensitivity (Prague, Czech Republic, 2004),[199,200] an international conference on EMF and non-specific health symptoms (COST 244bis, 1998),[201] a European Commission report (Bergqvist and Vogel, 1997),[202] and reviews of the literature.

The fact sheet stated that EHS is characterized by a range of non-specific symptoms that lack apparent toxicological or physiological basis or independent verification and that it differs from individual to individual.[203] The sheet stated that the symptoms are certainly real and can vary widely in their severity, and they can be a disabling problem for the affected individual.

The WHO document noted that a number of scientific studies had been conducted where EHS individuals were exposed to EMF similar to what they had attributed to the cause of their symptoms. The aim of the studies was to elicit symptoms under controlled laboratory conditions. The WHO fact sheet stated that the majority of studies indicated that EHS individuals could not detect EMF exposure any more accurately than non-EHS individuals. Double-blind studies which were well-controlled and well-conducted had shown that symptoms were not correlated with EMF exposure. Therefore, it stated, EHS has no clear diagnostic criteria, and there is no scientific basis to link EHS symptoms to EMF exposure.

It had been suggested that symptoms experienced by some EHS individuals might arise from environmental factors unrelated to EMF including flicker from fluorescent lights, glare and other visual problems with video displays, and poor ergonomic design of computer workstations. The fact sheet stated that other factors that may play a role included poor indoor air quality or stress in the workplace or living environment.

Finally, there were some indications that the symptoms may be due to pre-existing psychiatric conditions as well as stress reactions that were a result of worrying about EMF health effects, rather than EMF exposure itself. It explained that EHS is not a medical diagnosis, nor is it clear that it represents a single medical problem. Thus, some medical experts described EHS as an example of a psychogenic illness. A psychogenic illness is a constellation of symptoms suggestive of organic illness, but without an identifiable cause, that

---

[197] <http://www.who.int/about/en/>.
[198] <http://www.who.int/mediacentre/factsheets/fs296/en/index.html>.
[199] <http://www.who.int/peh-emf/meetings/hypersensitivity_prague2004/en/index.html>.
[200] <http://ihcp.jrc.ec.europa.eu/our_activities/public-health/exposure_health_impact_met/emf-net/docs/publications/WHO_EMF-NET%20Book.pdf>.
[201] <ftp://ftp.cordis.europa.eu/pub/cost/docs/244bisfinalreport.pdf>.
[202] <https://gupea.ub.gu.se/bitstream/2077/4156/1/ah1997_19.pdf>.
[203] Idiopathic Environmental Intolerance attributed to Electromagnetic Fields (IEI-EMF) is a term that is being increasingly used to describe this disorder.

occurs between two or more people *who share beliefs about those symptoms* (emphasis added). Psychogenic illnesses have made headlines when they have become manifest as a widespread phenomenon.[204]

## King's College London: Systematic Review of Provocation Studies for EHS

King's College London's School of Medicine is one of the UK's most renowned centers for medical research and teaching. It has three central London hospital campuses, and its research portfolio is closely aligned to its National Health Service partners. The school has ten research divisions and it hosts 12 externally awarded and funded specialist centers.[205]

In 2005, school researchers performed meta-analyses[206] to identify relevant blind or double-blind EMF provocation studies.[207] According to the researchers, thirty-one experiments testing 725 EHS participants were identified.[208] Out of the 31 studies, 24 found no evidence to support the existence of a biophysical hypersensitivity, whereas seven reported some supporting evidence. For two of these seven studies, the same research groups subsequently tried to replicate their findings but failed. In three of the seven studies, the positive results appeared to be statistical artifacts. The remaining two studies produced mutually incompatible results.

According to the King's College researchers, the meta-analyses found no evidence of an improved ability to detect EMF in EHS participants. They concluded that the symptoms described by EHS sufferers can be severe and are sometimes disabling but that it had proven difficult to demonstrate under blind conditions that exposure to EMF could trigger symptoms. The researchers stated that analyses suggested that EHS was unrelated to the presence of EMF. The researchers stated that more research into this phenomenon was required.

In 2009, a team of researchers from King's College performed an updated systematic review of provocation studies for EMF.[209] The researchers performed an extensive literature search and identified 15 new experiments. This time, 46 blind or double-blind provocation studies were analyzed in total, involving 1175 EHS volunteers to determine whether exposure to EMF is responsible for triggering symptoms in EHS individuals. The researchers determined that no robust evidence could be found to support the theory.

However, the researchers stated, the studies included in the review did support the role of the nocebo effect in triggering acute symptoms in EHS sufferers. A nocebo response is an unpleasant, harmful, or undesirable effect(s) that a subject manifests, typically after receiving a placebo. The nocebo effect has drawn increased interest from the medical community because studies show that patients are highly receptive to negative suggestion.[210]

---

[204] <http://www.cmaj.ca/content/172/1/36.full.pdf>.

[205] <http://www.kcl.ac.uk/medicine/about/index.aspx>.

[206] A meta-analysis is a systematic method of evaluating statistical data based on results of several independent studies of the same problem.

[207] A provocation study is a form of medical clinical trial whereby participants are exposed to a substance or situation that is claimed to provoke a response or to a sham substance or device that should provoke no response.

[208] <http://www.aefu.ch/typo3/fileadmin/user_upload/aefu-data/b_documents/themen/elektrosmog/Position_Forschungstand/rubin_Elektrosensib.Provokationsstudie05.pdf>.

[209] <http://www.essex.ac.uk/psychology/EHS/Rubin%20et%20al%20REVIEW_2009.pdf>.

[210] <http://www.aerzteblatt.de/pdf.asp?id=127210>.

### Recent Court Decision Regarding Claim of EHS

In a recent court decision in New Mexico, the plaintiff claimed to have health problems triggered by exposure to EMF generated by his neighbor's electrical equipment (e.g. cordless telephones, computer equipment, dimmer switches, and Wi-Fi routers and modems). The court concluded that EHS is not a scientifically recognized disease, excluded the testimony of the plaintiff's two experts, and dismissed the case.[211,212]

## *Use of EMF as a Weapon*

Some opponents of smart meters have spoken of two kinds of weapons being developed by military organizations such as the U.S. Department of Defense[213] or by other countries. Because weapons are typically associated with causing bodily harm or death, they are addressed in this paper.

Both kinds of weapons utilize electromagnetic radiation, but they use it differently and have different end goals. The first kind of weapon to be discussed has been demonstrated to the public. The existence of the second kind of weapon seems to be more speculative.

### Directed Energy Weapons

The first type of weapon is known as a directed energy weapon which delivers energy to a target. The target can be humans, electronic equipment, or other military targets, depending on the technology employed. It can be used for purposes other than to destroy a target or kill soldiers. For example, the Active Denial System (ADS) is a weapon under development that is intended for use against humans. It is non-lethal and designed for area denial,[214] perimeter security, and crowd control. The device is mountable on a small armored vehicle.

The ADS works by firing a narrow, high-powered beam of 95 GHz waves at a human target. The energy from an ADS works on a similar principle as a microwave oven, exciting the water and fat molecules in the skin, and instantly heating them (dielectric effect).

How deep a radio wave can penetrate an object depends upon the wave's frequency. The high frequency waves used in ADS penetrate 1/64th of an inch into the top layers of the subject's skin. At that skin depth lie "nociceptors" which are nerve endings sensitive to heat. *Wired* magazine indicated that documents it acquired from the government stated that 83% of the energy impacting the target was instantly absorbed by the top layer of the skin.[215] Being hit by the energy from the ADS gives the victim a sensation of his entire body being exposed to intense heat but without injury taking place. The pain reflex makes the targeted person instinctively pull away in less than a second. To avoid potential trauma to the subject, the trigger on the device only allows the weapon to be fired for three seconds.

The *Wired* article states that the energy delivered to a target is 12 joules per square centimeter.[216] The ADS delivers those 12 joules of energy over a three-second period, which is equivalent to delivering four watts (4000 mW) of power each second per square centimeter.

---

[211] Firstenberg v. Monribot and Leith, No. D-101-CV-2010-00029, New Mexico 1st Dist, Santa Fe County, Sept 18, 2012.
[212] <http://www.casewatch.org/civil/firstenburg/dismissal_order.pdf>.
[213] <http://jnlwp.defense.gov/>.
[214] Area denial weapon is used to prevent an adversary from occupying or traversing an area of land. Land mines and punji sticks are examples of denial weapons, albeit ones which are potentially lethal.
[215] <http://www.wired.com/dangerroom/2012/03/pain-ray-shot/>.
[216] <http://www.wired.com/science/discoveries/news/2006/12/72134?currentPage=all>.

The Human Effects Advisory Panel of Penn State concluded that ADS is a non-lethal weapon that has a high probability of effectiveness with a low probability of injury.[217]  The limit of damage was the occurrence of pea-sized blisters in less than 0.1% of the exposures (6 of 10,000 exposures).

While this information may be interesting, the existence of such a weapon cannot be credibly used as an argument against employing RF communication devices because:

- The ADS is specifically designed as a weapon, not communications equipment;
- The ADS is very dissimilar to a smart meter because it uses a frequency 100 times higher than the 902-928 MHz band used by the meters' communication module;
- The ADS has an enormous power output.  It delivers more than 3.5 million times the instantaneous peak energy of a smart meter radio module; and[218]
- Although the ADS is considered a weapon, it does not cause injury, only brief discomfort.

## Cold War Studies on Behavior Modification and Human Vulnerability

The second type of weapon mentioned by opponents of wireless communications technology does not seem to have been displayed or demonstrated as a functioning device.  Instead, some people who have provided material to the PUCT or appeared before it, the Texas Senate, or regulatory bodies in other jurisdictions have referred to research that had been performed mostly by Soviet Bloc countries during the Cold War, especially the Soviet Union.

Opponents of wireless technology have pointed to unclassified documents[219,220] produced by the U.S. Defense Intelligence Agency (DIA)[221] during the early 1970s as evidence that the Soviet Union was doing research on EMF along with exploring subject matter that was more unconventional.  The stated purpose of the DIA disseminating this information was for preparedness and to develop countermeasures.  It may be speculative to assume that more detailed information existed but was kept classified.  We are limited to the available documents.

The documents summarize the known research in which the Soviet Union was involved regarding human vulnerabilities to various environmental conditions and behavior modification through the application of certain stimuli.  Of particular interest to opponents of wireless technology are the studies performed to determine human vulnerability to EMF and how it could be used to alter a subject's behavior.  These weapons were intended for use against an individual rather than a group.

One may be intrigued by the fact that in addition to the cited studies on the effects of EMF on living organisms, the documents also discuss psychology and parapsychology research.  For example, some experiments involved telepathic communication, mind altering drugs, sensory deprivation, psychokinesis, and many other

---

[217] <http://jnlwp.defense.gov/pdf/heap.pdf>.

[218] ADS exposure: 12 joules/cm$^2$ delivered over a three-second burst = 4,000 mW/cm$^2$.  Smart meter exposure: 0.0011346 mW/cm$^2$ instantaneous peak field exposure in front of meter, at a distance of three feet, assuming a 100% duty cycle. Calculated from Table 9-5 of EPRI Report "An Investigation of Radiofrequency Fields Associated with the Itron Smart Meter," Page 9-15.

[219] <http://science.discovery.com/tv/dark-matters/documents/pdf/controlled-offensive-behavior.pdf>.

[220] <http://www.magdahavas.com/wordpress/wp-content/uploads/2011/02/BIOLOGICAL_EFFECTS_OF_ELECTROMAGNETIC_RADIATION-RADIOWAVES_AND_MICROWAVES-EURASIAN_COMMUNIST_COUNTRIES.pdf>.

[221] Although the specific focus of the DIA has changed over the years, its central function has been to provide military intelligence to various facets of the U.S. military community.

seemingly strange topics.  The fact that EMF research is mentioned in the same context as these arcane studies may lead some readers to errantly conclude that EMF is equally mysterious.

While some may find the material offered in the documents regarding EMF experiments on animal subjects interesting and germane to the topic of this report, several caveats are in order:

- The material is unclassified (compared to declassified) and offers nothing new – it is a part of the extensive body of knowledge on EMF.  Despite the Cold War, scientific research was published and shared between the two sides;
- The material is old and may be out of date;
- The descriptions of the research are only abstracts, providing very little detail;
- The citations are of individual studies.  Other studies may have conclusions that are incompatible; and
- Some material sourced from Soviet Bloc nations may be of questionable value.  The results could have been subject to the political environment of the era.

The Soviet Bloc was not alone in conducting such research.  The U.S. Central Intelligence Agency had also conducted behavioral modification experiments from the 1950s until the early 1970s.  These experiments, collectively known as Project MKULTRA, relied on mind-altering drugs, hypnosis, sleep deprivation and other forms of harassment.[222]

Claims have been made that the work done under Project MKULTRA may have been used in conjunction with EMF to create "psychotronic weaponry"[223] in the form of "Silent Sound" or "Voice to Skull" technology.  Voice to Skull technology is based on what is known as the microwave auditory effect or "microwave hearing." Microwave hearing is caused by using pulsed EMF in the microwave frequency band to induce audible clicks or sounds described as buzzing, hissing, or knocking.  The cause is thought to be thermoelastic expansion of portions of the ear.[224]  The sounds are generated directly inside the human head without the need of any receiving electronic device and are not audible to other people, even if they are nearby.  If the signal is modulated,[225] whole words can be produced.

The idea behind this technology was that the spoken words of a hypnotist could be conveyed through microwave hearing into an unknowing person's head.  This would allow the hypnotist to control the actions of the targeted individual's subconscious mind.  Some have speculated about another possibility - that a targeted individual who heard voices inside his head would be distressed over the notion of going insane or being viewed as such.

The microwave auditory effect was first reported by persons working in the vicinity of radar transponders during World War II.   The effect was later discovered to be inducible by frequencies higher in the electromagnetic spectrum.  American neuroscientist Allan H. Frey studied this phenomenon and first published information[226] on the nature of the microwave auditory effect.[227]  At least one patent has been issued for "Voice to Skull" technology based on the material in Frey's studies - U.S. Patent 4,877,027.[228]  Note that several

---

[222] <http://upload.wikimedia.org/wikipedia/commons/0/01/ProjectMKULTRA_Senate_Report.pdf>.
[223] A psychotronic weapon is an alleged type of mind control device.
[224] <http://www.ncbi.nlm.nih.gov/pubmed/17495664>.
[225] In telecommunications, modulation is the process of varying one or more properties of a high-frequency periodic waveform: amplitude, phase, or frequency.  The effective result is piggybacking a signal on top of the RF EMF.
[226] <http://jap.physiology.org/content/17/4/689>.
[227] <http://www.slavery.org.uk/Bioeffects_of_Selected_Non-Lethal_Weapons.pdf>.
[228] <http://patft.uspto.gov/netacgi/nph-Parser?Sect1=PTO2&Sect2=HITOFF&p=1&u=%2Fnetahtml%2FPTO%2Fsearch-bool.html&r=4&f=G&l=50&co1=AND&d=PTXT&s1=4,877,027&OS=4,877,027&RS=4,877,027>.

criteria must be met in order for a U.S. patent to be issued, but the existence of a functional device is not one of those criteria. There is no credible evidence to suggest that such a device exists.

While this may be an interesting phenomenon, it is not applicable to smart meters because:

- The energy intensity required to accomplish the microwave auditory effect would be greater than the output capability of the radio module in a smart meter – perhaps even above MPE levels;
- The frequencies involved (higher microwave bands) are outside the range emitted by smart meters;
- EMF is directional in nature. A device intended to produce these sounds would require a transmitting antenna that optimized this directionality, and the emitted energy would have to be aimed directly at a person's head. Studies performed by EPRI of emission patterns from smart meters show the transmitting antenna in a smart meter directs most of its RF energy outward, away from the wall on which it is mounted. The RF energy would be greatly attenuated inside the building. Also, meter antennas are not aimed at people's heads;
- The existence of psychotronic weapons as described above is merely speculative; and
- Smart meters are designed to measure a customer's overall electricity usage and deliver that data to the utility. They may also offer a limited set of information to an end user if he desires. Smart meters are not intended for, are not designed to, and do not have the capability to harm an individual or direct a person's thoughts or actions.

## *Other Material*

Critics of wireless technology have called attention to various materials in order to further claims about adverse health effects of exposure to EMF, including non-thermal effects. Some people have made assertions that this material has been forgotten, hidden, or suppressed. One example of a paper that opponents of wireless technology characterize as neglected was originally written for the Naval Medical Research Institute (NMRI) in 1971 and updated six months later. The document is "Bibliography of Reported Biological Phenomena ('Effects') and Clinical Manifestations Attributed to Microwave and Radio-frequency Radiation, MF12.524.015-0004B, Report No 2 Revised."[229]

The first chapter of the document provides an outline of biological phenomena that had been reported in individual studies of biological exposure to microwave or RF radiation. The more than 120 reported phenomena are placed into 17 categories such as "changes in physiologic function," "central nervous system effects," "psychological disorders," and "endocrine gland changes." The remainder of the document makes up the bulk of its content and is a bibliography that identifies 2311 research papers, the oldest of which dates from 1925 and the most recent from 1972. The author stated that the paper was created to provide a listing of studies that may be "needed in the formulation and appraisal of criteria and limits of human exposure to non-ionizing radiation, and in the planning and conduct of future research."

The author noted that a few citations were of marginal and/or peripheral relationship but were nonetheless included so a reader could judge the applicability to his individual research needs. The author draws no conclusions and admits that the screening of the entries was limited to relevance of the topic, not the quality of the studies or the validity of their results:

"Note: These effects are listed without comment or endorsement since the literature abounds with conflicting reports. In some cases the basis for reporting an "effect" was a single or a non-statistical observation, which may have been drawn from a poorly conceived (and poorly executed) experiment."

---

[229] <http://www.dtic.mil/cgi-bin/GetTRDoc?AD=AD0750271>.

While there may be people who believe that the listing in the NMRI paper of purported effects resulting from exposure to EMF reveals damning evidence of harm, the document is limited in value for the following reasons:

- The paper merely compiles a list of reported effects without assessing their validity or prevalence;
- The document is primarily intended as a bibliography, citing research performed;
- The material does not offer abstracts for the cited studies (no findings are given);
- The report does not provide conclusions or determine causality - no meta-analysis was performed;
- The list is no longer comprehensive - it is over 40 years old (research dates from 1925 – 1972); and
- The cited studies do not yield any new information - they have been a part of the extensive body of knowledge on RF EMF for many years.

Further, the stated purpose of the NMRI paper was for planning and to conduct future research.   When the FCC established its exposure standards in 1996, the results of the studies listed in the bibliography of the paper had been available for decades, and the standards took this research into consideration.  Research on the biological effects of EMF has continued and will continue for the foreseeable future.

# Conclusion

RF EMF, a form of non-ionizing radiation, has been utilized for nearly a century to broadcast radio and television programs and for many other types of telecommunication. Smart meters, an upgrade to our electrical infrastructure, emit EMF at only low intensity and within a narrow part of the RF band, close to the ranges where UHF TV, cordless phones, and cellular phones operate.

*Decades of scientific research have not provided any proven or unambiguous biological effects from exposure to low-level radio frequency signals. Further, after performing a review of all available material, Staff found no credible evidence to suggest that smart meters emit harmful amounts of RF EMF.*

At higher intensities, RF EMF can heat living tissue. As a result, the FCC established a more restrictive MPE for the general population that is 2% of the level where thermal effects are known to occur. This lower limit was established for the general population because exposure typically results from a situation that the recipient cannot control and a maximum possible time of exposure (24 hours per day) was presumed.

For decades, much scientific research has been performed to investigate the potential health effects of exposure to many kinds of EMF, including RF. Governmental health agencies from around the world, including but not limited to the U.S., Canada, the UK, and Australia, as well as academic institutions and other researchers, have stated that there are no known *non-thermal* effects from exposure to RF EMF. In other words, tissue heating is the only known risk of exposure to RF EMF. Nonetheless, substantial medical research on any potential non-thermal effects of non-ionizing radiation will continue in the future, and will include studies on emissions that fall into the RF bands.

Those concerned about health will often refer to the results of an individual research study or sometimes several studies to draw conclusions. It is important to use great caution when relying on the results of individual research studies because other studies may have inconsistent or even conflicting results. One must also consider that not all studies hold equal value in the scientific community; all research has some amount of inherent bias, and some studies arguably have flaws or lack scientific rigor.

EPRI, Naperville, the Vermont Department of Health, the Victorian State Government of Australia, and the City of Richmond in British Columbia, Canada have conducted investigations of smart meter RF EMF, and found that smart meters complied with the governmental exposure limits in their respective jurisdictions.

When measurements were taken at relative close proximity to smart meters or groups of smart meters, the RF EMF emissions were several orders of magnitude below the established exposure limits. It is important to note that increasing distance will decrease the intensity of an EM field by the square of the distance (i.e. decrease exponentially).

In addition to distance, in-residence exposure to emissions is further decreased by:

- Shielding of the meter enclosure;
- Building construction materials;
- Antenna orientation of the meter; and
- Meter duty cycle – data is transmitted only 1 - 5% of the time.

Some smart meter opponents have raised the concern that the meters may interfere with other electronic devices including implantable medical devices. Smart meters communicate using unlicensed spectrum. The FCC has mitigated the potential for interference among electronic devices operating in unlicensed spectrum by

requiring these devices to be tested and certified as compliant with its rules before they can be marketed. Financial penalties can be assessed if one does not comply with the appropriate FCC equipment authorization procedure. Medical devices must also comply with EMI standards.

Some opponents of smart meters have raised the idea of electromagnetic hypersensitivity and cite anecdotes of having witnessed or experienced various afflictions. After reviewing a substantial body of evidence, the WHO concluded that there was no scientific basis to link EHS symptoms to EMF exposure. It has suggested that symptoms experienced by some individuals described as EHS might arise from environmental factors unrelated to EMF or that the symptoms may be due to pre-existing psychiatric conditions or stress reactions resulting from worrying about EMF health effects, rather than the EMF exposure itself. Further, scientific studies show that people who are ill are highly receptive to negative suggestion and may demonstrate a "nocebo response" as a result of these suggestions.

The notion that EMF can be used as a weapon to cause pain, disrupt thought, or alter or control human behavior might be interesting to some people, but smart meters do not have the capabilities to do these things. First, the output energy from a smart meter radio module is miniscule. Second, the module does not transmit at frequencies near those used in directed energy weapons systems or which have been purportedly used in physiological or psychological experiments. Further, smart meters are designed to measure a customer's overall electricity usage and deliver that data to the utility. A meter may also offer a limited set of information to an end user if he desires. Smart meters are not intended for, are not designed to, and do not have the capability to harm an individual or direct a person's thoughts or actions.

A large number of scientific studies regarding the biological effects of EMF on living organisms have been performed over a period of at least seven decades. These studies are part of an extensive body of human knowledge on the subject, and safety standards have been devised based on the body of knowledge. One must be cautious when individuals make claims about research being suppressed, and when individual studies are cited as evidence that hazards or illnesses are being ignored. Other studies may produce conflicting results. One must be cognizant of what adherence to scientific principles entails and how to decipher research. Laymen often may not recognize poorly executed studies, or they can misinterpret the results of properly conducted scientific research. Either of these circumstances may lead a casual observer to draw errant conclusions.

# Acronyms and Abbreviations

| | |
|---|---|
| AAEM | American Academy of Environmental Medicine |
| AAMI | Association for the Advancement of Medical Instrumentation |
| ABEM | American Board of Environmental Medicine |
| ACMA | Australian Communications and Media Authority |
| AEIC | Association of Edison Illuminating Companies |
| AGNIR | Advisory Group on Non-ionising Radiation |
| AM | Amplitude Modulated |
| ANSI | American National Standards Institute |
| ARPANSA | Australian Radiation Protection and Nuclear Safety Agency |
| BC | British Columbia |
| BCCA | BC Cancer Agency |
| BfS | German Federal Office for Radiation Protection |
| CCST | California Council on Science and Technology |
| CDC | Center for Disease Control and Prevention |
| cm | centimeter (0.01 meter) |
| CPUC | California Public Utilities Commission |
| CRT | Cathode Ray Tube |
| DDT | dichlorodiphenyltrichloroethane |
| EA | Equipment Authorizations |
| EC | European Commission |
| EEG | Electroencephalography |
| EEI | Edison Electric Institute |
| EHS | Electromagnetic Hypersensitivity |
| EIRP | Effective Isotropic Radiated Power |
| ELF | EMF Extremely Low Frequency electromagnetic fields |
| EM | Electromagnetic |
| EMF | Electromagnetic Field |
| EMI | Electromagnetic Interference |
| EMR | Electromagnetic Radiation |
| EPA | U.S. Environmental Protection Agency |
| EPRI | Electric Power Research Institute |
| ERP | Effective Radiated Power |
| EU | European Union |
| eV | Electron Volt |
| FAQ | Frequently Asked Questions |
| FAS | Swedish Council for Working Life and Social Research |
| FCC | Federal Communications Commission |
| FDA | U.S. Food and Drug Administration |
| FM | Frequency Modulated |
| GAO | U.S. Government Accountability Office |
| GHz | Gigahertz (1 billion hertz) |

| | |
|---|---|
| GPS | Global Positioning System |
| HAN | Home Area Network |
| HHS | U.S. Department of Health and Human Services |
| Hz | Hertz (cycles per second) |
| IARC | International Agency for Research on Cancer |
| ICNIRP | International Commission on Non-Ionizing Radiation Protection |
| IEEE | Institute of Electrical and Electronics Engineers |
| kg | kilogram (1000 grams) |
| kHz | kilohertz (1000 hertz) |
| LBNL | Lawrence Berkeley National Laboratory |
| Maine CDC | Maine Center for Disease Control & Prevention |
| MHz | megahertz (1 million hertz) |
| MPE | Maximum Permissible Exposure |
| MPSC | Michigan Public Service Commission |
| MPUC | Maine Public Utilities Commission |
| mW | milliwatt (0.001 watts) |
| NCI | National Cancer Institute |
| NCRP | National Council on Radiation Protection and Measurements |
| NEMA | National Electrical Manufacturers Association |
| NIEHS | National Institute of Environmental Health Sciences |
| NIH | National Institutes of Health |
| NMRI | Naval Medical Research Institute |
| NSGI | Naperville Smart Grid Initiative |
| OET | FCC Office of Engineering and Technologies |
| OPA | Maine Office of the Public Advocate |
| OSHA | U.S. Occupational Safety and Health Administration |
| PG&E | Pacific Gas & Electric |
| PUCT | Public Utility Commission of Texas |
| RF | Radio Frequency |
| RF | EMF Radio Frequency Electromagnetic Field |
| RSC | Royal Society of Canada |
| SAR | Specific Absorption Rate |
| SGTAP | Smart Grid Technical Advisory Project |
| TV | Television |
| UHF | Ultra-high Frequency |
| UK | United Kingdom |
| U.S. | United States of America |
| UTC | Utilities Telecom Council |
| VHF | Very High Frequency |
| W | Watt |
| WHO | World Health Organization |
| µW | microwatt (1 millionth of a watt) |
| µW/cm$^2$ | microwatts per square centimeter |

# References and Resources

Ackerman, Spencer.  "Video: I Got Blasted by the Pentagon's Pain Ray – Twice".  *Wired*, 3/2012.  Web. 10/24/2012.  <http://www.wired.com/dangerroom/2012/03/pain-ray-shot/>.

Adams RL, Williams RA.  *"DST-1810S-074-76: Biological Effects of Electromagnetic Radiation (Radiowaves and Microwaves) - Eurasian Communist Countries (U)"*.  Defense Intelligence Agency, Washington, District of Columbia, 1976.  Web. 10/23/2012.  <http://www.magdahavas.com/wordpress/wp-content/uploads/2011/02/BIOLOGICAL_EFFECTS_OF_ELECTROMAGNETIC_RADIATION-RADIOWAVES_AND_MICROWAVES-EURASIAN_COMMUNIST_COUNTRIES.pdf>.

Ahlbom A, Feychting M, Hamnerius Y, Hillert L.  *"Radiofrequency Electromagnetic Fields and Risk of Disease and Ill Health - Research during the last ten years".*  Swedish Council for Working Life and Social Research, Stockholm, Sweden, 2012.  <http://www.fas.se/pagefiles/5303/10-y-rf-report.pdf>.

Alexander J, et. al.  *"Low-level radiofrequency electromagnetic fields – an assessment of health risks and evaluation of regulatory practice: English Summary".*  Norwegian Institute of Public Health, Oslo, Norway, 2012. Web. 10/31/2012.  <http://www.fhi.no/dokumenter/545eea7147.pdf>.  Full Report (Norwegian): <http://www.fhi.no/dokumenter/6563fe9a33.pdf>.

American Academy of Environmental Medicine.  Web.  8/7/2012.  <http://www.aaemonline.org/>.

American Board of Environmental Medicine, The.  Web.  8/7/2012. <http://www.americanboardofenvironmentalmedicine.org/>.

American Board of Medical Specialties, The.  Web.  8/7/2012. <http://www.abms.org/Who_We_Help/Physicians/specialties.aspx>.

American National Standards Institute.  *ANSI/AAMI PC69:2007 - Active implantable medical devices - Electromagnetic compatibility - EMC test protocols for implantable cardiac pacemakers and implantable cardioverter defibrillators.*  2012.  New York, New York.  Web.  8/24/2012. <http://webstore.ansi.org/RecordDetail.aspx?sku=ANSI%2FAAMI+PC69%3A2007>.

American Society of News Editors.  *Statement of Principles.*  Columbia, Missouri, 1975.  Web.  10/15/2012. <http://asne.org/content.asp?pl=24&sl=171&contentid=171>.

Associated Press Managing Editors.  *Statement of Ethical Principles.*  New York, New York, 1994.  Web. 10/15/2012.  <http://www.apme.com/?page=EthicsStatement>.

Atkinson B, Dawson P, Patton D, Shiell R, Slavin A, Wortis R.  "Opinion/Letters: Physicists see no danger from WiFi in schools." *Peterborough Examiner.*  Friday, October 15, 2010.  Web.  10/10/2012. <http://www.thepeteroroughexaminer.com/2010/10/15/physicists-see-no-danger-from-wifi-in-schools>.

Austin Bradford Hill.  *The Environment and Disease: Association or Causation?* Proceedings of the Royal Society of Medicine, 58 (1965), 295-300.  Web.  8/7/2012.  <http://www.edwardtufte.com/tufte/hill>.

Australia Office of Legislative Drafting and Publishing, Attorney-General's Department.  *Radiocommunications (Electromagnetic Radiation - Human Exposure) Standard 2003 as amended - F2011C00165.*  Canberra, Australia, 2011.  Web.  8/7/2012.  <http://www.comlaw.gov.au/Details/F2011C00165>.

Australian Centre for Radiofrequency Bioeffects Research. *ACRBR Position Statement on BioInitiative Report.* Hawthorn, Victoria, Australia, 2008. Web. 10/8/2012. <http://www.acrbr.org.au/FAQ/ACRBR%20Bioinitiative%20Report%2018%20Dec%202008.pdf>.

Australian Radiation Protection and Nuclear Safety Agency. *Maximum Exposure Levels to Radiofrequency Fields – 3 kHz to 300 GHz; Radiation Protection Series Publication No. 3.* Canberra, Australia, 2002. Web. 8/7/2012. <http://www.arpansa.gov.au/pubs/rps/rps3.pdf>.

BC Cancer Agency. *Smart Meter and Cancer Risk Statement.* Victoria, British Columbia, Canada, 2011. Web. 8/7/2012. <http://www.health.gov.bc.ca/pho/issues.html>.

Bergqvist U, Vogel E (eds). 1997. *Possible health implications of subjective symptoms and electromagnetic fields.* National Institute for Working Life, Solna, Sweden. Web. 10/17/2012. <https://gupea.ub.gu.se/bitstream/2077/4156/1/ah1997_19.pdf>.

California Council on Science and Technology. 8/7/2012. Web. <http://www.ccst.us/about.php>.

California Council on Science and Technology. *Health Impacts of Radio Frequency From Smart Meters.* Sacramento, California, 2011. Web. 8/7/2012. <http://www.ccst.us/publications/2011/2011smart-final.pdf>.

Casewatch: Your Guide to Health-Related Legal Matters. *William Rea, M.D. Settles Charges by the Texas Medical Board.* Stephen Barrett, M.D. Allentown, Pennsylvania, 2010. Web. 10/19/2012. <http://www.casewatch.org/board/med/rea/order.shtml>.

City of Naperville. *Naperville Smart Grid Initiative (NSGI) Pilot 2 RF Emissions Testing - Plan and Results – V2.0; Smart Meters, Household Equipment, and the General Environment.* Naperville, Illinois, 2011. Web. 8/7/2012. <http://www.naperville.il.us/emplibrary/Smart_Grid/Pilot2RFEmissionsTesting-Final.pdf>.

City of Naperville. *Naperville Smart Grid Initiative (NSGI) Pilot 2 RF Emissions Testing – Summary Report – V2.0; Smart Meters, Household Equipment, and the General Environment.* Naperville, Illinois, 2011. Web. 8/7/2012. <http://www.naperville.il.us/emplibrary/Smart_Grid/Pilot2-RFEmissionsTesting-SummaryReport.pdf>.

City of Naperville. *Naperville Smart Grid Initiative: Smart Meters and Radio Frequency Communications.* Naperville, Illinois, 2011. Web. 9/7/2012. <http://www.naperville.il.us/emplibrary/Smart_Grid/SmartMeterandRFCommunications.pdf>.

Code of Federal Regulations, Title 47 – Telecommunication, Chapter 1, Subchapter A, Part 1 §1.1307(b). 51 FR 15000, Apr. 22, 1986. Web. 10/23/2012. <http://www.gpo.gov/fdsys/pkg/CFR-2011-title47-vol1/xml/CFR-2011-title47-vol1-sec1-1307.xml>.

Code of Federal Regulations, Title 47 – Telecommunication, Chapter 1, Subchapter A, Part 1 §1.1310. 61 FR 41016, Aug. 7, 1996. Web. 8/7/2012. <http://www.gpo.gov/fdsys/pkg/CFR-2011-title47-vol1/xml/CFR-2011-title47-vol1-sec1-1310.xml>.

Code of Federal Regulations, Title 47 – Telecommunication, Chapter 1, Subchapter A, Part 2, Subpart J §1.1091. 70 FR 24725, May 11, 2005. Web. 10/23/2012. <http://www.gpo.gov/fdsys/pkg/CFR-2009-title47-vol1/xml/CFR-2009-title47-vol1-sec2-1091.xml>.

Code of Federal Regulations, Title 47 – Telecommunication, Chapter 1, Subchapter A, Part 2, Subpart J §1.1093. 74 FR 22704, May 14, 2009.  Web.  10/23/2012. <http://www.gpo.gov/fdsys/pkg/CFR-2009-title47-vol1/xml/CFR-2009-title47-vol1-sec2-1093.xml>.

Code of Federal Regulations, Title 47 – Telecommunication, Chapter 1, Subchapter A, Part 15.  Washington, District of Columbia, 2012.  Web.  8/7/2012. <http://www.gpo.gov/fdsys/pkg/CFR-2010-title47-vol1/xml/CFR-2010-title47-vol1-part15.xml>.

Code of Federal Regulations, Title 47 – Telecommunication, Chapter 1, Subchapter B, Part 22, Subpart H, § 22.913. 69 FR 75171, Dec. 15, 2004.  Web.  12/6/2012. <http://www.gpo.gov/fdsys/pkg/CFR-2011-title47-vol2/xml/CFR-2011-title47-vol2-sec22-913.xml >.

Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence, Federal Judicial Center, Committee on Science, Technology, Law Policy and Global Affairs, National Research Council. *Reference Manual on Scientific Evidence: Third Edition.*  Washington, District of Columbia.  The National Academies Press, 2011.  Web.  10/6/2012.  <http://www.nap.edu/catalog.php?record_id=13163>.

County of Santa Cruz. *Smart Meter Moratorium.*  Santa Cruz, California, January 18, 2012.  Web.  8/7/2012. <http://www.santacruzhealth.org/pdf/2012%20Report%20on%20SmartMeters.pdf>.

Department of Defense Non-lethal Weapons Program, U.S.  Quantico, Virginia, 2012.  Web.  10/25/2012. <http://jnlwp.defense.gov/>.

Department of the Army, U.S. *Bioeffects of Selected Nonlethal Weapons.*  Fort George G. Meade, Maryland, 2006. Web.  10/31/2012.  <http://www.slavery.org.uk/Bioeffects_of_Selected_Non-Lethal_Weapons.pdf>.

Edison Electric Institute. *A Discussion of Smart Meters and RF Exposure Issues: An EEI-AEIC-UTC White Paper.* Washington, District of Columbia, 2011.  Web.  8/7/2012. <http://www.aeic.org/meter_service/smartmetersandrf031511.pdf>.

Electric Power Research Institute.  Web.  8/7/2012.  <http://www.epri.com/>.

Electric Power Research Institute. *A Perspective on Radio-Frequency Exposure Associated With Residential Automatic Meter Reading Technology.*  Palo Alto, California, 2010.  Web.  8/7/2012. <http://my.epri.com/portal/server.pt?Abstract_id=000000000001020798>.

Electric Power Research Institute. *An Investigation of Radiofrequency Fields Associated with the Itron Smart Meter.*  Palo Alto, California, 2011.  Web. 8/7/2012. <http://my.epri.com/portal/server.pt?Abstract_id=000000000001021126>.

Electric Power Research Institute. *BioInitiative Working Group Report, The.*  Palo Alto, California, 2009.  Web. 10/8/2012.  <http://emf.epri.com/BioInitiative_Working_Group_Report_Updated_7-09.pdf>.

Electric Power Research Institute. *Characterization of Radio Frequency Emissions From Two Models of Wireless Smart Meters.*  Palo Alto, California, 2011.  Web.  8/7/2012. <http://my.epri.com/portal/server.pt?Abstract_id=000000000001021829>.

Electric Power Research Institute.  *EPRI Comment: Sage Report on Radio-Frequency (RF) Exposures from Smart Meters.*  Palo Alto, California, 2012.  Web.  8/22/2012. <http://my.epri.com/portal/server.pt?Abstract_id=000000000001022639>.

Electric Power Research Institute.  *EPRI Comments: A Perspective on Two Smart Meter Memoranda.*  Palo Alto, California, 2012.  Web.  8/7/2012. <http://my.epri.com/portal/server.pt?Abstract_id=000000000001024952>.

Electric Power Research Institute.  *EPRI 2013 Research Portfolio: Electric and Magnetic Fields and Radio-Frequency Health Assessment and Safety - Program 60.*  Palo Alto, California, 2012.  Web.  8/23/2012. <http://mydocs.epri.com/docs/Portfolio/PDF/2013_P060.pdf>.

Electric Power Research Institute.  *Program on Technology Innovation: Environmental and Health Issues Related to Radiofrequency Emissions from Smart Technologies - Summary of Two Workshops.*  Palo Alto, California, 2011.  Web.  8/7/2012.  <http://my.epri.com/portal/server.pt?Abstract_id=000000000001024737>.

Electric Power Research Institute.  *Radio-Frequency Exposure Levels from Smart Meters: A Case Study of One Model*.  Palo Alto, California, 2011.  Web.  8/7/2012. <http://my.epri.com/portal/server.pt?Abstract_id=000000000001022270>.

Elliott P, Toledano MB, Bennett J, Beale L, de Hoogh K, Best N, Briggs DJ.  2010.  *Mobile phone base stations and early childhood cancers: case-control study.*  BMJ 340:c3077.  Web.  8/7/2012. <http://www.bmj.com/highwire/filestream/370424/field_highwire_article_pdf/0/bmj.c3077>.  Correction: BMJ 341:c4115.  Web.  12/11/2012.  <http://www.bmj.com/content/341/bmj.c4115>

EMF and Health: Dedicated to Real Science.  *EMF Explained.*  Montréal, Québec, Canada, 2009.  Web. 8/7/2012.  <http://www.emfandhealth.com/EMFExplained.html>.

EMF and Health: Dedicated to Real Science.  *Science Sources: Evidence Based Science Web Sites.*  Montréal, Québec, Canada, 2009.  Web.  8/7/2012.  <http://www.emfandhealth.com/Science%20Sources.html>.

Encyclopaedia Britannica.  *Electromagnetic Field.*  Encyclopædia Britannica, Inc.  Chicago, Illinois.  10/4/2012. Web.  10/4/2012.  <http://www.britannica.com/EBchecked/topic/183201/electromagnetic-field>.

Environmental Protection Agency.  *Understanding Radiation: Ionizing & Non-Ionizing Radiation.*  Web. 9/7/2012.  <http://www.epa.gov/radiation/understand/index.html>.

European Commission.  *Health and electromagnetic fields.*  Research Directorate-General - European Communities, Brussels Belgium, 2005.  Web.  10/8/2012.  <http://ihcp.jrc.ec.europa.eu/our_activities/public-health/exposure_health_impact_met/emf-net/docs/publications/EMF_brochure_and_sheets_en.pdf>.

European Commission.  *Comments on the BioInitiative Report.*  EMF-NET Coordination Action – The Steering Committee, Brussels Belgium, 2007.  Web.  10/9/2012.  <http://ihcp.jrc.ec.europa.eu/our_activities/public-health/exposure_health_impact_met/emf-net/docs/efrtdocuments/EMF-NET%20Comments%20on%20the%20BioInitiative%20Report%2030OCT2007.pdf>.

European Cooperation in Science and Technology.  *COST 244bis, Biomedical Effects of Electromagnetic Fields: Final Report.*  Brussels, Belgium, 2000.  Web.  10/17/2012. <ftp://ftp.cordis.europa.eu/pub/cost/docs/244bisfinalreport.pdf>.

Fanelli D. 2009. *How Many Scientists Fabricate and Falsify Research? A Systematic Review and Meta-Analysis of Survey Data.* PLoS ONE 4(5): e5738. Web. 9/18/2012. <http://www.plosone.org/article/info%3Adoi%2F10.1371%2Fjournal.pone.0005738>.

Federal Communications Commission. *About the FCC.* Web. 8/7/2012. <http://transition.fcc.gov/aboutus.html>.

Federal Communications Commission Office of Engineering & Technology. *Evaluating Compliance with FCC Guidelines for Human Exposure to Radiofrequency Electromagnetic Fields.* OET BULLETIN 65, Edition 97-01. Washington, District of Columbia, 1997. Web. 8/7/2012. <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet65/oet65.pdf>.

Federal Communications Commission, Office of Engineering and Technology. *Equipment Authorization: Authorization procedures.* Washington, District of Columbia, 2012. Web. 8/7/2012. <http://transition.fcc.gov/oet/ea/procedures.html>.

Federal Communications Commission Office of Engineering & Technology. *Questions and Answers about Biological Effects and Potential Hazards of Radiofrequency Electromagnetic Fields.* OET BULLETIN 56, Fourth Edition. Washington, District of Columbia, August 1999. Web. 8/7/2012. <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet56/oet56e4.pdf>.

Federal Communications Commission Office of Engineering & Technology. *Radio Frequency Safety.* Washington, District of Columbia, 2012. Web. 8/24/2012. <http://transition.fcc.gov/oet/rfsafety/rf-faqs.html>.

Federal Communications Commission Office of Engineering & Technology. *Understanding The FCC Regulations for Computers and Other Digital Devices.* OET BULLETIN NO. 62. Washington, District of Columbia, 1997. Web. 8/11/2012. <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet62/oet62rev.pdf>.

Federal Communications Commission Office of Engineering & Technology. *Understanding The FCC Regulations for Low-Power, Non-Licensed Transmitters.* OET BULLETIN NO. 63. Washington, District of Columbia, 1996. Web. 8/11/2012. <http://transition.fcc.gov/Bureaus/Engineering_Technology/Documents/bulletins/oet63/oet63rev.pdf>.

Firstenberg v. Monribot and Leith, No. D-101-CV-2010-00029, New Mexico 1st Dist, Santa Fe County, Sept 18, 2012. Web. 10/5/2012. <http://www.casewatch.org/civil/firstenburg/dismissal_order.pdf>.

Food and Drug Administration, U.S. *Interference with Pacemakers and Other Medical Devices.* Silver Spring, Maryland, 2012. Web. 8/24/2012. <http://www.fda.gov/Radiation-EmittingProducts/RadiationEmittingProductsandProcedures/HomeBusinessandEntertainment/CellPhones/ucm116311.htm>.

Foster KR. 2007. *Radiofrequency exposure from wireless LANs utilizing Wi-Fi technology.* Health Phys 92:280-9.

Franke H, Ringelstein EB, Stögbauer F. 2005. Abstract: *Electromagnetic fields (GSM 1800) do not alter blood–brain barrier permeability to sucrose in models in vitro with high barrier tightness.* Bioelectromagnetics 26:529–535. Web. 8/7/2012. <http://www.ncbi.nlm.nih.gov/pubmed/16142784>.

Frei P, Poulsen AH, Johansen C, Olsen JH, Steding-Jessen M, Schüz J. 2011. *Use of mobile phones and risk of brain tumours: update of Danish cohort study*. BMJ 343:d6387. Web. 9/7/2012. <http://www.bmj.com/highwire/filestream/447947/field_highwire_article_pdf/0/bmj.d6387.full.pdf>.

French Agency for Environmental and Occupational Health Safety. *Mise à jour de l'expertise relative aux radiofréquences* (in French). Maisons-Alfort, France, 2009. Web. 10/9/2012. <http://www.afsset.fr/upload/bibliotheque/964737982279214719846901993881/Rapport_RF_20_151009_l.pdf>.

Frey A. 1962. "*Human auditory system response to modulated electromagnetic energy*". Journal of Applied Physiology 17(4):689-692. Web. 10/31/2012. <http://jap.physiology.org/content/17/4/689>.

German Federal Office for Radiation Protection. *Zusammenstellung der Studien, die öffentliches Interesse erweckt haben, und deren Bewertung durch das BfS* (in German). Salzgitter, Germany, 2008. Web. 10/8/2012. <http://www.emf-forschungsprogramm.de/int_forschung/wirk_mensch_tier/Synopse_EMFStudien_2008.pdf>.

Glaser ZR. "*Bibliography of Reported Biological Phenomena ('Effects') and Clinical Manifestations Attributed to Microwave and Radio-frequency Radiation, MF12.524.015-0004B, Report No 2 Revised.*" Naval Medical Research Institute, Bethesda, Maryland, 1972. Web. 11/5/2012. <http://www.dtic.mil/cgi-bin/GetTRDoc?AD=AD0750271>.

Government Accountability Office, U.S. *Exposure and Testing Requirements for Mobile Phones Should Be Reassessed.* Washington, District of Columbia, 2012. Web. 9/6/2012. <http://www.gao.gov/assets/600/592901.pdf>.

Habash RW, Elwood JM, Krewski D, Lotz WG, McNamee JP, Prato FS. 2009. *Recent advances in research on radiofrequency fields and health: 2004-2007.* Journal of Toxicology and Environmental Health, Part B Critical Reviews 2009; 12(4):250-88. Web. 8/24/2012. <http://www.ncbi.nlm.nih.gov/pubmed/20183523>.

Hambling, David. "Say Hello to the Goodbye Weapon". *Wired*, 12/05/2006. Web. 10/24/2012. <http://www.wired.com/science/discoveries/news/2006/12/72134?currentPage=all>.

Häuser W, Hansen E, Enck P. 2012. "*Nocebo phenomena in medicine: their relevance in everyday clinical practice.*" Deutsches Ärzteblatt International; 109(26): 459–65. Web. 12/5/2012. <http://www.aerzteblatt.de/pdf.asp?id=127210>.

Havas, M. *Dr. Magda Havas Bio.* Peterborough, Ontario, Canada, 2012. Web. 10/9/2012. <http://www.magdahavas.org/dr-magda-havas-bio/>.

Hayes DL, Wang PJ, Reynolds DW, Estes M, Griffith JL, Steffens RA, Carlo GL, Findlay GK, Johnson CM. 1997. *Interference with Cardiac Pacemakers by Cellular Telephones.* The New England Journal of Medicine. V. 336 N. 21 Web. 8/24/2012. <http://www.nejm.org/doi/pdf/10.1056/NEJM199705223362101>.

Health Canada. Web. 8/7/2012. <http://www.hc-sc.gc.ca/ahc-asc/index-eng.php>.

Health Canada. *Health Canada's Radiofrequency Exposure Guidelines.* Ottawa, Ontario, Canada, 2010. Web. 8/7/2012. <http://www.hc-sc.gc.ca/ewh-semt/pubs/radiation/radio_guide-lignes_direct-eng.php>.

Health Council of the Netherlands, The. *Electromagnetic Fields: Annual Update 2008.* The Hague, Netherlands, 2009. Web. 12/5/2012. <http://www.gezondheidsraad.nl/sites/default/files/200902.pdf>.

Institute of Electrical and Electronics Engineers, Inc., The, Committee on Man and Radiation. *COMAR Technical Information Statement: Expert reviews on potential health effects of radiofrequency electromagnetic fields and comments on the BioInitiative Report.* Health Phys Oct 2009; 97(4):348-56. Web. 10/9/2012. <http://www.emfandhealth.com/12265_COMAR_2009.pdf>.

Institute of Electrical and Electronics Engineers, Inc., The. *IEEE Std C95.1™ - 2005: IEEE Standard for Safety Levels with Respect to Human Exposure to Radio Frequency Electromagnetic Fields, 3 kHz to 300 GHz.* New York, New York, 2005. Web. 9/5/2012. <http://standards.ieee.org/findstds/standard/C95.1-2005.html>.

Institute of Electrical and Electronics Engineers, Inc., The. *IEEE Std C95.3™ - 2002 (R2008): IEEE Recommended Practice for Measurements and Computations of Radio Frequency Electromagnetic Fields With Respect to Human Exposure to Such Fields, 100 kHz–300 GHz.* New York, New York, 2008. Web. 9/5/2012. <http://standards.ieee.org/findstds/standard/C95.3-2002.html>.

Institute of Electrical and Electronics Engineers, Inc., The. *IEEE Std C95.6™ - 2002: IEEE Standard for Safety Levels with Respect to Human Exposure to Electromagnetic Fields, 0–3 kHz.* New York, New York, 2002. Web. 8/31/2012. <http://standards.ieee.org/findstds/standard/C95.6-2002.html>.

Institute of Electrical and Electronics Engineers, Inc., The. *IEEE Std C95.7™ - 2005: IEEE Recommended Practice for Radio Frequency Safety Programs, 3 kHz to 300 GHz.* New York, New York, 2005. Web. 9/5/2012. <http://standards.ieee.org/findstds/standard/C95.7-2005.html>.

International Agency for Research on Cancer. Web. 8/7/2012. <http://monographs.iarc.fr/>.

International Agency for Research on Cancer. *IARC Monographs on the Evaluation of Carcinogenic Risks to Humans.* Lyon, France 2006. Web. 8/7/2012. <http://monographs.iarc.fr/ENG/Preamble/CurrentPreamble.pdf>.

International Commission on Non-Ionizing Radiation Protection (ICNIRP). 2009. *Exposure to High Frequency Electromagnetic Fields, Biological Effects and Health Consequences (100 kHz-300 GHz).* International Commission on Non-Ionizing Radiation Protection, Oberschleißheim, Germany. Web. 8/31/2012. <http://www.icnirp.de/documents/RFReview.pdf>.

International Commission on Non-Ionizing Radiation Protection (ICNIRP). *ICNIRP Guidelines for Limiting Exposure to Time-Varying Electric, Magnetic and Electromagnetic Fields (Up To 300 GHz).* Health Physics 1998; 74 (4):494-522. Web. 8/31/2012. <http://www.icnirp.org/documents/emfgdl.pdf>.

International Telecommunication Union. "ITU releases latest global technology development figures". Geneva, Switzerland, 2012. Web. 10/22/2012. <http://www.itu.int/net/pressoffice/press_releases/2012/70.aspx>.

INTERPHONE Study Group, The. "*Brain tumour risk in relation to mobile telephone use: results of the INTERPHONE international case–control study".* International Journal of Epidemiology 2010; 39:675–694. Web. 8/7/2012. <http://ije.oxfordjournals.org/content/39/3/675.full.pdf>.

Itron, Inc.  *Analysis of Radio Frequency Exposure Associated with Itron OpenWay Communications Equipment.*
Liberty Lake, Washington, 2011.  Web.  8/7/2012.
<https://www.itron.com/na/PublishedContent/wp_analysis_RFexposure_OW_comm_equip.pdf>.

Itron, Inc.  *Wireless Transmissions: An Examination of OpenWay Smart Meter Transmissions in a 24-Hour Duty Cycle.*  Liberty Lake, Washington, 2011. Web.  8/7/2012.
<https://www.itron.com/na/PublishedContent/OpenWay%20Wireless%20Transmissions_24%20Hour%20Duty%20Cycle.pdf>.

Jauchem JR.  1993.  *"Alleged health effects of electric or magnetic fields: additional misconceptions in the literature."*  J Microwave Power Electromagnetic Energy 28(3):140-55.  Web.  10/22/2012.
<http://www.jmpee.org/JMPEE_PDFs/28-3_bl/JMPEE-Vol28-3-Pg140-Jauchem.pdf>.

Jauchem JR.  1991.  *"Alleged health effects of electromagnetic fields: misconceptions in the scientific literature."*  J Microwave Power Electromagnetic Energy 26(4):189-95.  Web.  10/22/2012.
<http://www.jmpee.org/JMPEE_PDFs/26-4_bl/JMPEE-Vol26-Pg189-Jauchem.pdf>.

Jauchem JR.  1995.  *"Alleged health effects of electromagnetic fields: the misconceptions continue."*  J Microwave Power Electromagnetic Energy 30(3):165-77.  Web.  10/22/2012.
<http://www.jmpee.org/JMPEE_PDFs/30-3_bl/JMPEE-Vol30-Pg165-Jauchem.pdf>.

Jauchem JR.  1992.  *"Epidemiologic studies of electric and magnetic fields and cancer: A case study of distortions by the media."*  J Clin Epidemiol.  45(10):1137-42.  Web.  10/22/2012.
<http://www.dtic.mil/dtic/tr/fulltext/u2/a275434.pdf>.

Kofsky, Harvey.  *Magda Havas: "Fear and Fabrication".*  EMF & Health, Montréal, Québec, Canada, 2009.  Web.  10/10/2012.  <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%205.html>.

Kofsky, Harvey.  *More Poor Quality EHS Studies: Comments on the Havas San Francisco Submission.*  EMF & Health, Montréal, Québec, Canada, 2009.  Web.  10/10/2012.
<http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%203.html>.

Krimsky S.  2005.  *The Weight of Scientific Evidence in Policy and Law.*  Am J Public Health 95:S129–S136.  Web.  10/18/2012.  <http://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2004.044727>.

Kuribayashi M, Wang J, Fujiwara O, Doi Y, Nabae K, Tamano S, Ogiso T, Asamoto M, Shirai T.  2005.  Abstract: *Lack of effects of 1439 MHz electromagnetic near field exposure on the blood–brain barrier in immature and young rats.  Bioelectromagnetics* 26:578–588.  Web.  8/7/2012.
<http://onlinelibrary.wiley.com/doi/10.1002/bem.20138/abstract>.

LaMothe J.  *"ST-CS-01-169-72: Controlled Offensive Behavior - USSR (U)".*  U.S. Army Office of the Surgeon General, Medical Intelligence Office.  Defense Intelligence Agency, Washington, District of Columbia, 1972.  Web.  10/23/2012.  <http://science.discovery.com/tv/dark-matters/documents/pdf/controlled-offensive-behavior.pdf>.

Letter from American Academy of Environmental Medicine to Michigan Public Service Commission, dated April 12, 2012.  *Re: Smart Meter Installation Case Number: U-17000.*  Web.  8/7/2012.
<http://efile.mpsc.state.mi.us/efile/docs/17000/0391.pdf>.

Letter from Julius P. Knapp, Federal Communications Commission to Ms. Cindy Sage, dated August 6, 2010. Web. 8/7/2012. <http://www.ccst.us/projects/smart/documents/Sage_Letter_from_%20Knapp_FCC.pdf>.

Letter from Prof. M. deVisser, Vice-president of The Health Council of the Netherlands to The Minister of Housing, Spatial Planning and the Environment, dated September 2, 2008. *Subject: BioInitiative report, Publication no. 2008/17E.* The Hague, Netherlands. Web. 10/8/2012. <http://www.gezondheidsraad.nl/sites/default/files/200817E_0.pdf>.

Letter from Roger Levy and Janie Page, Smart Grid Technical Advisory Project, Lawrence Berkeley National Laboratory to Patrick Hudson, Michigan Public Service Commission, dated April 12, 2012. *Review of the January 13, 2012 County of Santa Cruz Health Services Agency memorandum: Health Risks Associated with Smart Meters.* Web. 8/7/2012. <http://eetd.lbl.gov/ea/ems/reports/schsa-042012.pdf>.

Letter from Roger Levy and Janie Page, Smart Grid Technical Advisory Project, Lawrence Berkeley National Laboratory to Patrick Hudson, Michigan Public Service Commission, dated April 18, 2012. *Review of the April 12, 2012 American Academy of Environmental Medicine (AAEM) submittal to the Michigan Public Service Commission.* Web. 8/7/2012. <http://eetd.lbl.gov/ea/emp/reports/aaem-042012.pdf>.

Letter from Vancouver Coastal Health to Mayor and Council of City of Richmond, British Columbia, Canada, dated December 20, 2011. Web. 8/7/2012. <http://www.health.gov.bc.ca/pho/pdf/vch-response-to-richmond-city-council-re-investigation-into-smart-meters.pdf>.

Lin JC, Wang Z. 2007. *Hearing of microwave pulses by humans and animals: effects, mechanism, and thresholds.* Health Phys 92(6):621-8. Web. 11/15/2012. <http://www.ncbi.nlm.nih.gov/pubmed/17495664>.

Little MP, Rajaraman P, Curtis RE, Devesa SS, Inskip PD, Check DP, Linet MS. March 2012. *Mobile phone use and glioma risk: comparison of epidemiological study results with incidence trends in the United States*. BMJ 2012; 344:e1147. Web. 8/7/2012. <http://www.bmj.com/content/344/bmj.e1147>.

Maine Center for Disease Control and Prevention. Web. 8/7/2012. <https://www.maine.gov/dhhs/boh/smart_meters.shtml>.

Maine Center for Disease Control and Prevention. *Maine CDC Executive Summary of Review of Health Issues Related To Smart Meters.* Augusta, Maine, 2010. Web. 8/7/2012. <https://www.maine.gov/dhhs/boh/documents/Smart_Meters_Maine_CDC_Executive_Summary_11_08_10.pdf>.

Maine Center for Disease Control and Prevention. *Government or Government-Affiliated Resources Reviewed on the Health Effects of Non-Ionizing Radiation by the Maine CDC.* Augusta, Maine, 2010. Web. 8/7/2012. <https://www.maine.gov/dhhs/boh/documents/Smart_Meters_Review_of_Government_Resources_11_08_10.pdf>.

Maine Center for Disease Control and Prevention. *Eight Leading Questions/Concerns of Maine CDC's Approach to and Report on Smart Meters.* Augusta, Maine, 2010. Web. 8/7/2012. <https://www.maine.gov/dhhs/boh/documents/smart-meters-faq.pdf>.

Meta-Stat. *ERIC Clearinghouse on Assessment and Evaluation.* Department of Measurement, Statistics and Evaluation. 2002. University of Maryland, College Park, Maryland. Web. 9/6/2012. <http://echo.edres.org:8080/meta>.

Mobile Manufacturers Forum.  *MMF Commentary on BioInitiative Report.*  Brussels, Belgium, 2009.  Web. 10/9/2012. <http://mmfai.info/public/docs/eng/MMF_Viewpoint_BioInitiativeReport.pdf>.

Monterey County Health Department, Public Health Bureau, Epidemiology and Evaluation.  *Review of Health Issues Related to Smart Meters.*  Salinas, California, 2011.  Web.  8/7/2012. <http://publicagendas.co.monterey.ca.us/MG97205/AS97224/AS97230/AI99413/DO99416/DO_99416.pdf>.

Moran, Terry and Foster, Mary-Claude.  "Controversial Clinic for the 'Chemically Sensitive'".  ABC News.  New York, New York, 3/20/2008.  Web.  10/19/2012. <http://abcnews.go.com/Health/story?id=4489265>.

Multiple Signatories.  *Open Letter to the Public, English Version: Wireless Technologies: For an Informed and Responsible Debate Guided by Sound Science.*  Montréal, Québec, Canada, 2012.  Web.  8/7/2012. <http://www.polymtl.ca/phys/doc/Lettre_ouverte_de_scientifiques_quebecois_les_compteurs_intelligents.pdf>.

National Cancer Institute at the National Institutes of Health, The.  Web.  8/7/2012. <http://www.cancer.gov/cancertopics/factsheet/NCI/NCI>.

National Cancer Institute at the National Institutes of Health, The.  *Cell Phones and Cancer Risk*.  Bethesda, Maryland, 2012.  Web.  8/7/2012. <http://www.cancer.gov/cancertopics/factsheet/Risk/cellphones>.

National Cancer Institute at the National Institutes of Health, The.  *NCI Statement: International Study Shows No Increased Risk of Brain Tumors from Cell Phone Use.*  Bethesda, Maryland, 2012.  Web.  8/7/2012. <http://www.cancer.gov/newscenter/pressreleases/2010/Interphone2010Results>.

National Cancer Institute at the National Institutes of Health, The.  *U.S. population data show no increase in brain cancer rates during period of expanding cell phone use.*  Bethesda, Maryland, 2012.  Web.  8/7/2012. <http://www.cancer.gov/newscenter/pressreleases/2012/GliomaCellPhoneUse>.

National Council on Radiation Protection and Measurements.  *NCRP Report No. 86, Biological Effects and Exposure Criteria for Radiofrequency Electromagnetic Fields.*  Bethesda, Maryland, 1986.  Web.  8/7/2012. <http://www.ncrppublications.org/Reports/086>.

National Institute for Occupational Safety and Health.  *Manual for Measuring Occupational Electric and Magnetic Field Exposures.*  Cincinnati, Ohio, 1998.  Web.  10/18/2012. <http://www.cdc.gov/niosh/docs/98-154/pdfs/98-154.pdf>.

National Institute of Environmental Health Sciences at the National Institutes of Health.  *NIH Publication No. 98-3981: Assessment of Health Effects from Exposure to Power-Line Frequency Electric and Magnetic Fields.*  Research Triangle Park, North Carolina, 1998.  Web.  9/7/2012. <http://www.niehs.nih.gov/health/assets/docs_a_e/assessment_of_health_effects_from_exposure_to_powerline_frequency_electric_and_magnetic_fields.pdf>.

National Institute of Environmental Health Sciences at the National Institutes of Health.  *NIH Publication No. 99-4493: NIEHS Report on Health Effects from Exposure to Power-Line Frequency Electric and Magnetic Fields.* Research Triangle Park, North Carolina, 1999.  Web.  9/7/2012. <http://www.niehs.nih.gov/health/assets/docs_f_o/health_effects_from_exposure_to_powerline_frequency_ electric_and_magnetic_fields.pdf>.

National Institutes of Health Office of Research Integrity.  *Findings of Scientific Misconduct.*  Department of Health and Human Services.  Rockville, Maryland, June 18, 1999.  Web.  10/9/2012. <http://grants.nih.gov/grants/guide/notice-files/not99-111.html>.

National Telecommunications and Information Administration, U.S. Department of Commerce.  *United States Frequency Allocations.*  Washington, District of Columbia, 2011.  Web.  10/16/2012. <http://www.ntia.doc.gov/files/ntia/publications/spectrum_wall_chart_aug2011.pdf>.

Ng K, Girnara H, Zombolas C, Wood A, EMC Technologies.  *AMI Meter Electromagnetic Field Survey.*  October, 2011.  Department of Primary Industries, Victoria, Australia.  Web.  8/7/2012.  HTML webpage: <http://www.dpi.vic.gov.au/smart-meters/publications/reports-and-consultations/ami-meter-em-field-survey-repor>.  PDF document: <http://www.dpi.vic.gov.au/__data/assets/pdf_file/0011/138926/AMI-Meter-EM-Field-Survey-Report-Final-Rev-1.0.pdf>.

Niehaus M, Tebbenjohanns J.  *Electromagnetic interference in patients with implanted pacemakers or cardioverter-defibrillators.*  Heart 2001 86:246-248.  Web.  8/24/2012. <http://heart.bmj.com/content/86/3/246.full.pdf+html>.

Nightline.  "Cutting Edge or Reckless Medicine?"  ABC News Video.  New York, New York, 09/25/2008.  Web. 10/19/2012.  <http://abcnews.go.com/Nightline/video?id=5881281>.

Nightline.  "Dr. Lisa Nagy and Dr. William Rea appear on Nightline".  ABC News Video.  New York, New York, 2008.  Video uploaded by username "pehadoc" on Dec 23, 2008.  Web.  10/19/2012. <http://www.youtube.com/watch?v=-gx4zxxi0xQ>.

Norwegian Institute of Public Health.  *"Press Release: Mobile phones and wireless networks: No evidence of health risk found".*  Oslo, Norway, 2012.  Web.  9/12/2012. <http://www.fhi.no/eway/default.aspx?pid=238&trg=MainLeft_5895&MainArea_5811=5895:0:15,2829:1:0:0:: :0:0&MainLeft_5895=5825:99168::1:5896:1:::0:0>.

Novella, Steven.  *CFLs, Dirty Electricity and Bad Science.*  Science-Based Medicine, New Haven, Connecticut. 9/22/2010.  Web.  10/10/2012.  <http://www.sciencebasedmedicine.org/index.php/cfls-dirty-electricity-and-bad-science/>.

Occupational Safety & Health Administration, Cincinnati Technical Center.  *Field Service Memo dated May 20, 1990, Electromagnetic Radiation and How it Affects Your Instruments; Appendix B, Inverse-Square Law Explanation.* Cincinnati, Ohio, 1990.  Web.  8/7/2012. <http://www.osha.gov/SLTC/radiofrequencyradiation/electromagnetic_fieldmemo/electromagnetic.html#app endix_b>.

*Pathophysiology.*  Volume 16, Issues 2–3, Pages 67-250 (August 2009) Electromagnetic Fields (EMF) Special Issue. Ed. Martin Blank.  Web.  8/7/2012. <http://www.sciencedirect.com/science/journal/09284680/16/2-3>.

Penn State Applied Research Laboratory. *"A Narrative Summary and Independent Assessment of the Active Denial System".* University Park, Pennsylvania, 2008. Web. 10/25/2012. <http://jnlwp.defense.gov/pdf/heap.pdf>.

Planetworks Consulting Corporation. *BC Hydro – Bank of 10 Smart Meters Safety Code 6 Report.* North Vancouver, British Columbia, Canada, 2011. Web. 8/7/2012. <http://www.bchydro.com/etc/medialib/internet/documents/smi/SMI_MeterBank.Par.0001.File.SMI-MeterBank-2011-Oct-11.pdf>.

Planetworks Consulting Corporation. *BC Hydro – Single Smart Meter Safety Code 6 Report.* North Vancouver, British Columbia, Canada, 2011. Web. 8/7/2012. <http://www.bchydro.com/etc/medialib/internet/documents/smi/SMI_SingleSmartMeter.Par.0001.File.SMI-SingleSmartMeter-2011-Oct-11.pdf>.

Poole, Ian. *GSM Power Control and Power Class.* Adrio Communications Ltd. Dorking, Surrey, UK, 2012. Web. 12/6/2012. <http://www.radio-electronics.com/info/cellulartelecomms/gsm_technical/power-control-classes-amplifier.php>.

Public Utility Commission of Texas. *Executive Summary: Health Effects of Exposure to Powerline-Frequency Electric and Magnetic Fields.* Austin, Texas, 1992.

Public Utility Commission of Texas. *Health Effects of Exposure to Powerline-Frequency Electric and Magnetic Fields.* (Full report) Austin, Texas, 1992. Web. 12/11/2012. <http://www.centerpointenergy.com/staticfiles/CNP/Common/SiteAssets/doc/PUCT_Health_Effects_of_Exposure_to_Powerline_Frequency_EMF.pdf>.

Quebec Energy Board. Decision D-2012-127, October 5, 2012 (in French). Montréal, Québec, Canada, 2011. Web. 11/5/2012. <http://internet.regie-energie.qc.ca/Depot/Projets/111/Documents/R-3770-2011-A-0164-DEC-DEC-2012_10_05.PDF>.

Quebec Energy Board. Decision D-2012-127 Summary, October 5, 2012 (in French). Montréal, Québec, Canada, 2011. Web. 11/5/2012. <http://internet.regie-energie.qc.ca/Depot/Projets/111/Documents/R-3770-2011-A-0163-DEC-DEC-2012_10_05.pdf>.

Quebec Energy Board. "Expectations of the Board Concerning the Role of Expert Witnesses" (in French). Montréal, Québec, Canada, 2011. Web. 11/6/2012. <http://www.regie-energie.qc.ca/regie/DirectivesInstructions/Regie_RoleExperts_18juillet2011.pdf>.

Radio Television Digital News Association. *Code of Ethics and Professional Conduct.* Washington, District of Columbia, 2000. Web. 10/15/2012. <http://www.rtdna.org/pages/media_items/code-of-ethics-and-professional-conduct48.php?g=36?id=48>.

Ramsdale PA, Wiener A. 1999. *Cellular Phone Base Stations: Technology and Exposures.* Radiat Prot Dosimetry 83:125-130.

RFCom, McLaughlin Centre for Population Health Risk Assessment. Ottawa, Ontario, Canada. Web. 8/7/2012. <http://www.rfcom.ca/welcome/index.shtml>.

RFcom Review Panel Reports, McLaughlin Centre for Population Health Risk Assessment. Ottawa, Ontario, Canada. Web. 8/7/2012. <http://www.rfcom.ca/panel/index.shtml>.

Richard Tell Associates, Inc. Web. 8/7/2012. <http://www.radhaz.com/>.

Royal Society of Canada. *A Review of the Potential Health Risks of Radiofrequency Fields from Wireless Telecommunication Devices.* Web. Ottawa, Ontario, 1999. 8/24/2012. <http://www.rsc.ca/documents/RFreport-en.pdf>.

Royal Society of Canada. *Recent Advances in Research on Radiofrequency Fields and Health: 2001-2003.* Web. Ottawa, Ontario, 2003. 8/24/2012. <http://www.rsc.ca/documents/expert_panel_radiofrequency_update2.pdf>.

Rubin GJ, Munshi JD, Wessely S. 2005. *Electromagnetic Hypersensitivity: A Systematic Review of Provocation Studies.* Psychosomatic Medicine 67:224–232. Web. 8/7/2012. <http://www.aefu.ch/typo3/fileadmin/user_upload/aefu-data/b_documents/themen/elektrosmog/Position_Forschungstand/rubin_Elektrosensib.Provokationsstudie05.pdf>.

Rubin GJ, Nieto-Hernandez R, Wessely S. 2009. "Review: Idiopathic Environmental Intolerance Attributed to Electromagnetic Fields (Formerly 'Electromagnetic Hypersensitivity'): An updated Systematic Review of Provocation Studies." *Bioelectromagnetics* 31.1 (2010), 1–87. Web. 8/7/2012. <http://www.essex.ac.uk/psychology/EHS/Rubin%20et%20al%20REVIEW_2009.pdf>.

Sage C, Carpenter DO (eds). *BioInitiative Report: A Rationale for a Biologically-based Public Exposure Standard for Electromagnetic Fields (ELF and RF).* Santa Barbara, California, 2007. Web. 10/8/2012. <http://www.bioinitiative.org/freeaccess/report/index.htm>.

School of Medicine, King's College London. *About the School of Medicine.* London, England, 2012. Web. 8/7/2012. <http://www.kcl.ac.uk/medicine/about/index.aspx>.

Shwed U, Bearman P. 2010. "The Temporal Structure of Scientific Consensus Formation." *American Sociology Review 75(6):817–840.* Web. 10/18/2012. <http://asr.sagepub.com/content/75/6/817.full.pdf+html>.

Society of Professional Journalists. *Code of Ethics.* Indianapolis, Indiana, 1996. Web. 10/15/2012. <http://www.spj.org/ethicscode.asp>.

Southeastern Universities Research Association. *Chart of the Electromagnetic Spectrum.* Washington, District of Columbia, 2005. Web. 8/7/2012. <http://sura.org/news/docs/sura_electromagnetic_spectrum_full_chart.pdf>.

State Medical Board of Ohio, The. Minutes: August 10, 2011. Columbus, Ohio, 2010. Web. 10/19/2012. <http://www.med.ohio.gov/pdf/Minutes/2011/08-11minutes.pdf>.

Tell RA. 1978. *Field-strength measurements of microwave-oven leakage at 915 MHz.* IEEE Trans Electromagnetic Compatibility 20:341-346.

Tell RA, Mantiply ED. 1980. *Population Exposure to VHF and UHF Broadcast Radiation in the United States.* Proc IEEE 68:6-12.

Texas A&M Forest Service. *Survey Shows 301 Million Trees Killed By Drought*. College Station, Texas, 2012. Web. 11/15/2012. <http://texasforestservice.tamu.edu/main/popup.aspx?id=16509>.

Texas Medical Board. Press Release. "Medical Board Disciplines 187 Doctors and Issues 88 Licenses". Austin, Texas, 9/2/2010. Web. 10/19/2012. <http://www.tmb.state.tx.us/news/press/2010/090210.php>.

Texas Senate Committee on Business and Commerce. *Agenda, Public Hearing, October 9, 2012, 10:00 a.m.* Austin, Texas, 10/9/2012. Web. 12/12/2012. <http://bandc.posterous.com/updated-october-9-2012-agenda-with-links-57790>.

Trent University Department of Physics and Astronomy. "Some references associated with recent concerns raised about radio-frequency electromagnetic fields". Peterborough, Ontario, Canada, 2010. Web. 10/10/2012. <http://www.trentu.ca/physics/emfrefs.pdf>.

Trottier, Lorne. *More Poor Quality EHS Studies*. EMF & Health, Montréal, Québec, Canada, 2009. Web. 10/10/2012. <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%201.html>.

Trottier, Lorne. *More Poor Quality EHS Studies: Comments on a poor study done by leading Canadian alarmist Dr. Magda Havas.* EMF & Health, Montréal, Québec, Canada, 2009. Web. 10/10/2012. <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%202.html>.

Trottier, Lorne. *More Poor Quality EHS Studies: Magda Havas Dredging Up Outdated Reports.* EMF & Health, Montréal, Québec, Canada, 2009. Web. 10/10/2012. <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%204.html>.

Trottier, Lorne and Kofsky, Harvey. *Likely Fatal Flaw in New Havas Heart Rate Study.* EMF & Health, Montréal, Québec, Canada, 2009. Web. 10/10/2012. <http://www.emfandhealth.com/EMF&Health%20EHS%20Poor%20Studies%206.html>.

UK Health Protection Agency. Web. 8/7/2012. <http://www.hpa.org.uk/AboutTheHPA/>.

UK Health Protection Agency. *Health Effects from Radiofrequency Electromagnetic Fields: Report of the independent Advisory Group on Non-ionising Radiation.* London, England, 2012. Web. 8/7/2012. <http://www.hpa.org.uk/webc/HPAwebFile/HPAweb_C/1317133827077>.

Vermont Department of Health. *Radio Frequency Radiation and Health: Smart Meters.* Burlington, Vermont, 2010. Web. 8/7/2012. <http://healthvermont.gov/pubs/ph_assessments/radio_frequency_radiation_and_health_smart_meters.pdf>.

Vogel, Gretchen. "Fraud Charges Cast Doubt on Claims of DNA Damage From Cell Phone Fields." *Science.* August 29, 2008: Vol. 321 no. 5893 pp. 1144-1145. Web. 10/9/2012. <http://www.emfandhealth.com/sciencerudigerfraud.pdf>.

Way, Tom.  DHMO.org website.  DHMO Organization, 2012.  Web.  10/25/2012. <http://www.dhmo.org>. NOTE: Content from the DHMO website does not appear in this report, but is mentioned here for illustrative purposes only.  The DHMO site is a humor website that provides a satirical perspective on how one's perception can be manipulated through the use of emotive appeals about safety and health, especially when combined with technical jargon.  The DHMO site is filled with information about a real chemical compound, Dihydrogen Monoxide (DHMO), and makes a substantial number of assertions about the substance (especially its potential hazards) that can be supported by verifiable facts from innumerable credible sources.  The author chooses specific language to give the uninitiated reader the impression that DHMO is one of the most dangerous chemical substances on earth.  DHMO is just one of several technical terms for $H_2O$ – better known as water.

Weatherall, Martin (username "martinwea").  *Stratford Smart Meter Killing Shrub.*  YouTube, 2010.  Stratford, Ontario, Canada.  Web.  10/10/2012. <http://www.youtube.com/watch?v=lsuP_WBBr2c>.

Weir E.  2005.  *Mass sociogenic illness.*  Canadian Medical Association Journal, 172:36. Web.  12/6/2012. <http://www.cmaj.ca/content/172/1/36.full.pdf>.

Wikipedia, The Free Encyclopedia.  *Scientific Method.*  Wikimedia Foundation, Inc.  San Francisco, California. 9/3/2012.  Web.  9/17/2012. <http://en.wikipedia.org/wiki/Scientific_method>.

WiMax.com Broadband Solutions.  *What is unlicensed spectrum? What frequencies are they in?*  Austin, Texas, 2012.  Web.  8/7/2012. <http://www.wimax.com/wimax-regulatory/what-is-unlicensed-spectrum-what-frequencies-are-they-in>.

World Health Organization.  *About WHO.*  Geneva, Switzerland, 2012.  Web.  8/7/2012. <http://www.who.int/about/en/>.

World Health Organization.  *Electromagnetic fields and public health: Electromagnetic hypersensitivity, Fact sheet No. 296.*  Geneva, Switzerland, 2005.  Web.  8/7/2012. <http://www.who.int/mediacentre/factsheets/fs296/en/index.html>.

World Health Organization.  *Electromagnetic Hypersensitivity: Proceedings International Workshop on EMF Hypersensitivity.*  Prague, Czech Republic, 2004.  Web.  10/8/2012. <http://ihcp.jrc.ec.europa.eu/our_activities/public-health/exposure_health_impact_met/emf-net/docs/publications/WHO_EMF-NET%20Book.pdf>.

World Health Organization.  *Establishing a Dialogue on Risks from Electromagnetic Fields.*  Geneva, Switzerland, 2002.  Web.  10/23/2012. <http://www.who.int/peh-emf/publications/en/emf_final_300dpi_ALL.pdf>.

World Health Organization.  *International EMF Project, The.*  Geneva, Switzerland, 2012.  Web.  11/9/2012. <http://www.who.int/peh-emf/project/en/>.

World Health Organization.  *What are Electromagnetic Fields? Summary of Health Effects.*  Geneva, Switzerland, 2012.  Web.  8/7/2012. <http://www.who.int/peh-emf/about/WhatisEMF/en/index1.html>.

World Health Organization.  *WHO International Seminar and Working Group meeting on EMF Hypersensitivity.*  Prague, Czech Republic, 2004.  Web.  8/7/2012. <http://www.who.int/peh-emf/meetings/hypersensitivity_prague2004/en/index.html>.

**APPENDIX C**

**Project 40190 Info on Proposed Rule**

**Donna L. Nelson**
Chairman

**Kenneth W. Anderson, Jr.**
Commissioner

**Rolando Pablos**
Commissioner

**Brian H. Lloyd**
Executive Director



2013 FEB 21 PM 2: 32

**Rick Perry**
Governor

*Public Utility Commission of Texas*

February 21, 2013

To:     All parties in Project No. 40190 also interested in Project No. 41111.

Ladies and Gentlemen:

The Commission has filed with the Secretary of State a proposal for publication as approved at the February 14, 2013 Open Meeting. The project number assigned to the rulemaking proposal is:

Project No. 41111 - *Rulemaking Related to Advanced Metering Alternatives*

The proposal will be published in the *Texas Register* on March 1, 2013. Comments are due April 1, 2013. Reply comments are due April 15, 2013. If you wish to file comments, please file the requested number of copies, as indicated in the publication, with the Commission's filing clerk.

No final date or time has been set for an open meeting to permanently adopt the proposal. When the open meeting is set, notice will be filed with the Secretary of State as required by the Open Meetings Act, Texas Government Code, Chapter 551, but no individual notice will be sent.

Sincerely,

Adriana A. Gonzales
Rules Coordinator and Texas Register Liaison
(512) 936-7223
adriana.gonzales@puc.texas.gov

**APPENDIX D**

**Project 41111 Request for Hearing**

| REVIEW OF RULES | § | PUBLIC UTILITY |
| RELATING TO ADVANCED | § | COMMISSION |
| METERING ALTERNATIVES | § | OF TEXAS |

**Request for Hearing by
Texas Eagle Forum**

COMES NOW Texas Eagle Forum to request a public hearing in Project No. 41111 Proposal for publication of new §25.133, relating to Advanced Metering System Customer Options, and amendment to §25.214, relating to Terms and Conditions of Retail Delivery Service Provided by Investor Owned Transmission and Distribution Utilities (Tariff for Retail Delivery Service). The proposed sections would require a transmission and distribution utility (TDU) with an advance metering system (AMS) deployment plan to create a service in which a customer may choose to have electric service metered through a non-communicating meter. The proposed sections would also require the TDU to charge participants for the costs associated with the service. The section is a competition rule subject to judicial review as specified in Public Utility Regulatory Act (PURA) §39.001(e). Project Number 41111 was assigned to this proceeding.

Because of the broad impact of Project No. 41111, we request that the Public Utility Commission (PUC or Commission) hold a public hearing on April 19, 2013 as set forth in the proposal for publication. At the present time, the hearing is scheduled to begin at 9:30 a.m. on April 19, 2013 at the commission's offices located in the William B. Travis Building, 1701 North Congress Avenue, Austin, Texas 78701. While this time may be convenient for persons who work in Austin, or whose travel expenses are paid for by an employer, we believe it will prevent

# PROJECT NO. 41111

active participation by the public. Indeed this time almost assures that members of the public from South Texas, from Dallas, and from Houston will not be able to attend without considerable expense. Also, given the amount of increased road construction around Austin and the difficulty in finding parking places near the Capitol, members of the public would be greatly hindered in making a 9:30a.m. hearing time. Thus, we formally request that the Commission initiate the following actions to encourage public participation:

* Post the public hearing as an open meeting so that the Commissioners may attend.

* Verify with a filing in Project No. 41111 that the hearing now scheduled for 9:30a.m. will not begin until 11:00a.m. and will be continued until all those who desire to testify may do so.

While Texas Eagle Forum holds great admiration for the Chairwoman and the Commissioners of the PUC as well as for its excellent staff, we believe that information gathered at the public hearing will better equip the PUC Staff and the Commissioners to adopt a rule that is equitable and unbiased to the millions of electric consumers who will be affected by the decisions made in Project No. 41111. We hereby ask that the Commission honor our requests.

Respectfully Submitted:

*Beth J. Biesel*

Beth T. Biesel
on behalf of Texas Eagle Forum
3608 Southwestern Blvd.
Dallas, TX 75225
214.691.4180

**APPENDIX E**

**Project 41111 Notice of Public Hearing**

RECEIVED

PROJECT NO. 41111

2013 APR 10 PM 1: 24

| | | |
|---|---|---|
| RULEMAKING RELATED TO | § | PUBLIC UTILITY COMMISSION |
| ADVANCED METERING | § | FILING CLERK |
| ALTERNATIVES | § | OF TEXAS |

## NOTICE OF PUBLIC HEARING
## PUBLIC UTILITY COMMISSION OF TEXAS

**April 19, 2013**
1701 N. Congress Avenue, William B. Travis Building, 7th Floor
Commissioners' Hearing Room - Overflow in Hearing Room A
**Sign In Begins: 9:30 A.M.**
**Start Time: 11:00 A.M.**

The hearing will be broadcast by www.texasadmin.com
Transcripts may be ordered through www.kennedyreporting.com

The purpose of this public hearing is for the Public Utility Commission of Texas (Commission) to receive public comment on the rule proposed in Project No. 41111. A court reporter will be present at the public hearing to create a transcript of all public comments. The public hearing will also be broadcast live and available for viewing after the hearing from Texas Admin.

The public hearing will be open to the public. Prior to the public hearing, individuals do not need to register or contact Commission Staff to attend or participate. Public comments will be taken in the order in which persons signed the sign-up sheet on the day of the public hearing. Speakers do not need to be present at the beginning of the hearing. However, persons wanting to provide comments should arrive and sign in no later than 1:00 P.M. to ensure that they will have the opportunity to provide comments. Comments should be specific to the rule proposed in Project No. 41111.

Questions concerning the public hearing should be directed to Commission Staff at meterforum@puc.texas.gov, or Jacob Lawler, Legal Division, at (512) 936-7275, or Christine Wright, Infrastructure and Reliability Division, at (512) 936-7376. Individuals with hearing or speech disabilities with text telephones (TTY) may contact the Commission at (512) 936-7136.

PUBLIC UTILITY COMMISSION OF TEXAS
PUBLIC HEARING AGENDA
APRIL 19, 2013 at 11:00 A.M.
1701 N. CONGRESS AVENUE, WILLIAM B. TRAVIS BUILDING, 7TH FLOOR

1. Call to order.

2. Public hearing to receive comments from interested persons concerning the new rule proposed relating to advanced metering alternatives. The proposed new rule, 16 TAC §25.133, was published in the March 1, 2013 issue of the *Texas Register*. Any interested person may appear and offer comments; however, questioning of commenters will be reserved exclusively to the Commission or its staff as may be necessary to ensure a complete record. While any person with pertinent comments or statements will be granted an opportunity to present them during the course of the public hearing, the Commission reserves the right to restrict statements in terms of time or repetitive content. Organizations, associations, or groups are encouraged to present their commonly held views or similar comments through a representative member where possible. Persons with disabilities who have special needs and who plan to attend the meeting should contact the Commission at (512) 936-7000.

3. Adjourn.

**APPENDIX F**

**Order Adopting 25.133**

| RULEMAKING RELATED TO | § | PUBLIC UTILITY COMMISSION |
|---|---|---|
| ADVANCED METERING | § | |
| ALTERNATIVES | § | OF TEXAS |

## ORDER ADOPTING NEW §25.133 AND AMENDMENTS TO §25.214
## AS APPROVED AT THE AUGUST 9, 2013 OPEN MEETING

The Public Utility Commission of Texas (commission) adopts new §25.133, relating to Non-Standard Metering Service, and amendments to §25.214, relating to Terms and Conditions of Retail Delivery Service Provided by Investor Owned Transmission and Distribution Utilities (Tariff for Retail Delivery Service) with changes to the proposed text as published in the March 1, 2013 issue of the *Texas Register* (38 TexReg 1328). The adopted sections require a transmission and distribution utility (TDU) with an advanced metering system (AMS) deployment plan to provide a service through which a customer may choose to have electric service metered through an alternative to the standard advanced meter. The adopted sections also require the TDU to obtain and retain written customer acknowledgement regarding the negative consequences arising from choosing non-standard metering service, and to separately charge for the costs associated with the service. The adopted sections constitute competition rules subject to judicial review as specified in Public Utility Regulatory Act (PURA) §39.001(e). The sections are adopted under Project Number 41111.

A public hearing on the new and amended sections was held at commission offices on April 19, 2013, at 11:00 a.m. Representatives from Texas Ratepayers Organization to Save Energy and Texas Legal Services Center (TX ROSE/TLSC) provided comments at the hearing. In addition, comments at the hearing were provided by the following: Catherine Wilson, Thelma Taormina,

41

Nick Taormina, Devvy Kidd, David Tuckfield, John Ryan, Dr. Laura Pressley, John Marler, David Allen, A.K. Muir, Martin Kralik, Carl Young, John Hancock, Q. Coleman, Bill Biesel, Beth Biesel, Mark Summerlin, Sonia Borgialli, Sheila Hemphill, Michelle Guy, Terry Guy, Bobby Reed, Coleman Hemphilll, Dr. Ivette Lozano and Russell Ramsland (collectively, Public Commenters). To the extent that these comments differ from the submitted written comments, such comments are summarized separately below.

The commission received written comments on the proposed sections from the Retail Electric Provider Coalition (REP Coalition); the Steering Committee of Cities Served by Oncor (Cities); Texas Ratepayers Organization to Save Energy and Texas Legal Services Center (TX ROSE/TLSC); City of Houston (Houston); AEP Texas Central Company, AEP Texas North Company, CenterPoint Energy Houston Electric, LLC, Oncor Electric Delivery Company LLC, Texas-New Mexico Power Company, and Sharyland Utilities, L.P. (TDUs); Mr. H. Ragland; Mr. David Allen; and Texas Energy Association for Marketers (TEAM) and Direct Energy.

The REP Coalition was composed of the Alliance for Retail Markets (ARM); Reliant Energy Retail Services; the Texas Energy Association of Marketers (TEAM); and TXU Energy Retail Company LLC. Members of ARM participating in this proceeding were: Champion Energy Services, LLC; Constellation NewEnergy Inc.; Direct Energy, LP; Gexa Energy, LP; Green Mountain Energy Company; Liberty Power; Noble Americas Energy Solutions LLC; and Texas Power. Members of TEAM participating in this proceeding are: Accent Energy d/b/a IGS Energy, Cirro Energy, Just Energy, Spark Energy, StarTex Power, Stream Energy, TriEagle Energy, and TruSmart Energy.

*General Comments*

TDUs stated that the proposed new rule strikes a fair and reasonable balance between the interests of the customers who wish not to have an advanced meter and the interests of the other stakeholders, including customers who choose to have an advanced meter. TLSC/Texas ROSE commented that the proposed new rule recognizes a customer's right to choose to opt-out of the AMS. This is a positive step in recognizing the individual needs of customers and providing options to serve those needs and will serve the public interest, according to TLSC/Texas ROSE. They also recommended that the commission remove the AMS surcharges from customers who choose to take alternative metering service under this rule.

Houston expressed its opposition to new §25.133. Its opposition is primarily because of the potential impact on electric reliability in the Houston area, which it considers to be a public safety issue for the city. Houston stated that offering such a program may diminish the reliability benefits of the intelligent grid. It asked that the commission reconsider implementing rules that allow retail customers to choose an alternative to a fully-functioning advanced meter. Houston explained that the widespread power outages caused by Hurricane Ike in September 2008 made improving reliability and outage preparedness prominent on Houston's long-term agenda. Houston stressed that the installation of a fully-functioning intelligent grid is central to its initiative. This was an initiative pursued in cooperation with CenterPoint Energy.

The TDUs, Cities, and Houston agreed that a widespread or ubiquitous deployment of advanced metering systems provides benefits to all customers, including those without an advanced meter, and helped utilities to identify outages and expedite repairs. The TDUs agreed with Cities that

all customers should pay AMS surcharges, including those who choose to decline advanced metering, because all customers will benefit from reduced outage events and restoration times. Houston requested that the commission consider an exemption from this new rule for those utilities that have substantially completed deployment pursuant to the utility's deployment plan as approved by the commission. Within Houston, advanced meter deployment is considered complete.

The TDUs stated that an AMS also facilitates the offering of time-of-use pricing products offered by REPs. They added that those who have advanced meters also benefit from lower commodity prices that will be achieved by broad implementation of time-of-use pricing and the corresponding decline in energy consumption during peak periods.

Houston commented that only a negligible number of customers persist in declining advanced meter installation - less than 0.002% - approximately 40 customers out of more than 2.2 million customers of CenterPoint Energy. It stated that if a program offering an alternative to advanced metering were applied to all customers, it could significantly undermine the overall success of advanced meter deployment in Houston. Houston commented that it anticipates an overall increase in the number of advanced meter opt-out customers if all are given an option to select an alternative to an advanced meter. It believes that any proposed AMS alternative program must proceed on a case-by-case basis in areas where advanced meter deployments are considered complete. Any such program should be designed and executed based on the specific needs of the utility, its customers, and other affected parties. Commission rules should provide for this flexibility and should ensure cost neutrality for the remaining advanced meter customers.

*Commission Response*

The commission agrees with TLSC/Texas ROSE that adopting this new rule is in the public interest. Although the commission does not share the health and privacy concerns with advanced meters expressed by some commenters, the commission concludes that it is appropriate to address these concerns by giving customers the right not to be served by advanced meters. The commission agrees with the TDUs that the new rule strikes a fair and reasonable balance between the interests of the customers who wish to decline advanced meters and the interests of the other stakeholders, including customers served by advanced meters. Therefore, the commission adopts a new rule that will allow a customer to take non-standard metering service. As the TDUs, Cities, and Houston state, a widespread deployment of AMS provides benefits to all customers, including those without advanced meters. The commission agrees with Houston that the new rule should ensure cost neutrality for the remaining advanced meter customers.

The commission declines to eliminate the AMS surcharges for customers who choose to take non-standard metering service under this new rule, as recommended by TLSC/Texas ROSE. First, PURA §39.107(h) provides that the AMS surcharge is nonbypassable, and therefore the commission does not have the authority to remove customers' obligation to pay the AMS surcharges. Furthermore, even customers who decline advanced metering benefit from the deployment of advanced meters, as the technology enables the utility to manage its entire system more efficiently. The commission further agrees with Cities and TDUs that customers without advanced meters benefit from AMS through shorter

durations of being without power during outages that affect more than one customer and emergency events.

The commission acknowledges the comments from Houston regarding the adverse effects opt-out customers have on reliability and outage management. These effects will vary in relation to the number of customers who choose to have non-standard metering service. If few customers choose non-standard metering service, the effects will be small. These adverse effects support the new rule's requirement that customers who choose non-standard metering pay for all of the costs of that service.

TLSC/Texas ROSE argued that low-income customers should be exempt from paying fees for declining an advanced meter, or should receive a low-income discount on the associated fees. They added that the utility should have the ability to recover costs of customers declining an advanced meter from shareholders. TDUs disagreed with TLSC/Texas ROSE because providing a discount to low-income customers would require other customers to pay more. The TDUs stated that this would be contrary to the commission's goal of requiring customers who decline an advanced meter to pay the costs associated with that choice.

*Commission Response*

The commission disagrees with TLSC/Texas ROSE that low-income customers should be exempt from paying fees, or receive a discount on the fees, when choosing non-standard metering service. As the TDUs commented, implementing the TLSC/Texas ROSE request

**would result in shifting those costs onto other non-standard metering customers or customers who receive service through advanced meters.**

TLSC/Texas ROSE commented that the proposed new rule, as currently written, does not require a customer outreach campaign. They stated that in areas where advanced meters have not been deployed, all customers should be provided the opportunity in advance to decline installation of an advanced meter. This notification would reduce costs because no additional field trips would be needed. TLSC/Texas ROSE added that customer education should include an explanation of the AMS, how it differs from the traditional system, what alternatives a customer would have to an advanced meter, and the corresponding costs. TLSC/Texas ROSE recommended that social and mass media be used to provide customer outreach. TLSC/Texas ROSE explained that REP and TDU websites should be required to include information about the ability to decline an advanced meter, but should not be the only source of information to customers.

The REP Coalition and the TDUs disagreed with TLSC/Texas ROSE that a customer outreach campaign for the right to decline advanced metering is required, because it would negatively impact the benefits of universal deployment of AMS. Thus, the commission should not encourage customers to decline advanced metering, nor require the TDUs to engage in a customer outreach campaign. The REP Coalition also responded that further customer outreach related to declining advanced metering is unnecessary. They noted that interested customers are well aware that the issue is under review by the commission by virtue of Project Number 40190 and the commission's request for written public comment, and public forums on the topic have been well-attended. The REP Coalition clarified that both TDUs and REPs will incur costs and

expend resources to implement the program. The new rule and amendments to the tariff address a TDU's recovery of those costs through commission-approved rates and a REP may choose to address the increased cost of doing business attributable to an opt-out program through institution of a fee.

*Commission Response*

**The commission declines to adopt a customer outreach campaign as recommended by TLSC/Texas ROSE. PURA §39.107(i) provides that it is the intent of the Legislature that AMS "be deployed as rapidly as possible to allow customers to better manage energy use and control costs, and to facilitate demand response initiatives." Demand response can lower costs to customers who decrease their usage during peak demand which has the potential to play a part in helping to ensure adequate resources in Texas' growing economy. A customer outreach campaign to inform customers of alternative metering service that undermines these overarching goals would be an unwarranted expense.**

**The commission posed the following questions:**

(1) *Are there any circumstances, such as premises where an advanced meter has not been deployed, where a customer should not have to pay the one-time fee or should pay a reduced one-time fee under proposed subsection (e)?*

Cities, REP Coalition, TLSC/Texas ROSE, and Mr. Ragland commented that a one-time fee was not always appropriate. David Allen stated that under this scenario, the customer should not be charged the one-time fee if an advanced meter has not been deployed. Cities stated there are

certain situations where it is reasonable to exempt certain customers from the one-time fee. Specifically, if the utility did not incur a cost for physically altering the existing meter arrangement, such as by disabling data transmitting technology or providing a non-standard meter, then the one-time fee is unnecessary.

Similarly, TLSC/Texas ROSE stated that there are circumstances where the TDU is not required to perform any additional work or the incremental cost of installation would be less than the inclusive one-time fee. The REP Coalition commented that the new rule should not limit the TDU's ability to assess a lower one-time fee when circumstances warrant such rate treatment and it is deemed reasonable such as when an advanced meter has not been installed and the TDU does not incur upfront non-recurring costs in providing the service.

The TDUs stated that it is incorrect to assume that by leaving an existing meter in place, the TDU will not incur any installation expense and therefore the opt-out customer should not be assessed any costs. The TDUs maintained that costs will be incurred regardless of whether an advanced meter has been deployed at the premises. TDUs stated that they will also incur back-office costs associated with the process. These costs may include a truck roll for existing analog meter inspection and testing, as well as a truck roll for installation once the opt-out customer vacates the premises. The TDUs requested that the commission reject requests to eliminate the one-time fee. The TDUs noted that these same principles apply to the proposals for a reduced one-time fee for customers who currently have an analog meter. The TDUs stated that the proposed new rule properly allows the utility to file a tariff that covers the actual costs incurred by the utility.

Cities disagreed with the TDUs. They responded that forcing a customer to pay for installation of a non-standard meter or reinstallation of an advanced meter after a move-out (potentially years in advance) does not make sense and generates free cash for a TDU that has not yet, and may not for some time, incurred the cost underlying the fee. Cities maintained that including these charges in the one-time fee is inconsistent with cost causation principles.

Mr. Ragland stated that a customer who is currently being serviced by a properly working non-standard meter should be allowed to keep the existing meter, decline the advanced meter, and bypass the one-time fee. TLSC/Texas ROSE commented that a customer, not the TDUs, should have the discretion to choose how it receives opt-out service and the cost should vary depending upon that choice. The TDUs disagreed, stating that if a meter has not already been deployed, the TDU has sole discretion to either leave the existing meter or remove the meter and install a non-transmitting advanced meter. The TDU will therefore incur installation and back office costs at the time of the opt-out, or when the customer vacates the premises. Opt-out customers should pay the costs they cause the utility to incur.

TLSC/Texas ROSE commented that the argument could be made that customers should not have to pay a one-time fee because an opt-out provision should have been provided from the beginning. TLSC/Texas ROSE stated that issues should have been identified early on in the process and built into the deployment plans and that the commission should have withheld approval of major expenditures until all major issues were verified and resolved.

*Commission Response*

The commission does not agree with TLSC/Texas ROSE that issues in this proceeding should have been addressed during development of the advanced metering rule, §25.130. During a process that lasted several years and which included public hearings, workshops, and four contested cases for deployment plan approval and cost recovery, the issues being addressed in this rulemaking were not raised. Each of the four contested cases were settled, with no party objecting to the commission's final order requiring full deployment of advanced meters and cost recovery from all customers in the customer classes receiving advanced meters. Furthermore, the commission evaluated health and privacy concerns subsequently raised against advanced meters and concluded that the concerns are unwarranted. Through this rule, the commission is creating a new discretionary service to give customers the right to be served using non-standard metering service.

The commission agrees with Cities that a customer choosing to take service under this new rule should not be charged the cost of the potential, future installation of an advanced meter if an advanced meter has not been installed for the customer. The initial installation of an advanced meter for a customer not choosing non-standard metering service is not being direct-billed to that customer but is instead being recovered through the AMS surcharge, and a customer choosing non-standard metering service should be treated comparably in that regard. However, a customer choosing non-standard metering service that requires removal of an advanced meter should have to pay for the eventual, second installation of an advanced meter rather than having the cost of that second installation spread to other customers. The commission therefore has modified the rules accordingly.

(2) *For the recurring monthly fee for AMS Alternative Service under section 6.1.2.1 of the Tariff for Retail Delivery Service, should the fee be prorated so that the customer pays for the portion of the first month in which service under the AMS Alternative Service is provided and for the portion of the last month in which service under the AMS Alternative Service is provided?*

Cities and TLSC/Texas ROSE commented that it is appropriate to prorate the proposed monthly AMS Alternative Service fee. Cities stated that customers receiving AMS Alternative Service should only pay for the time period that the customer actually received such service and therefore prorating the monthly fee was fair and consistent with cost-based rates. TLSC/Texas ROSE agreed that the fee should be prorated if the commission determines that it is appropriate to charge the monthly fee.

The REP Coalition and the TDUs disagreed with Cities and TLSC/Texas ROSE. The TDUs stated that since the recurring costs are primarily driven by the time and expense incurred to read the opt-out customer's meter, these expenses will be incurred by the utility and passed on through the recurring fee regardless of the length of the billing cycle. It is incorrect to assume that the length of the billing period affects the monthly opt-out fee. The TDUs maintained that the TDU will bear the full array of costs associated with the opt-out regardless of whether the customer takes service for a few days or the whole month. The TDUs agreed in principle with Cities that billing should be consistent with cost-based rate making, but stated that billing for the full extent of the fee is the best implementation of this principle. The TDUs stated that the fee should therefore not be prorated.

Similarly, the REP Coalition commented that since the monthly AMS Alternative Service fee proposed is designed to recover costs associated with the TDU reading the customer's non-standard meter and managing that meter data, it is unclear how the charges could be prorated since the associated activities would occur each month regardless.

*Commission Response*

**The commission declines to adopt changes as proposed by TLSC/Texas ROSE and Cities. The commission agrees that the REP Coalition and the TDUs are correct, and the recurring costs are primarily driven by the time and expense incurred to read the opt-out customer's meter. These expenses will be incurred by the utility regardless of the length of the billing cycle. The commission agrees with the TDUs that the utility will bear the full array of costs associated with the opt-out customer regardless of whether the customer takes service for a few days or the whole month. The commission agrees with the TDUs that billing for the full extent of the fee is the best implementation of standard ratemaking principles.**

(3) *Should the TDU, rather than the REP, be primarily responsible for interacting with a customer concerning service using a non-transmitting meter, including providing the notification required by proposed §25.133(c)(1)(A), obtaining the acknowledgement required by proposed §25.133(c)(1)(B), and informing the customer of the access requirements described in proposed §25.133(d)(3)?*

Cities and REP Coalition recommended that the TDU be the primary point of contact with the customer. TLSC/Texas ROSE and TDUs argued that the REP should have primary responsibility.

Cities and the REP Coalition recommended that the TDU rather than the REP be primarily responsible for interacting with a customer concerning service using a non-standard meter. Cities noted that this approach is consistent with the traditional TDU ownership model regarding meters and commented that TDUs are familiar with their own tariffs and are better positioned to communicate any costs associated with non-standard meter service. Cities also stated that competitive issues may arise if REPs are responsible for interacting with customers regarding non-standard meters, including highlighting the increased wait time to switch proposed under subsection (c)(1)(A)(ii).

Similarly, the REP Coalition stated that the customer should communicate and interact with the entity that is in the best position to answer questions and facilitate the customer's opt-out request, which it maintained is the TDU. The REP Coalition noted that the TDU should be required to fulfill customer communication and interface related to the technical aspects involving metering equipment and service performance. The TDU has traditionally been and remains the best suited contact for issues relating to advanced metering and each deployment plan includes funds for customer education. Customers may already view the TDU as their point of contact for information on advanced metering. The REP Coalition commented that the TDU is the entity performing the physical activities required to effectuate an opt-out request and inserting the REP in the process would create confusion and result in inefficiencies. The REP Coalition noted that

the current tariff supports allowing the customer to communicate with the TDU directly regarding the installation of non-standard facilities. The tariff sets a precedent for designating the TDU as the point of contact for opt-out inquiries and supports requiring the TDU to directly bill the customer the one-time fee required to effectuate an opt-out request.

The REP Coalition went further in reply comments, stating that the TDU is required to provide metering services within its service area to those customers for whom ERCOT does not require an interval data recorder meter, and the provision of such metering services entails the TDU's ownership of the customer's meter as reflected in the AMS surcharge. Since the TDU owns and provisions the advanced meter, it is the appropriate entity to convey technical, rate, and other information to the customer relating to the disablement of the communications functionality and required meter access. For example, the TDU can better explain how the de-activation of an advanced meter's communication functionality serves to eliminate radio frequencies and/or electromagnetic fields to and from the meter, the nature of associated costs and charges, as well as the operational differences between advanced meters and the alternative meter options. REPs do not have detailed and well-informed information regarding these matters. Further, upon completion of deployment, advanced meters will be the standard meter for residential customers and any opt-out request will constitute a non-standard metering request. The REP Coalition noted that the TDU's tariff places the burden on the TDU for non-standard metering requests and the collection of any associated costs or charges. The REP Coalition stated that the TDU should be the initial and final contact with regards to a customer's opt-out request.

The TDUs and TLSC/Texas ROSE disagreed and stated that the REPs are the best contact for primary customer interaction. TLSC/Texas ROSE commented that under the current customer protection rules, the REP is responsible for communicating with customers and has the appropriate customer service staff able to communicate the customer's preference to the TDU as it does with any other discretionary service.

The TDUs requested that the commission reject Cities' and the REP Coalition's proposals. The TDUs commented that the REP has pre-existing, direct relationships with customers and informational responsibilities, so therefore the REP should be primarily responsible for interacting with opt-out customers. The TDUs stated that this imposes no additional undue burden on the REPs and that implementing the opt-out provisions would be no different than administering and communicating the TDU move-in provisions as is current market practice. The TDUs stated that the REP Coalition's argument that TDUs should assume opt-out communication and billing responsibilities is inconsistent with the position commonly taken by REPs in other proceedings, namely that only REPs should be entrusted to communicate with their customers. As an example, the TDUs cited Project Number 41061 in which the REPs stated in regards to demand response that the "REPs are best positioned to deliver these types of programs [. . .] because the REP has the direct customer relationship, with insights into the customer's wants and needs." Additionally, the TDUs countered that the TDUs do not have a traditional role with respect to opting out of meters, because residential customers have never before had the right to opt out of using the utility's standard meter. Therefore, there is no precedent for the TDU assuming responsibility.

In response to Cities, the TDUs stated that no matter who communicates the opt-out fee to the customer, the fee will be adopted in the TDU's tariff and therefore is set and non-negotiable. The fee will be fixed regardless of who communicates the charge to the customer. The TDUs commented that the REPs should be primarily responsible for interacting with the customer regardless of the type of meter at a customer's premises, as the REP has a preexisting direct relationship with the customer and is aware of the customer's contract and service agreements. The TDU would not be able to explain to the customer potential impacts of opting out, such as possible effects on the customer's electric service plan choice, termination fees, or penalties. Additionally, REPs already regularly quote TDU tariff fees and charges to the customer.

The REP Coalition agreed that the REP should be required to fulfill communication and service requirements impacting the customer's retail product choice and retail service contract. The customer might have to choose an alternative product before an opt-out request can be completed. The REP Coalition proposed conforming language amendments to proposed subsection (c), clarifying the allocation of communication, interface, and administration responsibilities appropriately between the REP and TDU. Cities responded that the REP Coalition's proposal to split communication responsibilities between the REP and the TDU appears reasonable and strikes a reasonable balance between competing concerns.

The TDUs and TLSC/Texas ROSE disagreed. TLSC/Texas ROSE stated that the REP Coalition's proposed amendments would be both cumbersome and time-consuming, allowing for a customer to be bounced back and forth between the TDU and REP. TLSC/Texas ROSE maintained that the REP should be the initial point of contact for opt-out service.

The TDUs noted the REP Coalition's concession that the customer must still communicate with the REP before seeking to opt-out in any event. The TDUs stated that it would be more efficient and less confusing to the customers if the REPs are required to make the necessary disclosures and to obtain acknowledgement. The bifurcated approach advocated by Cities and the REP Coalition would confuse and frustrate customers, causing multiple phone calls to each entity as questions arise. The TDUs commented that the convoluted communication mechanism proposed by the REP Coalition for processing opt-out requests illustrates the complications of trying to divide the responsibilities. The TDUs requested that the commission adopt the simple process prescribed by the proposed rule. The REP Coalition maintained that the REP should only bear the responsibility to convey information to the customer regarding compatibility of an opt-out request and the customer's current retail product or service, and to work with the customer to resolve any related issues. The TDU is the appropriate entity to be primarily responsible for interacting with the customers, and the proposed rule should allocate responsibility in a manner consistent with the roles the TDU and REP serve in effectuating a customer's opt-out request. The REP Coalition agreed with the TDUs that it is the REP's responsibility to communicate any customer contract or product concerns.

*Commission Response*

**The commission adopts language to make the TDU primarily responsible for working with customers who take service under this rule. While commission policy has generally made the REP the primary market interface for customers, the commission disagrees with the TDUs that the REP should be primarily responsible for handling issues relating to this service. Although the TDUs correctly pointed out that there are instances where the REP**

relationship with the customer has been acknowledged in commission rules, the commission notes there have been several exceptions. These exceptions relate to metering (*e.g.*, deployment, education, installation, troubleshooting), construction service under the tariff, administration for critical care and chronic condition customers, and meter tampering. In each of those instances, the commission has found that it is appropriate for the TDU to have primary responsibility for interfacing with the customer. Construction service under the tariff and the meter tampering rule include requirements for the TDU to directly bill the customer. The commission agrees with Cities and the REP Coalition that requiring the TDU to have primary responsibility is consistent with the TDU's ownership of the meters. The TDUs are familiar with their own tariffs and are better positioned to communicate the costs associated with this non-standard service. The commission also agrees with the REP Coalition that the TDUs are better able to communicate with customers about the technical aspects involving metering equipment and service performance. The commission agrees that concerned customers may already view the TDU as their point of contact for information on metering. The commission agrees with the REP Coalition that the current tariff supports allowing the customer to communicate with the TDU directly regarding the installation of non-standard facilities. The existing language in the tariff for construction service and metering and other services set a precedent for designating the TDU as the primary point of contact for non-standard metering service, and supports requiring the TDU to directly bill the customer the one-time fee. This is addressed further in §25.133(e).

**REPs will address questions about the impact of non-standard metering service on their customers' electric service contracts.  And if the REPs receive calls regarding technical aspects of the provision of non-standard metering service from their customers, they can refer the customers to the TDU.**

The REP Coalition recommended that if an affirmative written acknowledgement from the customer is required, the TDU should be the party to obtain the acknowledgement, as it would trigger modification to the TDU's metering equipment.  The REP Coalition reiterated that the tariff sets a precedent for requiring the TDU to directly bill the customer the one-time fee required to effectuate an opt-out request.  The REP Coalition maintained that the one-time fee could be billed by the TDU directly to customers similar to the market mechanism for construction charges, but if the REP were required to bill the customer instead, it should be adequately protected from risk of nonpayment.

*Commission Response*

**The commission finds that an affirmative, written acknowledgement from the customer shall be required.  The TDU shall be the party required to obtain and retain the signed acknowledgement from the customer.  This requirement is addressed in §25.133(c).**

The TDUs stated that they have no objections to the commission adopting a mechanism providing REPs any protections when collecting one-time or monthly opt-out fees from customers.  The TDUs noted that a REP could protect itself from nonpayment of the one-time fee by waiting to notify the utility of the customer's opt-out request until after the customer

tenders payment. The TDUs disagreed, however, that the utility should be the billing agent. The TDUs stated that the same arguments used to justify making the REP the point of contact for communications purposes with the customer also support making the REP the billing and collections agent with respect to the one-time and monthly opt-out fees. The TDUs noted that the REPs have existing billing arrangements with the customers, whereas the TDUs do not and that any construction charges are generally one-time collections handled through a manually-intensive process. TLSC/Texas ROSE disagreed that the TDU should directly bill the opt-out customer the one-time service fee. The proposal would cause additional administrative expenses and confuse customers who expect to receive their bills from the REP.

*Commission Response*

**The commission finds that the TDU should be responsible for billing the customer directly for the one-time fee. This is discussed below, and rule language is added in §25.133(c).**

*Public Hearing*

A public hearing was requested by Texas Eagle Forum. The commission held a public hearing on Friday, April 19, 2013. Public Commenters commented on a number of issues not specific to the rule at the public hearing. These issues included customer choice, constitutional freedoms, personal testimonials regarding experiences with TDUs, Texas sovereignty, health concerns, privacy, and damage to consumer appliances. Hearing comments that relate to particular rule language are included in the summary for the applicable rule provision.

Public Commenters voiced their opposition to the installation of advanced meters and the continued implementation of Smart Grid technologies, and asked that the Texas state government protect its citizens from any rules or regulations stemming from the United Nations' Agenda 21. Beth Biesel stated that the deployment of advanced meters was not mandatory. Ms. Biesel stated that the TDUs are regulated monopolies. By failing to provide flexibility or options for customers and requiring fees to be paid by those customers declining advanced meters is incompatible with the free market model. Ms. Biesel pointed out that other new technology, such as cell phones, were developed and deployed in a free market exchange, and initially only wealthy or tech-savvy chose to purchase a cell phone. She stated that the cost of new technology tends to decrease over time, and more customers subsequently adopt it. She added that no one was forced to buy a cell phone, nor was anyone penalized for not buying one.

Ms. Biesel also urged the commission to keep the Texas electric grid separate and independent.

Public Commenters provided anecdotal information related to the negative health effects they attribute to the installation of advanced meters. David Tuckfield, representing the petitioners in Project Number 40404 (Petitioners), commented that the commission should conduct a study on the health effects of advanced metering and provide the public with information regarding health and safety.

The Petitioners stated that the costs incurred by a TDU to implement the proposed new rule should not be borne only by the customers who choose to receive service using non-standard meters because a customer's decision to maintain an analog meter is not simply a preference, but

may be a medical necessity because of disabilities. Russell Ramsland stated that health concerns by themselves should dictate that declining installation of an advanced meter be made available at no cost. Coleman Hemphill expressed the same position.

Bill Biesel stated that he owns various warehouses and retail buildings in the Dallas/Fort Worth area and leases them to tenants. Mr. Biesel stated he would like to decline installation of advanced meters on his properties because he does not want to expose his business to potential liabilities in the form of negative health effects.

Public Commenters voiced concerns regarding their privacy and the security of meter data. David Allen stated that a meter that has had its data transmission capabilities disabled still collects data and can be activated at any time. Mr. Allen also stated that an analog meter should be made available on request to ensure that no data transmission could take place. Mr. Biesel also stated his concern about the loss of private data by his tenants, including unspecified intellectual property, and feared such loss would expose his business to potential liability.

Public Commenters stated that there were numerous instances where people had suffered damage to appliances upon installation of an advanced meter. Mr. Allen stated that the disconnect relay in an advanced meter can be activated which could damage appliances. An analog meter should be made available on request to ensure that inadvertent power disconnections do not take place.

*Commission Response*

**The commission acknowledges the comments made by Public Commenters, Mr. Biesel, Ms. Biesel, Mr. Tuckfield, Mr. Allen, Mr. Ramsland, Mr. Hemphill, and the Petitioners. The commission evaluated health, privacy, and operational concerns against advanced meters and concluded that the concerns are unwarranted. However, through this rulemaking the commission is giving customers the right to choose metering service that does not require use of advanced meters. As with other non-standard services, customers choosing this non-standard metering service will be required to pay the costs for the service.**

*Section 25.133*

*Subsection (a) Purpose*

TEAM and Direct Energy raised the issue of the applicability to commercial customers. They stated that customer classes were not specified in the published rule, and therefore the rule and tariff changes would apply to all customers who have advanced meters. TEAM and Direct Energy expressed concern that the application of the rule would be overly broad and could lead to unintended consequences, such as potential ERCOT settlement issues and market distortions.

TEAM and Direct Energy argued that commercial customers have other avenues available to them to alleviate their concerns with advanced meters. TEAM and Direct Energy stated that commercial customers also have additional premises construction and property configuration options that could be used to alleviate any concerns with proximity of the meter to certain portions of premises. Further, commercial customers have the ability today to obtain a meter

other than an AMS meter as installed by the utility through the competitive metering process under §25.311.

TEAM and Direct Energy commented that the rule does not appear to contemplate the ability of a customer who chooses a non-standard meter to be settled on 15-minute data. Because of this, TEAM and Direct Energy believe the provisions of the proposed rule changes should not apply to non-residential customers. Without the 15-minute data, premises will be settled on an estimated profile of usage. Estimated profiles of usage are not appropriate for commercial customers whose actual usage may be much different than the profile, depending on the nature and type of business. Commercial customers generally receive electric service based on their usage, and advanced metering services allow their service to be provided on the most efficient basis possible using real 15-minute data.

Mr. Pratt responded that the term commercial is applied to virtually any location with less use than a residence, such as with outdoor security lights, barns, and other separate structures on a homeowner's property that have separate meters. As such, Mr. Pratt argued that homeowners with electric service that is partly classified as commercial, or non-residential, would be greatly impacted by TEAM's and Direct Energy's recommendation. Moreover, Mr. Pratt argued, business owners will be able to judge for themselves what is in their best interest.

*Commission Response*

**The commission agrees with Mr. Pratt that homeowners with electric service who may be partly classified as commercial or non-residential would be put at a disadvantage by the**

**recommendations made by TEAM and Direct Energy. TEAM and Direct are correct that the non-standard metering service provided for under the new rule will not be settled using the customer's actual usage each 15 minutes. The commission does not believe that the potential for ERCOT settlement issues raised by TEAM and Direct requires non-residential customers be exempt from this rule. Although sub-optimal, some commercial customers have for years been served by non-advanced meters and therefore settled by ERCOT using averaged load profiles. As indicated by the comments of Bill Biesel, persons concerned with smart meters include owners of commercial facilities such as warehouses and retail buildings. The commission therefore declines to adopt the recommendation put forth by TEAM and Direct.**

Cities stated that all customers should continue to pay the fixed AMS surcharge, even those opting for non-standard meter service. Cities argued that deployment of advanced meters and the resulting Smart Grid technologies allow the TDUs to better manage reliability and respond more quickly to outages. This benefits all customers, and it is only fair that all customers carry those costs. Cities noted that the rule as proposed appropriately does not exempt customers who will choose non-standard meters from paying the surcharge. The TDUs agreed with Cities. TDUs added that advanced metering customers also benefit from the potential for lower commodity prices that can be achieved through broad implementation of time-of-use pricing, and the corresponding decline in peak period consumption.

*Commission Response*

**The commission agrees with TDUs and Cities that all customers should continue to pay the fixed AMS surcharge, even those opting for non-standard metering service, as required by PURA. Under PURA §39.107, the "commission shall establish a *non-bypassable* surcharge for an electric utility or transmission and distribution utility to use to recover reasonable and necessary costs incurred in deploying advanced metering and metering information networks." (Emphasis added.) Furthermore, AMS benefits customers not served by advanced meters. AMS allows a TDU to better manage system reliability and respond more quickly to an outage in the case where a customer without an advanced meter is situated close to customers with advanced meters and is affected by the same outage.**

*Section 25.133*

*Subsection (b) Definitions*

TLSC/Texas ROSE stated that the proposed new rule should articulate what alternative options would be available to customers in place of advanced meters. They suggested that more than one option should be offered, including customer retention of the analog meter rather than being limited to the TDU provisioning a non-standard advanced meter. They pointed out that providing customers with options is consistent with a competitive market and should be encouraged. Mr. Ragland stated that the customer should be allowed to choose not to have the existing analog meter replaced with an advanced meter. Public Commenters agreed. Mr. Pratt recommended that a customer be allowed to choose an analog meter, not merely a digital non-communicating meter. Mr. Pratt expressed concern with customers being overcharged as a result

of advanced meters, and that merely turning off the communication functions of a digital meter may not protect customers from being overcharged.

TLSC/Texas ROSE stated that the costs incurred in providing alternate metering services should vary depending on the circumstances, and that customers who decline advanced metering, and not the TDUs, should have the discretion to choose how they will receive service, including using analog meters.

*Commission Response*

**The commission agrees with Public Commenters, Mr. Pratt, and TLSC/Texas ROSE that more than one option should be offered under this rule. The commission therefore adopts a rule that offers four options to customers. None of the four options will transmit 15-minute data. These options will allow the customer to receive service metered through either (1) an advanced meter that has the radio communications disabled; (2) if applicable, the existing meter if the TDU determines that it meets applicable accuracy standards; (3) an analog meter, if commercially available to the TDU and if determined by the TDU to be accurate; or (4), a digital, non-communicating meter.**

*Section 25.133*

*Subsection (b)(2)*

The REP Coalition proposed changing the term "non-transmitting meter" to "non-advanced meter." They stated that this would capture both the disabling of the advanced meter's communications capability and the absence of transmitted meter data for settlement purposes. The REP Coalition added that the modification appears to be consistent with the purpose and

intent of the proposed rule. They recommended revising the definition to be less prescriptive, because the proposed rule as a whole adequately covers what is intended.

The TDUs disagreed, arguing that the current language provided a clear definition for a "non-transmitting meter" and the TDUs' obligations regarding such a meter. They stated that changing the term to "non-advanced meter" would be a misnomer for advanced meters whose wireless communications capabilities have been disabled or removed. TDUs commented that if the meter's communications capability is disabled, it logically follows that the meter is not transmitting meter data for settlement purposes. Moreover, they explained that some of the TDUs intend to remove all analog meters and replace them with non-transmitting meters.

TLSC/Texas ROSE and Public Commenters' argued that a disabled advanced meter should not be the only option available to a customer that wants to opt out. They urged the commission to allow customers to keep their analog meter if it is still on the premises, or choose from other options such as a digital non-communicating meter, in addition to the non-transmitting advanced meter as proposed in the rule.

*Commission Response*

**The commission has changed the term "non-transmitting meter" to "non-standard meter," which more accurately reflects the four non-standard metering options available under the adopted rule.**

*Section 25.133*

*Subsection (c) Participation*

The REP Coalition and Cities restated their position that the TDU should be primarily responsible for communicating with customers regarding requests for non-standard metering service. TLSC/Texas ROSE and TDUs disagreed, and reiterated their support for the REP responsibilities as described in the proposed rule.

**Commission Response**

**As explained above, the commission agrees with the REP Coalition and Cities that the TDU should be primarily responsible for communicating with customers regarding this service. The commission therefore declines to adopt the recommendations made by TLSC/Texas ROSE and the TDUs.**

*Section 25.133*

*Subsection (c)(1)(A)*

The TDUs commented that the notification requirements under this provision will not impose any material, additional burden on the REP because the majority of the conditions listed and included in the acknowledgement apply to the TDU's advanced meter and the discretionary services relating to the non-standard meter. The REP Coalition disagreed, and argued that the customer's informed request to decline installation of an advanced meter after the receipt of pertinent information and payment of the one-time fee should serve as the customer's affirmation to receive electric service through a non-standard meter. The REP Coalition stated that the TDU

is allowed cost recovery under the proposed rule so it is better positioned to recover the costs associated with administering the process.

The REP Coalition argued that existing processes should be leveraged, and suggested that TDUs and REPs could use ERCOT's existing MarkeTrak process to handle customer requests. The REP Coalition provided proposed language to this effect, and described a detailed alternative to the proposed rule process. First, all customers would contact the TDU if they had questions about non-standard meters and/or desired to affirmatively request an alternative to an advanced meter. The TDU would notify the customer of the information listed in proposed subsection (c)(1)(A). If the customer chooses to affirmatively request a non-standard meter after receipt of this information, the TDU would initiate a standard market process (*e.g.*, MarkeTrak) to notify the REP of the customer's request. TDUs responded that these fees would be approved by the commission and included in the tariff, so the REP should be able to explain those fees, just as it does with other fees today.

Second, the REP Coalition proposed that the REP would then have ten days from the date of notification by the TDU to attempt to work with the customer to transition them to a different retail product or service in the event the customer is currently enrolled in a product or service that relies on an advanced meter. If the REP is unable to transition the customer within the ten-day period, the REP will notify the TDU that the request cannot move forward. Otherwise, the default action by the TDU is to move the request forward. TDUs responded that under this scenario, the TDU would have to issue the MarkeTrak notice and then monitor the process for up to ten days to see if the REP replies.

If the TDU is not contacted by the REP within ten days, the TDU would be required to assume that the opt-out request was approved by the REP. The TDUs said this is problematic, and that assumptions should not be made about the customer's opt-out request.

Third, the REP Coalition proposed that for the requests that can move forward, they support the 30-day timeline proposed in subsection (d)(1). Once the request to have a non-standard meter is completed, the TDU would be required to provide notice to the customer and the REP that a non-standard meter has been activated at the customer's premises.

Lastly, the REP Coalition commented that to address the requests that do not move forward because of the customer's current enrollment in a product or service that relies on an advanced meter, the rule should direct the TDU to inform the customer that the request could not move forward and advise the customer to contact the REP for further details. The rule should also state that the customer may submit a new request after the issue is resolved.

The TDUs maintained that the mechanism proposed by the REP Coalition illustrates the complications of trying to divide the communication responsibilities between TDUs and REPs.

*Commission Response*

**For the reasons discussed above, the commission believes that the TDU is the appropriate party to serve as the primary point of contact for customers wishing to decline an advanced meter. Once the TDU has obtained the signed written acknowledgement and one-time fee**

**from the customer, the TDU shall notify the REP through market notice procedures of the customer's choice to decline an advanced meter. The TDU shall not commence the opt-out process until it receives both the signed written acknowledgement and the one-time fee. For a customer for whom the TDU has not installed an advanced meter, the commission has included a deadline of 60 days for the customer to provide the signed written acknowledgement and one-time fee.**

**The commission agrees with the REP Coalition that the rule needs to address retail electric product compatibility with non-standard metering service. The commission has therefore added §25.133(f), which provides that if a customer is on a retail electric product that is not compatible with non-standard metering service, the REP must transition the customer to a product that is compatible with non-standard metering service.**

*Section 25.133*

*Subsection (c)(1)(B)*

The REP Coalition recommended that the acknowledgement requirement in this paragraph be deleted, or alternatively, the TDU be required to obtain the acknowledgement. They argued that obtaining this written acknowledgement will be difficult from an administrative standpoint and may delay completion of an opt-out request because of the customer's own dilatory action. Further, it is unnecessary because the receipt of payment from the customer would serve as the customer's affirmation to obtain a non-standard meter. The REP Coalition stressed that placing this responsibility on the TDU would avoid the complexities that would otherwise ensue if the customer switches REPs in the middle of the opt-out process.

The REP Coalition added that given the TDU is allowed cost recovery under the proposed rule, it is better positioned to recover the costs associated with administering this potentially time and resource-intensive step in the opt-out process.

The TDUs disagreed with this suggestion. They argued that the written and executed acknowledgement adds value in at least two ways. First, it ensures that each customer has been informed of the disadvantages associated with opting out. Second, it provides a written record of the customer's decision to opt out, which can be used not only to trigger the meter switch, but also defend against later allegations that the customer did not opt out and therefore should not be charged the monthly fee. TDUs commented that it was unclear from the REPs why this process would be administratively difficult, and that any delay in effectuating the opt-out as a result of not receiving the customer acknowledgment would not hurt the REP. The TDUs also pointed out that only the REP knows the information required as to whether the customer is currently enrolled in a product or service requiring an advanced meter as a condition of enrollment.

*Commission Response*

**The commission agrees with the TDUs that a written acknowledgement adds value. A customer who chooses to opt-out may experience substantial disadvantages resulting from that choice. These include but are not limited to the potential for longer restoration times in the event of an outage, inability to choose retail services that depend on advanced meters such as prepaid service, increased discretionary service charges to account for the truck roll necessary for moving-in and moving-out of premises and for switching, and longer**

switch times. Given these disadvantages, it is reasonable to require a written acknowledgement. A written acknowledgement will ensure that the customer has been informed of, and has acknowledged, the disadvantages associated with opting-out. A written acknowledgement will also create a clear record of the customer's choice to opt-out. In order to ensure that the written acknowledgement is available, the commission has added a requirement that the acknowledgement be retained by the TDU for at least two years after the non-standard meter is removed from the premises. In addition, to ensure that the written acknowledgement conveys sufficient information and is consistent throughout TDU service areas, the commission may adopt a form for the written acknowledgement.

The commission agrees with the REP Coalition that the TDU is in the best position to obtain and retain the customer's written acknowledgement. Under this rule, the TDU will continue to provide service for the customer regardless of whether the customer switches REPs and therefore the written acknowledgement can be readily located and provided by the TDU if it is needed long after the non-standard metering service is initiated. If the REP were required to obtain and retain the written acknowledgement, there would be logistical challenges and costs if the customer switched REPs and the written acknowledgement needed to be located and provided long after the non-standard metering service is initiated.

*Section 25.133*

*Subsection (d)(1) TDU Installation and meter reading obligations*

The REP Coalition recommended deleting this provision.

*Commission Response*

**The commission agrees with the REP Coalition and deletes this language accordingly.**

*Section 25.133*

*Subsection (d)(3)*

TLSC/Texas ROSE again stated the proposed new rule does not provide enough alternatives for those wishing to avoid having an advanced meter. This subsection requires the TDUs to read a non-standard meter monthly but does not include other options such as the customer reading the meter, which would lower the costs of providing an alternative to advanced metering.

Mr. Allen suggested that if a customer could enter their electric usage data into a web page, no meter reading charge would be needed. He explained that his coworker in Austin County read her own meter for 30 years, each month sending in the readings on a prepaid post card from the power company. He stated that a TDU should be able to create a data entry webpage to enable analog meter customers to enter their monthly meter readings and this would save both the TDU and customers millions of dollars in meter reading charges.

Ms. Biesel commented that declining an advanced meter does not necessarily require a meter reader because the TDUs could transmit electric consumption over existing phone lines or power lines. She stated that this method would also be more secure than wireless transmissions and eliminate RF exposure. She added that she was aware of landline technology being removed from a house when an advanced meter had been installed.

The TDUs opposed the recommendations to allow customers who decline an advanced meter to read their own meters and report their usage, and cautioned against the unintended consequences. They explained that accurate consumption is necessary to ensure system costs are paid fairly by all customers. The TDUs stated that, while they do not believe that the customers who desire to decline advanced meters are dishonest, allowing the self-reporting of usage would encourage dishonest people to decline advanced meters so that they could under-report their usage. This would also enable meter tampering to occur because a customer without an advanced meter would be able to evade detection by meter readers that have been trained by the TDU to detect instances of meter tampering during the monthly meter reading.

*Commission Response*

**The commission declines to adopt the recommendation that customers be able to read their own meters and self-report their electricity consumption. The commission believes that the commenters advocating for the option to receive non-standard metering service are motivated by health, privacy, and operational concerns about smart meters. Furthermore, although customers receiving non-standard metering service should pay all of the costs for that service, they should not have to pay unnecessary costs for that service. Allowing self-reporting of usage could perversely encourage a practice of declining advanced meters in order to under-report electricity usage. In addition, customers could inadvertently fail to timely report their electricity consumption or unintentionally misstate their consumption through mistakes in writing down the meter consumption numbers. Although such problems would be addressed later, the price of electricity varies substantially over time, and therefore the errors would have to be corrected using estimates of consumption for all**

of the numerous 15-minute intervals affected by the errors.  As a result of these errors and estimates, a non-standard metering service customer who had delays or other errors in meter consumption numbers will be undercharged or overcharged for service, even after correction of the errors through estimates.  The effects of the error will be spread to other customers.  As a result, other customers would be forced to pay for the delays or other mistakes of these customers.  In addition, even without errors or intentional under-reporting, some cost shifting will occur from non-standard metering service because averaged load profiles will have to be used because 15-minute consumption data will not exist for these customers.  Allowing non-standard metering service customers to self-report their usage would exacerbate this cost shifting.  Therefore, the commission declines to allow non-standard metering service customers to self-report their consumption.

*Section 25.133*

*Subsection (e) Cost Recovery*

*Utility Direct Bill Proposal*

The REP Coalition reiterated its position that requests for a non-standard meter should be handled in the manner that customer requests for non-standard services are currently handled – by the TDU.  They argued that the TDU has the ability to directly bill the customer the construction charges relating to the request for non-standard service.  The one-time fee that is required by the proposed rule to have a non-standard meter should be treated as a construction charge, with billing to occur directly from the TDU to the customer using existing market processes.

The REP Coalition stated that requiring the TDU to directly bill and collect the one-time fee from the customer is the best way to protect against the risk of nonpayment of such a fee. The REP should not be required to bear the entire risk of nonpayment of the one-time fee, because of the potentially significant amount of the fee and the possibility that many customers charged the fee may not feel compelled to pay it. Treating the one-time fee as a discretionary service charge for electric service will allow a REP to compel payment of the fee through potential service disconnection, but a customer could request a non-standard meter and then switch to another REP to avoid paying the one-time fee, resulting in bad debt for the unpaid REP.

The REP Coalition suggested two ways for the REP to address the risk of nonpayment. The first way is for a REP to require the customer to remit full payment of the one-time fee before the opt-out request proceeds. The second is if the REP elects not to require the up-front and full payment of the fee, it could place a switch-hold on the customer's account until the one-time fee is paid in full. This would be subject to informing the customer of the REP's right to apply a switch-hold before allowing the customer's request to decline an advanced meter to proceed. The TDUs also commented that the REP could require the payment of the fee upfront.

If the determination is made that the TDU should not be required to directly bill the customer the one-time fee, the REP Coalition asserted that the commission should adequately protect REPs from the risk of nonpayment. Any monthly charge for a non-standard meter should be treated as a discretionary service charge for electric service, regardless of whether the TDU or REP is designated as the entity responsible for billing the one-time fee.

The REP Coalition pointed out that if the REP were required to bill the one-time fee, a REP would need to design and implement new internal processes to ensure the removal of the TDU charge from its bill to the customer, provided that the customer has prepaid the amount. This second alternative would require the development of new market processes to create a switch-hold category designed specifically for requests to decline advanced meter installation.

The REP Coalition summarized that the complexity and costs associated with either option are precisely why the TDU should bill and collect the one-time fee for a non-standard meter, consistent with the handling of construction charges in the tariff.

TLSC/Texas ROSE and TDUs did not support the REP Coalition's recommendation. TLSC/Texas ROSE responded that this proposal would cause additional administrative expense, increasing the costs customers would bear to receive opt-out services. It also could result in confusion from the customer who expects the bill to come from the customer's REP. TDUs commented that the same reasons that justify making the REP the point of contact for communications also support making the REP the billing and collection agent. The TDUs pointed out that the REPs have existing billing arrangements with their customers, whereas the TDUs do not. They also pointed out that comparing opt-out to construction charges is not apples to apples because construction charges are generally one-time charges that are handled through a manually-intensive process. In contrast, TDUs argued, the REPs have well-developed processes for billing customers.

*Commission Response*

**The commission agrees with the REP Coalition that the installation of a non-standard meter under this rule is a non-standard, one-time service and should be handled by the TDU. As pointed out by the REP Coalition, the one-time fee that is required by the proposed rule to have a non-standard meter should be treated as a construction charge, with billing to occur directly from the TDU to the customer using existing market processes. Requiring the REP to assess the fee from the customer would require each REP in the market to invest in system and process changes, even if the REP never has a customer that chooses non-standard metering service. The commission adopts language accordingly to require the TDU to bill this fee to customers. The REP shall bill the customer for the recurring monthly fee for non-standard metering service, like other recurring charges for ongoing service.**

*Proceeding to Set Fees*

TDUs commented that the fees to be charged to customers should be approved administratively. Cities, TLSC/Texas ROSE, and the REP Coalition commented that costs could vary depending on the circumstances. TLSC/Texas ROSE stated that any recurring fees proposed by a utility should be supported in advance by evidence of the reasonable and necessary costs, and that the proposal should also include alternatives for the customer and alternatives for cost recovery. They stated that all customers should be treated equally whether they choose to decline an advanced meter before or after its installation. Cities recommended that the commission require the TDUs to file the supporting calculations for developing the fees or revisions to the fees.

They commented that the proposed rule is unclear about what information the utilities must file to establish the opt-out fees to ensure that they are appropriately supported by costs.

Cities opposed tariff approval without commission action. Cities also did not support the concept of the TDUs using an administrative review process to change the one-time opt-out fee and the monthly opt-out fee because it is inconsistent with §22.33(b). The rule requires the docketing of a proposed tariff if the commission receives a motion to intervene by a third party or if a proposed revision of an existing tariff will increase the utility's revenues or the customer's bill. Cities also cited §22.32, which states that such a filing does not qualify for administrative review unless the docket has been referred to the State Office of Administrative Hearings, at least 30 days have passed since the completion of all notice requirements, the matter has been fully stipulated by the parties so that there are no issues of law or fact in dispute, and the administrative law judge finds that no hearing or commission action is necessary.

Cities pointed out that in the AMS implementation dockets, utilities provided estimates of savings and benefits resulting from the deployment of advanced meters, such as meter reading savings, ad valorem tax savings, as well as other savings. Cities suggested that if recurring charges for non-standard meter service exceed the relevant components of the operating savings credited to AMS surcharge recovery, TDUs may over-recover costs. Thus, utilities should provide sufficient information regarding the savings embedded in AMS surcharge recovery at the same time that they present their proposals for non-standard meter service. This will demonstrate that the combined charges do not result in TDUs double recovering operating costs.

TLSC/Texas ROSE recommended that the proposed rule include language so that rates for declining an advanced meter are set in a public rate hearing. This would ensure that the reasonableness and necessity of costs the TDUs use to determine their recommended fees. They argued that customers have the right to a hearing to contest a rate proposed by a utility, and the proposed new rule should be amended to replace the phrase "compliance tariff" with "rate filing."

The TDUs agreed that one-time and recurring monthly fees should be based on costs incurred by TDUs for a customer to decline an advanced meter, but took issue with having the fees determined through contested hearings. They argued that the process would give rise to rate case expenses, which would be allocated to those who decline an advanced meter in the form of a surcharge added to the monthly recurring fees.

The TDUs also argued that contested cases would deny the commission and TDUs the flexibility to change the fees associated with declining advanced metering services. The TDUs stated that maintaining this flexibility is important because the costs of maintaining a manual data entry system or installing an automated system (in the event a large number of customers wish to decline advanced metering) are fixed, while the amount allocated to those customers who decline advanced metering services would be a variable cost, depending on how many make that choice. The TDUs explained that conducting a cost-of-service study and undertaking a contested case each time it wanted to reallocate fixed costs would take a considerable amount of time before rates could be changed to reflect the new customer counts. The TDUs proposed as a solution to instead use good faith estimates of costs in filing compliance tariffs, and that existing remedies

can be used in the event that the true costs incurred by a TDU necessitate a challenge to its compliance Tariff.

The TDUs suggested that language could be added to define when and how a TDU can change the one-time, up-front fee and the monthly fee. TDUs pointed out that it is currently unknown how many customers will take advantage of the alternative service. Moreover, the number of opt-out customers may change from month to month. The TDUs stated that it is important that they have a mechanism to change the one-time, up-front fee and the monthly fee to ensure that the costs incurred by those who decline an advanced meter are borne solely by them, without undertaking a full tariff revision process and its attendant delays.

The REP Coalition stated that it did not oppose the TDUs' proposal to update the one-time fee and recurring monthly charge approved in the compliance tariff required under the rule provided that the REPs are given reasonable notice (*i.e.*, 45 days) of any revisions to the one-time fee and recurring monthly charge. The REP Coalition stated it supported this if the rates are expressed as specific dollar amounts, rather than "as calculated" amounts that may vary from customer to customer, as the TDUs currently use for certain discretionary services in the tariff.

*Commission Response*

**The procedures that will be used for the commission to approve the fees will depend on whether there are disputed issues. If there are no disputed issues, the fees can be approved by the commission without the need for a hearing. In order to minimize the possibility of disputed issues, the TDUs should make reasonable proposals that are fully supported with**

testimony and documentation, and the commission has included language in the rule to this effect. If there are disputed issues, the commission anticipates that it may preside over the hearings rather than refer the disputes to the State Office of Administrative Hearings, in order to reduce the time necessary to approve the fees. Under PURA, a TDU has the right to seek changes to the fees if the TDU determines that the fees do not accurately reflect the costs of the service. To more explicitly provide for recovery of all such costs, the commission has added language to the rule allowing the fixed costs not related to the initiation of non-standard metering service to be allocated between the one-time and monthly fees, and recovered through the monthly fee over a shortened period of time. In addition, the commission has added language to the rule allowing the TDU to recover through the fees the reasonable rate cases expenses that it incurs for the proceedings to set the fees.

The commission agrees with the REP Coalition that changes made to the fees pursuant to this rule should include a 45-day notice period to account for changes to the recurring monthly charge and adds language to this effect.

*Installation Costs for Advanced Meters*

Cities argued that the TDUs should not charge customers in advance the cost of re-installing the advanced meter when the customer who declined the advanced meter vacates the premises. They stated that it is unclear when the customer will vacate the premises. It could be a period of years before they vacate, and if the customer owns the residence, the decision to decline an advanced meter may be permanent. Cities stated that requiring advance payment for reversing

the decision to decline an advanced meter would generate free cash for a TDU because the TDU has not yet incurred the cost underlying the fee and this would be inconsistent with cost causation.

Public Commenters did not support the proposed cost structure in this subsection. Mr. Allen stated that customers have been billed monthly surcharges for years to pay for the advanced meters and customers should not be charged again to remove them.

The REP Coalition stated that advanced meters will constitute the standard meter and the objective of the approved deployment plans is ubiquitous deployment. A customer's request for non-advanced meter is a request for a non-standard meter. A customer today may directly request delivery service utilizing non-standard facilities from a TDU under §5.7.5 of the tariff, subject to the operational feasibility of installing or constructing those facilities and the requirement that the customer pay the cost of those facilities directly to the TDU. In addition, §5.7.8 of the tariff allows a customer to directly request a TDU to remove a meter under similar operational restrictions and payment requirements.

*Commission Response*

**The commission agrees with the REP Coalition that the objective of the approved deployment plans is ubiquitous deployment. The commission agrees with Public Commenters, Cities, and Mr. Allen that a customer taking service under this rule should not be charged the cost of the potential, future installation of an advanced meter if an advanced meter has not been installed for the customer. The initial installation of an advanced meter for a customer not choosing non-standard metering service is not being**

**direct-billed to that customer but is instead being recovered through the AMS surcharge, and a customer choosing non-standard metering service should be treated comparably in that regard. However, a customer choosing non-standard metering service that requires removal of an advanced meter should have to pay for the eventual, second installation of an advanced meter rather than having the cost of that second installation spread to other customers.**

*Section 25.133*

*Subsection (f) Effective Date for Non-Standard Metering Service*

The TDUs commented that when the new rule is adopted, all market participants will need time to establish processes for communication of requests, billing, and other back-office functions. They provided language clarifying that provisions of this rule shall not become effective until the 180th day after the date on which the final rule is published in the *Texas Register*. TLSC/Texas ROSE responded that the rule should take effect in less than 180 days after the rule is promulgated. They stated that the TDUs should make rate filings within 30 days of the effective date of the rule, and that the alternate metering service commence within 45 days of commission adoption of the associated service fees.

The REP Coalition agreed with the TDUs that all market participants will need time to establish processes to handle customer requests. Regarding the effective date, they did not have an opinion on whether it should be 180 days after publication in the *Texas Register*. They suggested that the effective date should be calculated based on several factors. These include the reasonable estimate of the time it will take for market processes to be developed to handle

customer requests; the time for the commission to review and approve the TDUs' compliance tariffs relating to opt out service; and the need for a 45-day notice period from the date of compliance tariff approval to allow REPs adequate time to implement any new charges assessed by the TDU to a REP.  The REP Coalition indicated it would like to work with commission staff and other parties to determine the most appropriate effective date once the opt-out process is finalized.

*Commission Response*

**The commission agrees with the REP Coalition's statement that certain factors should be considered to determine the appropriate implementation date for non-standard metering service and has added a new subsection (g) to address that implementation date.  Under the Administrative Procedure Act, a rule generally takes effect 20 days after the date on which it is filed in the office of the Secretary of State.  Therefore, TDUs will be required to file compliance tariffs no later than 25 days after the effective date of the new rule and TDUs will be required to begin offering non-standard metering service pursuant to the new rule the later of 160 days from the effective date of the new rule or 45 days after notice of the approved rates to REPs.**

**§25.214 - Pro-forma Retail Delivery Tariff**

*Subsection (d)*

*One-Time Fee*

Cities stated that the new rule appropriately incorporated the principle of cost neutrality to customers who do not select non-standard meters.  Cities stated that all customers should

continue to pay the fixed AMS surcharge, even those opting for non-standard meters. The rule as currently proposed relies upon PURA §39.107(h) and §25.130(k) of the commission's rules. The TDUs stated that no broader public interest is served by an individual customer's decision to decline an advanced meter, so the costs should be borne solely by the customer who causes the costs to be incurred. Cities agreed with the TDUs in that regard, and stated that the option for a customer to select a non-standard meter should be cost neutral to those customers who do not select them.

Public Commenters argued that they should not be charged to opt-out because they did not want the advanced meter in the first place. Mr. Ragland commented that by leaving the existing meter (non-advanced meter) in place, the TDU will not incur any installation expense, and therefore he should not be assessed the one-time fee. He added that this option will help minimize costs for both customers and the TDUs. Mr. Biesel stated that his business should not be penalized for not participating in the advanced meter program because it was not mandatory. He opined that because the cost of deployment has been socialized, then declining advanced metering should also be socialized. Mr. Allen stated that customers have already been billed monthly surcharges for years to pay for the advanced meters and customers should not be charged to have an alternative meter. Ms. Biesel commented that being charged a fee to decline an advanced meter is discriminatory because only the wealthy will be able to afford it. She stated that it would be challenging for people who are elderly, disabled, or on a limited or fixed income to pay the costs of declining an advanced meter. She pointed out that many of these classes of people are the ones who are potentially the most vulnerable to health-related issues. Ms. Biesel also argued that imposing a charge to decline installation of an advanced meter could be considered as

discriminatory against minorities because those who have been requesting it have been referred to as a "discreet [sic], small number of people."

The TDUs stated that the new rule allows customers to elect non-standard meters if they choose, but also requires them to bear the full costs of their choice. This avoids the forced subsidization that would occur if the costs caused by customers who decline an advanced meter were spread among all customers. The TDUs argued that the new rule is appropriate by requiring those who decline advanced metering to pay the full cost incurred by the TDU because of the customer's decision. The TDUs stated that nearly all the stakeholders filing comments endorse the principle that customers with advanced meters should not subsidize those who make the choice to decline the advanced meters.


*Commission Response*

**As discussed previously, through PURA the Legislature has established a policy of promoting the deployment of advanced meters and requiring all customers in the customer classes for which advanced meters are deployed to pay the costs for the advanced meters. Even customers who choose not to be served by advanced meters benefit from the advanced meters through increased reliability and lower electricity prices. For a TDU that has deployed advanced meters, service through a meter that is not an advanced meter is a non-standard service and, like other non-standard discretionary services, a customer requesting the service should pay all of the costs for that service rather than shifting any of those costs to customers receiving the standard service.**

A TDU will incur fixed and variable costs to provide non-standard metering service. One of the most challenging aspects of implementing non-standard metering service will be setting the fees to ensure that the TDU's fixed costs to provide the service are recovered only from the customers who choose the service. The commission anticipates that customers choosing the service will be largely limited to a subset of the customers who have resisted advanced meters and for whom TDUs therefore did not install advanced meters pending the resolution of how to serve these customers. The commission anticipates that some customers on a TDU's "do not install" list will decide not to opt-out of standard metering service, once they are responsible for the one-time and monthly fees required for non-standard metering service. In addition, the commission anticipates that the number of customers receiving the service will decline over time, as concerns about advanced meters diminish; the benefits of advanced meters become more apparent; and new customers move into locations served by non-standard meters and the meters are replaced with advanced meters.

The conundrum that the commission will face in initially approving the one-time and recurring monthly fees includes balancing the following factors: the difficulty of setting the fees so that they will recover the TDU's fixed costs of providing the service when the number of customers who will choose the service is unknown; the level of the fees are dependent on the number of customers choosing the service (*i.e.*, the fewer the customers the higher the fees); the number of customers choosing the service will depend on the level of the fees; and the number of customers receiving the service is likely to decline over time. The recovery of 25% of the fixed costs not related to the initiation of non-standard

metering service (*e.g.*, billing software costs) through the one-time fee with the remaining fixed costs of this type recovered over a three-year period may be appropriate. In any event, consideration of the various factors will be fact-specific to the particular TDU whose fees the commission is setting. The commission has therefore modified §25.133(e) to permit allocation of fixed costs not related to the initiation of non-standard metering service between the one-time and monthly fees, and permit recovery of such fixed costs through the monthly fee over a shortened period of time. If the number of customers choosing the service is less than estimated, it may be necessary for the utility to request revision of the fees. In deciding whether to choose non-standard metering service, customers need to be aware that the fees may increase over time. Therefore, the commission has modified §25.133(c)(1)(A) to require that the written acknowledgement to the customer disclose this risk.

*Discretionary Service Charges*

The REP Coalition stated that the TDUs' implementation of a program for non-standard meter service will also require the establishment of charges for certain existing discretionary services (*e.g.*, move-in) that are separate from the charges assessed for the performance of those same services at premises with advanced meters.

The REP Coalition stated that discretionary service charges applicable to premises with non-standard meters must take into account the costs the TDU incurs to perform those services (*e.g.*, the cost of "rolling a truck"). They stated that customers at premises with advanced meters should not subsidize the provision of those discretionary services to or on behalf of customers

who choose an alternative to advanced metering through the discretionary service charges paid by customers with advanced meters.

*Commission Response*

**The commission agrees with the REP Coalition. The commission has therefore modified §25.133(e) to make this clear.**

All comments, including any not specifically referenced herein, were fully considered by the commission. The commission has modified the rules to clarify its intent.

The sections are adopted under the Public Utility Regulatory Act, Texas Utilities Code Annotated §14.002 (West 2007 and Supp. 2012), which provides the commission with the authority to make and enforce rules reasonably required in the exercise of its powers and jurisdiction; and specifically, §14.001, which provides the commission with the general power to regulate and supervise the business of each public utility within its jurisdiction and to do anything specifically designated or implied by PURA that is necessary and convenient to the exercise of that power and jurisdiction; §32.101, which requires an electric utility to file its tariff with each regulatory authority; §36.003, which requires that each rate be just and reasonable and not unreasonably preferential, prejudicial, or discriminatory; §38.001, which requires an electric utility to furnish service, instrumentalities, and facilities that are safe, adequate, efficient, and reasonable; and PURA §39.107(h), which requires the commission to establish a nonbypassable surcharge for an electric utility or transmission and distribution to use to recover reasonable and necessary costs incurred in deploying advanced metering and meter information networks to

residential customers and nonresidential customers other than those required by the independent system operator to have an interval data recorder meter.

Cross Reference to Statutes: Public Utility Regulatory Act §§14.001, 14.002, 32.101, 36.003, 38.001, and 39.107(h).

**§25.133. Non-Standard Metering Service.**

(a)    **Purpose.** This section allows a customer whose standard meter is an advanced meter to choose to receive electric service through a non-standard meter and authorizes a transmission and distribution utility (TDU) to assess fees to recover the costs associated with this section from a customer who elects such a meter.

(b)    **Definitions.** As used in this section, the following terms have the following meanings, unless the context indicates otherwise:

     (1)    Advanced meter--As defined in §25.130 of this title (relating to Advanced Metering).

     (2)    Non-standard meter--A meter that does not function as an advanced meter.

(c)    **Initiation and termination of non-standard metering service.**

     (1)    **Initiation of non-standard metering service.**

         (A)    This subparagraph applies to a TDU that, on the date that the TDU begins offering non-standard metering service pursuant to subsection (g) of this section, has completed deployment of advanced meters except for customers for whom the TDU did not install advanced meters because of the requests of the customers. The TDU shall serve on such a customer by certified mail return receipt requested notice consistent with subparagraph (D) of this paragraph within 30 days of the date that the TDU begins offering non-standard metering service pursuant to subsection (g) of this section.

(B)    This subparagraph applies to a TDU that has not completed deployment of advanced meters.

    (i)    This clause applies to a customer for whom the TDU has not, on the date that the TDU begins offering non-standard metering service pursuant to subsection (g) of this section, installed an advanced meter because of the request of the customer.  The TDU shall serve on such a customer by certified mail return receipt requested notice consistent with subparagraph (D) of this paragraph within 30 days of the date that the TDU begins offering non-standard metering service pursuant to subsection (g) of this section.

    (ii)    This clause applies to a customer for whom, after the date that the TDU begins offering non-standard metering service pursuant to subsection (g) of this section, the TDU attempts to install an advanced meter as part of its advanced meter deployment plan but the customer requests non-standard metering service.  The TDU shall promptly serve on such a customer by certified mail return receipt requested notice consistent with subparagraph (D) of this paragraph.

(C)    For circumstances not addressed by subparagraph (A) or (B) of this paragraph in which a customer requests from the TDU non-standard metering service, ,the TDU shall provide notice consistent with

subparagraph (D) of this paragraph within seven days of the customer's request, using an appropriate means of service.

(D)    Pursuant to subparagraphs (A)-(C) of this paragraph, a TDU shall notify a customer of the following through a written acknowledgement.

(i)    The customer will be required to pay the costs associated with the initiation of non-standard metering service and the ongoing costs associated with the manual reading of the meter, and other fees and charges that may be assessed by the TDU that are associated with the non-standard metering service;

(ii)    The current one-time fees and monthly fee for non-standard metering service;

(iii)    The customer may be required to wait up to 45 days to switch the customer's retail electric provider (REP), and may experience longer restoration times in case of a service interruption or outage;

(iv)    The customer may be required by the customer's REP to choose a different product or service before initiation of the non-standard metering service, subject to any applicable charges or fees required under the customer's existing contract, if the customer is currently enrolled in a product or service that relies on an advanced meter; and

(v)    For a customer that does not currently have an advanced meter, the date (60 days after service of the notice) by which the customer must provide a signed, written acknowledgement and payment of

the one-time fee to the TDU prescribed by subsection (e)(3) of this section. If the signed, written acknowledgement and payment are not received within 60 days, the TDU will install an advanced meter on the customer's premises.

(E)     The TDU shall retain the signed, written acknowledgement for at least two years after the non-standard meter is removed from the premises. The commission may adopt a form for the written acknowledgement.

(F)     A TDU shall offer non-standard metering through the following means:

      (i)     disabling communications technology in an advanced meter if feasible;

      (ii)     if applicable, allowing the customer to continue to receive metering service using the existing meter if the TDU determines that it meets applicable accuracy standards;

      (iii)     if commercially available, an analog meter that meets applicable meter accuracy standards; and

      (iv)     a digital, non-communicating meter.

(G)     The TDU shall not initiate the process to provide non-standard metering service before it has received the customer's payment and signed, written acknowledgement. The TDU shall initiate the approved standard market process to notify the customer's REP within three days of the TDU's receipt of the customer's payment and signed, written acknowledgement. Within 30 days of receipt of the payment of the one-time fee and the signed written acknowledgement from the customer, the TDU, using the

approved standard market process, shall notify the customer's REP of the date the non-standard metering service was initiated.

(2)     **Termination of non-standard metering service.** A customer receiving non-standard metering service may terminate that service by notifying the customer's TDU. The customer shall remain responsible for all costs related to non-standard metering service.

(d)     **Other TDU obligations.**

(1)     When a TDU completes a move-out transaction for a customer who was receiving non-standard metering service, the TDU shall install and/or activate an advanced meter at the premises.

(2)     A TDU shall read a non-standard meter monthly. In order for the TDU to maintain a non-standard meter at the customer's premises, the customer must provide the TDU with sufficient access to properly operate and maintain the meter, including reading and testing the meter.

(e)     **Cost recovery and compliance tariffs.** All costs incurred by a TDU to implement this section shall be borne only by customers who choose non-standard metering service. A customer receiving non-standard metering service shall be charged a one-time fee and a recurring monthly fee.

(1)     Not later than 25 days after the effective date of this section, each TDU shall file a compliance tariff that is fully supported with testimony and documentation. The compliance tariff shall include one-time fees and a monthly fee for non-standard

metering service and shall also include the fees for other discretionary services performed by the TDU that are affected by the customer's selection of non-standard metering service. Each TDU shall be allowed to recover the reasonable rate case expenses that it incurs under this subsection as part of the one-time fee, the monthly fee, or both. The compliance tariff filing shall describe the extent to which the back-office costs that are new and fixed vary depending on the number of customers receiving non-standard metering service. Unless otherwise ordered, the TDU shall serve notice of the approved rates and the effective date of the approved rates within five working days of the presiding officer's final decision, to REPs that are authorized by the registration agent to provide service in the TDU's distribution service area. Notice under this paragraph may be served by email and, consistent with subsection (g) of this section, shall be served at least 45 days before the TDU begins offering non-standard metering service.

(2)    A TDU may apply to change the fees approved pursuant to paragraph (1) of this subsection. The application must be fully supported with testimony and documentation. Each TDU shall be allowed to recover the reasonable rate case expenses that it incurs under this subsection as part of the one-time fee, the monthly fee, or both. Unless otherwise ordered, the TDU shall serve notice of the approved rates and the effective date of the approved rates within five working days of the presiding officer's final decision, to REPs that are authorized by the registration agent to provide service in the TDU's distribution service area. Notice under this paragraph may be served by email and, if possible, shall be served at least 45 days before the effective date of the rates.

(3)     A TDU shall have a single recurring monthly fee for non-standard metering service and several one-time fees, one of which shall apply to the customer depending on the customer's circumstances. A one-time fee shall be charged to a customer that does not have an advanced meter at the customer's premises and will continue receiving metering service through the meter currently at the premises. For a customer that currently has an advanced meter at the premises, the fee shall vary depending on the type of meter that is installed to provide non-standard metering service, and the fee shall include the cost to remove the advanced meter and subsequently re-install an advanced meter once non-standard metering service is terminated. The one-time fee shall recover costs to initiate non-standard metering service. The monthly fee shall recover ongoing costs to provide non-standard metering service, including costs for meter reading and billing. Fixed costs not related to the initiation of non-standard metering service may be allocated between the one-time and monthly fees, and recovered through the monthly fee over a shortened period of time.

(f)   **Retail electric product compatibility.** After receipt of the notice prescribed by subsection (c)(1)(D) of this section, if the customer's current product is not compatible with non-standard metering service, the customer's REP shall work with the customer to either promptly transition the customer to a product that is compatible with non-standard metering service or transfer the customer to another REP, subject to any applicable charges or fees required under the customer's existing contract. If the customer is unresponsive, the REP may transition the customer without the customer's affirmative

consent to a market-based, month-to-month product that is compatible with non-standard metering service. Alternatively, if the customer is unresponsive the REP may transfer the customer to another REP pursuant to §25.493 (relating to Acquisition and Transfer of Customers from One Retail Electric Provider or Another) so long as the new REP serves the customer using a market-based, month-to-month product with a rate (excluding charges for non-standard metering service or other discretionary services) no higher than one of the tests prescribed by §25.498(c)(15)(A)-(C) of this title (relating to Prepaid Service). The REP shall promptly provide the customer notice that the customer has been transferred to a new product and, if applicable, to a new REP, and shall also promptly provide the new Terms of Service and Electricity Facts Label.

(g)    **Implementation.** A TDU shall begin offering non-standard metering service pursuant to this section the later of 160 days from the effective date of this section or 45 days after the notice to REPs prescribed by subsection (e)(1) of this section.

**§25.214.    Terms and Conditions of Retail Delivery Service Provided by Investor Owned Transmission and Distribution Utilities.**

(a)-(c) (No change.)

(d) **Pro-forma Retail Delivery Tariff.**

**Tariff for Retail Delivery Service**

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority. It is therefore ordered by the Public Utility Commission of Texas that §25.133, relating to Non-Standard Metering Service, and the amendments to §25.214, Terms and Conditions of Retail Delivery Service Provided by Investor Owned Transmission and Distribution Utilities, are hereby adopted with changes to the text as proposed.

SIGNED AT AUSTIN, TEXAS on the 12th day of AUGUST 2013.

PUBLIC UTILITY COMMISSION OF TEXAS

DONNA L. NELSON, CHAIRMAN

KENNETH W. ANDERSON, JR., COMMISSIONER

Q:\CADM\TXR-Rules Management\Rules\Rulemaking Projects\Electric\41xxx\41111adt.docx